# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

May 9, 2025

**By Email and CM/ECF**
The Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Tarek Bazrouk*
              25 Cr. 203 (RMB)

Dear Judge Berman,

     I write to respectfully request that the Court grant Tarek Bazrouk bail pending trial. As Pre-Trial Services recommended, and as Judge Stewart D. Aaron determined after a thorough hearing, the nature and circumstances of the offense and Tarek's record do not suggest that there are no conditions that will reasonably assure the safety of the community and Tarek's future appearance in court. Although the charges are serious, they do not carry a presumption in favor of detention, and the Government cannot meet its burden as to dangerousness or risk of flight given the circumstances surrounding the allegations and Tarek's young age, lack of a criminal record, strong family support and ties to New York City, and history of appearing in court as directed in parallel state court proceedings, for which Tarek has been on bail since January without incident.

     Accordingly, the Court should adopt the strict conditions Judge Aaron prescribed, and release Tarek to home incarceration enforced by location monitoring and secured by a $150,000 personal recognizance bond, co-signed by Tarek and three financially responsible persons. The Court should further appoint Tarek's parents as third-party custodians and require Tarek's participation in mental health treatment, including anger management. Lastly, in addition to these conditions, and with appreciation for the Court's substantial and noteworthy experience as both a jurist and a social worker, the defense requests that the Court hold regular check-ins with Tarek to monitor and promote his progress as it routinely does in the context of post-release supervision.

**Tarek Bazrouk is a 20-year-old native New Yorker with tremendous potential who comes from a loving and supportive family with a deeply personal connection to the Israel/Palestine conflict.**



*Tarek with his parents, brother, and one of his sisters*

Tarek was born in New York City on ███████, 2004, to ██ and ██ Bazrouk. Along with his parents, he lives with two sisters, ██ and ██, and a brother, ██. The family all lives together in a homely, three-bedroom apartment in ██████. ██, Tarek's oldest sibling, is awaiting a position as an ████████ through ████████. ██ is presently enrolled as a graduate student at ██████, where she is specializing in education for students with disabilities. She is set to graduate this month. ██ graduated from ██████ in 2024 with a degree in business and marketing and is an entrepreneur. Tarek's father, ██, purchases clothing from wholesalers and accepts commission on the resales. Tarek's mother, ██, is a stay-at-home mom who runs the household to this day.

When Tarek was in elementary school, he received counseling and an individualized education plan to help him focus and learn how to better regulate his behavior. While he was a smart and curious child, he also struggled academically, which sometimes led him to associate with negative peer influences. When he started high school, Tarek was a mediocre student, and his father had to push him to study and pay attention in class. But by the time Tarek was a senior, a switch flipped, and he became much more enthusiastic about his education. He applied to ██████ and was denied. Undeterred, however, Tarek enrolled in ██████ to obtain an associate's degree, and he is scheduled to graduate this month. Tarek also reapplied to ██████ and was admitted. Tarek is excited to begin taking classes at ██████ this fall.

Tarek's family is Palestinian, and he still has close family in the West Bank. When Tarek was about three years old, in the summer of 2007, his parents took him and his siblings to their family village to visit relatives. It was on that trip that Tarek met his first cousins, including a 19-year-old named Rashad Khater, who was the son of one of Tarek's father's brothers. Unfortunately, the following summer, in May 2008, when Rashad was just 20 years old, he was killed by Israeli forces even though he was not participating in any hostilities. The well-respected Israeli human rights organization, B'Tselem, reported on the fatality. *See*

2

https://statistics.btselem.org/en/all-fatalities/by-date-of-incident/pal-not-take-not-objects/west-bank?section=minors&tab=overview.[1]



*Tarek and Rashad in July 2007*

Tarek was not even four years old when his cousin Rashad was killed and only remembers his family's overwhelming sadness in the months following the incident. As Tarek got older, and he learned that the soldiers responsible for Rashad's killing went unpunished, he became more politically inspired and tried to start a pro-Palestine group at his high school when he was in 12th grade. But without any experience in organizing, Tarek's efforts never materialized.

The terrible events of October 7, 2023, in which fighters associated with the designated terrorist organization Hamas massacred and took hostage hundreds of Israeli civilians, coincided with Tarek's first year at ███████. Israel's ongoing military campaign in the Gaza Strip in response to the terror attack have spurred mass protests in the United States and internationally that continue to this day. It was in this context that Tarek began attending protests throughout New York City against Israel's actions in Gaza.

**The government has accused Tarek of engaging in brief, physical altercations with pro-Israel counter-protesters at pro-Palestine rallies.**

The government's three Hate Crimes Act charges accuse Tarek of physically assaulting others because of their actual and perceived race and religion on three separate dates: April 15, 2024; December 9, 2024; and January 6, 2025. On each of those occurrences, Tarek was alongside hundreds of others protesting Israel's military campaign against the Gaza Strip and clashing with pro-Israel counter-protesters. At these events, emotions were running extremely high and interpersonal conflict was ubiquitous.

---

[1] Here is a screenshot of the reference to Rashad's killing from B'Tselem's website:

- May

> **Rashad 'Ali Ahmad Khater**
>
> 20 year old resident of Ein Siniya, Ramallah and al-Bira District, killed on May 9, 2008, next to 'Ein Yabrud, Ramallah and al-Bira District, by gunfire. Did not participate in hostilities when killed. Additional information: Killed when with friends hunting birds in the wadi between the villages 'Ein Yabrud, Dura al-Qra, and 'Ein Sinia.

3

Physical violence of any kind is completely unacceptable, especially when it is motivated by a person's actual or perceived race or religion. Critically, however, Tarek is not accused of roaming the streets of New York City, looking for and assaulting people who appear to be Jewish or Israeli. He is also not accused of using, brandishing, or even carrying a weapon on the dates in question, nor is he accused of causing anyone injury requiring medical care, let alone serious bodily injury. Rather, the circumstances surrounding the charges suggest that the events at issue can be readily recast as physical fights between people who are passionately expressing themselves about an issue of significant international and personal importance.

Indeed, according to the government's own detention memo, when Tarek allegedly kicked a person standing with individuals bearing regalia associated with Israel and being Jewish, he was already handcuffed by NYPD officers. On information and belief, he was facing jeers and insults from pro-Israel counter-protesters while he was being dragged to a police vehicle. And on December 9, 2024, an NYPD spokesperson stated that the complainant "initiated a verbal dispute with Bazrouk" before Bazrouk purportedly stole his Israeli flag. Notably, the NYPD reported no injuries from this encounter. *See* Emily Pickering and Colette Holcomb, *NYPD charges suspect accused of punching Columbia student with robbery and hate crime*, Columbia Spectator (Dec. 17, 2024, at 9:41 PM), available at: https://www.columbiaspectator.com/news/2024/12/17/nypd-charges-suspect-accused-of-punching-columbia-student-with-robbery-and-hate-crime/.

It is worth emphasizing that Tarek turned himself in to police in connection with the December 9, 2024, allegations, which, along with those from January 2025, comprise a pending matter in Manhattan Supreme Court. Tarek has been on bail in state court for the past several months without incident. He has appeared at court as directed and has otherwise abided the terms of his state-issued bail.

In detailing its allegations against Tarek, the government relies heavily on a collection of his text messages and other social media posts related to the Israel/Palestine conflict. Some of the messages and postings contain reprehensible language, and some even indicate sympathies for designated terrorist organizations like Hamas and Hizballah. Of course, there is no justification for hate speech of any kind, and the views expressed in many of the messages are despicable. At the same time, the communications do not reveal that Tarek attended a particular protest with the intent to physically attack individuals who appear to be Jewish or Israeli, nor are the messages themselves illegal. While deplorable, hate speech is protected under the First Amendment unless it directly incites imminent lawless action and is likely to produce such action. *See generally Brandenburg v. Ohio*, 395 U.S. 444 (1969). Similarly, independent advocacy for a designated terrorist organization

4

and/or its goals, however misguided or misinformed, is also protected by the First Amendment. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010).[2]

Of course, the defense understands that Tarek is not facing federal charges for his expression of racist or anti-Semitic views, and that the government's position is likely that the messages are relevant to understanding his motive. However, without more of a nexus between the messages and his intent on the dates in question, the text messages are of little probative value and do not otherwise suggest that he is unbailable. To the contrary, the totality of the circumstances plainly weighs in favor of Tarek's release to pre-trial supervision.

**The government cannot meet its burden regarding dangerousness or risk of flight to justify Tarek's detention at MDC Brooklyn.**

As Judge Aaron and Pre-Trial Services determined, the Court can release Tarek to pre-trial supervision under strict conditions that will both reasonably assure the safety of the community and his future appearance in court. Tarek has no felony convictions and would readily qualify as a zero-point offender under the U.S. Sentencing Guidelines. He has a history of showing up to court as directed in his pending and overlapping state case (where he has been on bail for months without incident) and has an extremely close relationship to his parents and siblings, all of whom are prepared to cosign a hefty, $150,000 personal recognizance bond on his behalf. There is no indication that Tarek would leave his family in the lurch and shirk his commitments to the Court if granted bail. And because the allegations are all tied to Tarek's presence at emotionally charged political rallies and protests, home incarceration is more than sufficient to ameliorate any risk to public safety Tarek potentially poses.

Preliminarily, the defense challenges the government's ability to obtain a detention hearing in the first instance. There are only two bases to hold a detention hearing in this matter. The first depends on whether 18 U.S.C. § 249(a)(1)(A), the provision of the Hate Crimes Act charged here, fits the definition of a "crime of violence" as defined by 18 U.S.C. § 3156(a)(4). *See* 18 U.S.C. § 3142(f)(1)(A). The second depends on whether the government can proffer a "serious risk" that Tarek will flee. *See* 18 U.S.C. § 3142(f)(2)(A). Neither provision applies to this case.

---

[2] The government also points to knives and shell casings recovered from Tarek's apartment in its submission. To be clear, the government has not alleged that the knives are themselves illegal and there is no indication that Tarek carried, brandished, or used a weapon during any of the protests. With respect to the shell casings, the government suggests that they could subject Tarek to liability under 18 U.S.C. § 922(n), which makes it a crime to possess a firearm or ammunition while under felony indictment. However, as discussed before Judge Aaron, this case appears to be the first time Tarek has been indicted for a felony, thereby precluding liability under Section 922(n). The shell casings, remnants from a trip to a licensed shooting range before any charges were brough, and the knives have also been seized. There is no credible indication Tarek has ever unlawfully possessed a gun, let alone kept one at his home.

*First*, 18 U.S.C. § 249(a)(1)(A) does not qualify as a crime of violence under § 3156(a)(4) because it does not require the use of force against the person or property *of another*, nor does it carry a substantial risk that physical force against the person or property *of another* may be used in committing the offense. Indeed, Section 249(a)(1)(A) calls for bodily injury to *any* person. By the plain text of the statute, and as a categorical matter, it therefore can be violated by injuring or threatening to injure oneself. Thus, by definition, Section 249(a)(1)(A) sweeps more broadly than Section 3156(a)(4)'s definition of a crime of violence. Further, "physical force" under § 3156(a)(4) is limited to "violent force," that is, force capable of causing physical pain or injury to another person. *See Johnson v. United States*, 559 U.S. 133, 138-40 (2010). But pursuant to Section 249(a)(1)(B)(i), the variant of the Hate Crimes Act at issue here criminalizes willfully causing "bodily injury"—*i.e.*, "any … injury to the body, no matter how temporary," *see* 18 U.S.C. §§ 249(c)(1) and 1365(h)(4)(E) through *de minimis* force. Accordingly, and as a categorical matter, because a violation of § 249(a)(1)(A) does not necessarily require the use of violent physical force required by Supreme Court precedent, it does not qualify as a "crime of violence" sufficient to trigger a detention hearing.

*Second*, there is insufficient evidence suggesting that Tarek poses a serious risk of flight. He is a native New Yorker who has lived here his entire life. All of Tarek's immediate family resides in New York City, in the same apartment they have shared together for the past ten years and counting. Tarek has also appeared in court as directed in his parallel state case and has been on bail and in the community in connection with that case without incident. Any potential risk of flight is therefore speculative and falls far short of the standard required by § 3142(f)(2)(A).

Nevertheless, assuming *arguendo* that the government can establish the propriety of a detention hearing, there is no presumption in favor of Tarek's remand. Because the government cannot prove by a preponderance of the evidence that no conditions will reasonably assure Tarek's appearance in court, and because it cannot establish by clear and convincing evidence that there are no conditions that would reasonably assure the safety of the community, the Court should release him to the conditions set by Judge Aaron.

As set forth above, any risk of flight Tarek poses is minimal and speculative at best and can certainly be addressed through home incarceration backed by a substantial personal recognizance bond co-signed by his immediate family members and reinforced by his parents' third-party custodianship. Similarly, home incarceration is sufficient to address any danger to the community. Without diminishing the seriousness of the charges, Tarek is not accused of using a weapon or causing anyone injury requiring medical care or attention. His alleged offense conduct—brief physical altercations with others—is confined to his participation in

political protests, which he will not be able to attend while confined to his home. Further, there is every indication that his family will play an active and affirming role in his pre-trial rehabilitation. As set forth in the attached letter from his sister, ▮▮▮▮, Tarek's family is devastated over his detention and is firmly committed to doing everything necessary to get Tarek the help and support he needs. *See* Exhibit A (letter from ▮▮▮▮▮▮▮).

Ultimately, the government is asking the Court to indefinitely detain a 20-year-old with no felony convictions (and who is accused of engaging in street-level fistfights at emotionally charged protests) at MDC Brooklyn, a hellish federal jail where extreme violence and fatal stabbings are routine. *See, e.g.*, Lola Fadulu, *Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail*, NY Times (July 17, 2024), available at: https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html?unlocked_article_code=1.F08.l1HL.8ByWXK6BFXJp&smid=url-share. This is just not a case where the intervention of pre-trial detention at a dysfunctional and chronically understaffed and neglected is warranted. *Cf. United States v. Chavez*, 710 F. Supp. 3d 227 (S.D.N.Y. 2024) (decision by Judge Jesse M. Furman holding that MDC Brooklyn's delays in providing necessary medical and mental health treatment, and the facility's decrepit physical conditions, constitute "exceptional reasons" justifying continued release of a defendant under 18 U.S.C. § 3145(c)).[3]

Instead, the approach that is most consistent with the Bail Reform Act and all the circumstances presented is to release Tarek to home incarceration, where the Court can ensure that he receives tailored mental health treatment and rigorous oversight through Pre-Trial Services designed to address the underlying causes of his conduct. Indeed, the Court has a strong and fruitful track record of using its social work background and experience to work closely with individuals on post-release supervision to assist in their reentry. There is no reason why the Court should not employ that same approach in this case on the front end and work directly with Tarek and his family to get him back on the right track. Far from irredeemable, Tarek has a bright future ahead of him and the Court should take the opportunity to illustrate the criminal justice system's potential to transform a young person's life so that he may be a positive example to his community and peers.

---

[3] Unfortunately, in the wake of the announcement of the Indictment, Tarek's family has received alarming, anonymous messages threatening harm to Tarek. In one voicemail left on his father's cell phone, which I can provide to the Court and the government upon request, an unknown caller stated, "Tarek Bazrouk will die in prison. He will be killed in prison. He will be raped in the ass and murdered." Messages like these heighten the risk to Tarek's life and safety should he remain at MDC Brooklyn.

For all these reasons, and for any that are apparent at the detention hearing scheduled for Tuesday, May 13, 2025, at 10:00 a.m., the Court should affirm Judge Aaron's bail determination and release Tarek Bazrouk to home incarceration. I thank the Court for its time and consideration of this application.

Respectfully submitted,

Andrew John Dalack, Esq.
Assistant Federal Defender, SDNY
(646) 315-1527

Cc: AUSA Samuel Adelsberg
AUSA James Ligtenberg