```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          25 Cr. 203 (RMB)

5   TAREK BAZROUK,

6                  Defendant.

7   ------------------------------x       Arraignment/Bail
                                                   Hearing
8
                                          May 7, 2025
9

10

11

    Before:
12
                        HON. STEWART D. AARON,
13
                                      U.S. Magistrate Judge
14

15

16                      APPEARANCES

17
    JAY CLAYTON
18       United States Attorney for the
         Southern District of New York
19  BY:  SAMUEL S. ADELSBERG
         JAMES A. LIGTENBERG
20       Assistant United States Attorneys

21
    FEDERAL DEFENDERS OF NEW YORK
22       Attorneys for Defendant
    BY: ANDREW J. DALACK
23

24

25
```

1              THE DEPUTY CLERK:  This is the matter of U.S. v.

2    Tarek Bazrouk, Docket No. 25 Cr. 203.

3              Counsel, please state your appearances for the

4    record.

5              MR. ADELSBERG:  Good afternoon, your Honor.  Sam

6    Adelsberg, on behalf of the United States.  I'm joined at

7    counsel's table by AUSA Jim Ligtenberg.

8              THE COURT:  Good afternoon.

9              MR. DALACK:  Good afternoon, Judge.  I'm Andrew

10   Dalack, from the Federal Defenders of New York, on behalf of

11   Tarek Bazrouk.

12             THE COURT:  Good afternoon.

13             May I please have the date and time of arrest?

14             MR. ADELSBERG:  Yes, your Honor.  Mr. Bazrouk was

15   arrested this morning, at approximately 6 a.m., and that is

16   Wednesday, May 7.

17             THE COURT:  Mr. Bazrouk, I am Magistrate Judge Aaron.

18             You are here because you are charged with certain

19   crimes by an indictment.

20             The purpose of today's proceeding is to advise you of

21   certain rights that you have, inform you of the charges

22   against you, consider whether counsel should be appointed for

23   you, and decide under what conditions, if any, you should be

24   released pending trial.

25             Now, I am going to explain certain constitutional

1   rights that you have.

2          You have the right to remain silent.  You are not

3   required to make any statements.  Even if you have already

4   made statements to the authorities, you don't need to make any

5   further statements.  Any statements you do make can be used

6   against you.

7          You have the right to be released, either

8   conditionally or unconditionally, pending trial, unless I find

9   there are no conditions that would reasonably assure your

10  presence at future court appearances and the safety of the

11  community.

12          If you are not a United States citizen, you have the

13  right to request that a government attorney or a law

14  enforcement official notify a consular officer from your

15  country of origin that you have been arrested.  In some cases,

16  a treaty or other agreement may require the United States

17  government to give that notice whether you request it or not.

18          You have the right to be represented by an attorney

19  during all court proceedings, including this one, and during

20  all questioning by the authorities.

21          You have the right to hire your own attorney.  If you

22  cannot afford an attorney, I will appoint one today to

23  represent you.

24          Do you understand those rights as I have just

25  explained them?

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right.

3          So I have before me a financial affidavit that

4    indicates that you wish for me to appoint Mr. Dalack as your

5    counsel.

6          Am I correct?

7          THE DEFENDANT:  Correct.  Yes.

8          THE COURT:  And you signed this document?

9          THE DEFENDANT:  Yes.

10          THE COURT:  If I could ask you to please raise your

11    right hand.  Do you swear that the contents of this affidavit

12    are true and correct, so help you God?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Based upon the contents of the affidavit,

15    I am approving the appointment, and Mr. Dalack is your

16    counsel.  And I am affixing my signature to the document to

17    reflect that.

18          MR. DALACK:  Thank you, Judge.

19          THE COURT:  You're welcome.

20          Mr. Bazrouk, the document that contains the charges

21    against you is an indictment issued by a grand jury here in

22    the Southern District of New York.  It contains two counts --

23    excuse me, three counts of a hate crime act, each of them on

24    three different dates—April 15, 2024; December 9, 2024; and

25    January 6, 2025.

1              Let me ask Mr. Dalack, have you had an opportunity to

2       review the charges in the indictment with your client?

3              MR. DALACK:  I have, your Honor, reviewed the

4       indictment, Mr. Bazrouk understands the charges, and we wish

5       to enter a plea of not guilty.

6              THE COURT:  Okay.  And you waive its public reading?

7              MR. DALACK:  We waive its public reading, your

8       Honor --

9              THE COURT:  All right.

10             MR. DALACK:  -- yes.  Thank you.

11             THE COURT:  Okay.  So I am going to indicate that

12      Mr. Bazrouk has been arraigned and that he enters a plea of

13      not guilty.

14             Because this is the first proceeding on the

15      indictment, I want to direct the prosecution to comply with

16      its obligations, under *Brady v. Maryland* and its progeny, to

17      disclose to the defense all information, whether admissible or

18      not, that is favorable to the defendant, material as to guilt

19      or to punishment, and known to the prosecution.

20             Possible consequences for noncompliance may include

21      dismissal of individual charges or the entire case, exclusion

22      of evidence, and professional discipline or court sanctions on

23      the attorneys responsible.  I will be entering a written order

24      more fully describing this obligation and the possible

25      consequences of failing to meet it, and I direct the

```
 1    prosecution to review and comply with that order.
 2              Does the prosecution confirm that it understands its
 3    obligations and will fulfill them?
 4              MR. ADELSBERG:  Yes, your Honor.
 5              THE COURT:  I will next hear from the government with
 6    respect to its position on bail, detention, or release.
 7              MR. ADELSBERG:  Thank you, your Honor.
 8              The government submits that there is no combination
 9    of conditions that will reasonably assure the safety of the
10    community and the defendant's appearance in court.
11              Your Honor, should I go into the argument or --
12              THE COURT:  Yes.  I assume, Mr. Dalack, you are going
13    to be arguing for release?
14              MR. DALACK:  We are, your Honor.  But I just want to
15    note, in the first instance, we would object to even holding a
16    detention hearing in the first instance, under 18 U.S.C.
17    3142(f)(2)(A).
18              THE COURT:  You are getting ahead of me.
19              MR. DALACK:  I appreciate it, your Honor.
20              THE COURT:  Because I was going to ask the government
21    to explain to me the basis for having a detention hearing.
22              So why don't I first hear from the government,
23    Mr. Dalack, and then obviously I will hear from you.
24              MR. DALACK:  Thanks, Judge.
25              THE COURT:  Okay.
```

1          So why don't you explain to me please, Mr. Adelsberg,

2     the basis upon which you believe the detention hearing should

3     be held.

4          MR. ADELSBERG:  Yes, your Honor.

5          I believe there are two bases, at least two bases.

6          The first is, these are both crimes of violence as

7     set forth in our letter.  And so, under 3142(f)(1)(A), they

8     are also -- they also have a maximum term of imprisonment of

9     10 years or more.  They all have a 10 -- these are the 10-year

10    max.  So we -- proceeding under those statutes and under --

11    sorry, under this statute of the bail provisions, we would get

12    a hearing.

13         And then additionally, given the risk of flight here,

14    which we set forth in our letter, as well, that would be an

15    independent basis under 3142(f)(2)(A).

16         THE COURT:  All right.  So let me hear from

17    Mr. Dalack.

18         So, Mr. Dalack, I am looking at 3142(f)(1)(A), and it

19    says that "upon motion of the attorney for the government in a

20    case that involves"——this is when I shall hold a detention

21    hearing, the judicial officer——"a crime of violence."  And

22    then I refer over to -- oh, let me ask the government first.

23         Does the "for which a maximum term of imprisonment of

24    10 years or more is prescribed," does that modify a crime of

25    violence in addition to the other items in the list?  In other

1    words, do I only hold the detention hearing if the crime of

2    violence is one where there is a maximum term of imprisonment

3    of 10 years or more?

4         MR. ADELSBERG:  So I have researched this, actually,

5    in a separate case, and my understanding is that it actually

6    is a separate prong.  I had an 875 case, I think it was before

7    Judge Wang, where that came up.  I don't -- here, because

8    these statutes all have a 10-year statutory maximum --

9         THE COURT:  You don't think it matters.

10        MR. ADELSBERG:  We don't think it matters.  But the

11   Second Circuit, I believe, has held that those are two

12   separate -- the reading, the more logical reading, is to

13   separate those.

14        THE COURT:  Okay.

15        And then the other thing I will note before I ask to

16   hear from Mr. Dalack on this point is that 3156(a)(4) says

17   that the term "crime of violence" means an offense that has as

18   an element of the offense "the use, attempted use, or

19   threatened use of physical force against the person or

20   property of another."  That is one of the elements.

21        So it seems to me, Mr. Dalack——and obviously I would

22   like to hear from you——that under 3142(f)(1)(A), since this is

23   a crime -- which says "crime of violence," and since the crime

24   that is charged under 3156(a)(4)(A) is one that involves the

25   use of physical force against the person, that that would seem

1    to me to fit with the charges in the indictment, would appear

2    to fall within that definition.

3              MR. DALACK:  I think that the issue that we have,

4    your Honor, is that, as a categorical matter the -- 18 U.S.C.

5    249(a)(1) does not categorize -- require the use, attempted

6    use, or threatened use of physical force against the person or

7    property of another.

8              THE COURT:  Okay.  So just give me a minute.

9              MR. DALACK:  Sure.

10             THE COURT:  So 249(a)(1)(A).

11             Well, Mr. Dalack, it does say, "whoever, whether or

12   not acting under color of law, willfully causes bodily injury

13   to any person."  So I am sorry.  So I guess I am missing

14   your --

15             MR. DALACK:  Well, I --

16             THE COURT:  -- point.

17             MR. DALACK:  It talks in terms of bodily injury, your

18   Honor.  And there are ways of -- hypothetical and conceivable

19   ways of causing another person to suffer bodily injury under

20   the statute that do not necessarily require -- under the

21   Supreme Court's decision in *Johnson v. United States* (2010),

22   the actual use of physical force against the person or

23   property of another can be done through other passive means.

24             I think also the statute, in the alternative,

25   penalizes or criminalizes the use of fire, and so --

1          THE COURT:  The use of what?

2          MR. DALACK:  The use of fire to cause bodily injury,

3    which that alone doesn't necessarily, as a categorical matter,

4    require that a person -- that a jury would have to find that

5    the person used serious -- you know, violent physical force,

6    as the Supreme Court has defined it, to cause that bodily

7    injury.

8          So my argument essentially is that the statute talks

9    in terms of bodily injury.  It doesn't talk in terms of the

10   use of violent physical force to effectuate that bodily

11   injury.  And so it necessarily sweeps more broadly than the

12   elements clause definition of a crime of violence.

13         And for the purposes of this proceeding, I understand

14   that there might also be a residual clause definition of a

15   crime of violence that is in place.  My position would be that

16   that residual clause definition of a crime of violence is

17   identical to the residual clause definition of a violent

18   felony that the Supreme Court struck down in *Johnson v.*

19   *United States* from 2015, and that, as a result, when the

20   government is seeking detention in situations like this, the

21   Court cannot rely on that residual clause definition to remand

22   somebody, to detain somebody.

23         And so the operative definition is the elements

24   clause definition, and our position is that 18 U.S.C.

25   249(a)(1)(A) sweeps more broadly than the elements clause

1    definition of a crime of violence.

2              THE COURT:  And what about the second part of

3    (f)(1)(A), which I thought the government was arguing, which

4    is an offense listed in 2332b(g)(5)(B), for which a maximum

5    term of imprisonment of 10 years or more is prescribed?

6              Was the government arguing that?

7              MR. DALACK:  You Honor, I am looking at the list of

8    violations under that subsection, and I do not see

9    249(a)(1)(A) listed there.

10             THE COURT:  Got it.

11             MR. ADELSBERG:  I must have misunderstood your

12    question.  We are not arguing that 249 is one of the terrorism

13    offenses.

14             THE COURT:  Oh, you are not.

15             MR. ADELSBERG:  Yes.

16             THE COURT:  So you are only -- you are relying upon

17    two things, then: one, a serious risk of flight, which I want

18    to hear from Mr. Dalack about; and, two, a crime of violence.

19             MR. ADELSBERG:  Yes.

20             And I have some retorts to Mr. Dalack's points about

21    crime of violence, if you are ready to hear that.

22             THE COURT:  Why don't I first hear from Mr. Dalack

23    about the -- well, I don't think you can argue, Mr. Dalack, if

24    I were to find that Mr. Bazrouk is a serious risk of flight,

25    that would be a basis to hold a hearing.

```
 1              MR. DALACK:  That's correct, your Honor.

 2              THE COURT:  Okay.

 3              MR. DALACK:  At least as a threshold matter.

 4              THE COURT:  Yes.

 5              MR. DALACK:  Yes.

 6              THE COURT:  Understood.  Okay.

 7              MR. DALACK:  Yes, that's correct.

 8              THE COURT:  Yes.

 9              MR. DALACK:  That -- but I have points on that score,

10     as well.

11              THE COURT:  Okay.  Why don't we first deal with the

12     issue of a crime of violence?

13              MR. DALACK:  Sure.

14              THE COURT:  So let me hear from the government.

15              MR. ADELSBERG:  Thank you, Judge.

16              Your Honor, I think that the statute itself is quite

17     clear on its face that this is a use of force.

18              Just to take one example that Mr. Dalack used, he

19     talked about the use of fire.  If you look at the statute, it

20     says, "willfully cause bodily injury through the use of fire,"

21     which is obviously a use of --

22              THE COURT:  And now you are looking at 249(a)(1).

23              MR. ADELSBERG:  249(a)(1).  Exactly.

24              THE COURT:  Right.

25              MR. ADELSBERG:  And the Supreme Court has held that
```

1    even, you know, through poison, you could, you know, use force

2    in that way, for the purposes of this analysis, and so I don't

3    see that this -- that Mr. Dalack's point is going to anything

4    meritorious on this ground.

5         And I would also say that, in our letter, we have

6    cited several different courts who found that Section 249 is a

7    crime of violence for bail purposes and for broader 924(c)

8    analysis purposes.  And so, based on our initial research, at

9    least, this would be the first court to say that Section 249

10   would fail that standard.

11        And our position is that both because it -- the

12   defendant poses a flight risk and because this seems to be a

13   very clear crime of violence, we should proceed with the

14   hearing.

15        THE COURT:  So, Mr. Dalack, obviously, anything else

16   you have to say on the 249(a)(1) --

17        MR. DALACK:  I --

18        THE COURT:  -- as well as on the serious risk of

19   flight, I am happy to hear from you.

20        MR. DALACK:  Sure.

21        So with respect to 249(a)(1)(A) and whether it

22   satisfies the elements clause, having received the

23   government's letter just a couple hours ago, I admittedly did

24   not have an opportunity to do a deep dive into the cases they

25   cite.

1          I would just point to the fact that it is not the

2     case that a statute that criminalizes the willful infliction

3     of bodily injury necessarily satisfies the elements clause set

4     forth in the crime of violence definition under the statute.

5          Be that as it may, though, I think it is worth me

6     also addressing the serious risk of flight issue as a

7     threshold matter, your Honor, because I think that also bears

8     on the considerations the Court is likely to decide or

9     consider -- the factors the Court is likely to consider in

10    connection with bail here.

11         Mr. Bazrouk doesn't have any felony record.  He has

12    never been convicted of a felony before.  He has never been to

13    jail or prison before.  The government, in its letter, set

14    forth a number of prior arrests and prior cases and, in fact,

15    Mr. Bazrouk does have currently pending a state case in

16    Manhattan Supreme Court that largely overlaps with the

17    allegations in the present indictment, at least with respect

18    to Counts Two and Three.

19         There is absolutely no indication that Mr. Bazrouk

20    has ever failed to appear, to come to court as directed.  In

21    fact, I understand that, in connection with the case stemming

22    from the allegations from December of 2024, Mr. Bazrouk

23    self-surrendered through his attorney in connection with that

24    case.  And when he was subsequently charged in connection with

25    the allegations for January, he was released on his own

 1    recognizance.

 2          He has a court appearance tomorrow.  He has been in

 3    touch with his attorney.  I have spoken with his attorney from

 4    the Legal Aid Society who is representing him in the pending

 5    matters in Manhattan Supreme Court.  She expects that those

 6    charges are going to be dismissed, both on speedy trial

 7    grounds and for other reasons, but there is just no indication

 8    whatsoever that Mr. Bazrouk has ever failed to show up to

 9    court as directed or otherwise failed to abide by any other

10    court order.

11          He is a U.S. citizen who was born here.  He has

12    extremely strong ties to New York.  Since we began this

13    argument, I just wanted to note that his family is in the

14    gallery here, your Honor——his mother, his father, his sister,

15    and his brother.  They would all serve willingly and

16    enthusiastically as cosigners to a personal recognizance bond.

17    And in fact——and I might be getting ahead of myself again, and

18    forgive me for doing that——Pretrial Services has recommended

19    Mr. Bazrouk's release on pretty strict conditions that we

20    would accept, including home incarceration and a substantial

21    personal recognizance bond.

22          And I would even propose additional conditions, as

23    well.  If your Honor is willing to hear that now, I can --

24          THE COURT:  Why don't we hold off.

25          And I know, Mr. Dalack, you are at a disadvantage

1  because, as you said, you received this letter only two hours

2  ago and, I am sure, haven't had the time to do the research.

3           But based upon the government's letter -- and does

4  the government intend on filing this to the ECF docket, the

5  redacted version?

6           MR. ADELSBERG:  Yes, your Honor.

7           THE COURT:  Yes.

8           So, for the record, it is page 17 of the letter, and

9  the case law that they cite here, based upon that case law

10  that classifies Section 249 as a crime of violence for bail

11  purposes, I am going to hold a bail hearing under

12  3142(f)(1)(A).  And obviously, that doesn't preclude you,

13  Mr. Dalack, from later challenging—if appropriate and if

14  needed—that ruling, because, again, you haven't had the

15  opportunity to do the research yourself.

16           So with that, what I would like to do in order to

17  keep things in the order I usually do them, I would like to

18  first hear from the government as to -- since they have the

19  burden --

20           MR. ADELSBERG:  Yes, your Honor.

21           THE COURT:  -- as to the reasons they are seeking

22  detention.  And then, of course, Mr. Dalack, I will hear from

23  you.

24           MR. DALACK:  Great.

25           And notwithstanding -- and I understand the Court's

1    ruling and its reliance on the case law cited by the

2    government, I just want to clarify that this is not a

3    presumption case and --

4            THE COURT:  Well, now you are getting to it -- again,

5    you are stealing my thunder on each of these things.  The

6    first thing I was going to ask the government is whether this

7    was a presumption.

8            MR. DALACK:  Sorry, Judge.

9            THE COURT:  So this is not a presumption case?

10           MR. ADELSBERG:  This is not a presumption case, your

11   Honor.

12           THE COURT:  Okay.  So let me please hear from you

13   with respect to the reasons you are seeking detention, please.

14           MR. ADELSBERG:  Your Honor --

15           THE COURT:  And obviously, for the record, I have

16   received the letter dated May 7, 2025, which the government

17   has represented they will be filing to the ECF docket, which

18   consists of 19 and a little bit pages.

19           So I am obviously aware of the reasons, but I want

20   you to articulate them to give Mr. Dalack an opportunity to

21   respond to each of them.

22           So go ahead.

23           MR. ADELSBERG:  Understood, your Honor.

24           And given that -- the fairly lengthy nature of the

25   memo, I will be aiming to be more brief than I would be

otherwise.  But if there is anything, your Honor, that in the

memo causes you any concern, we obviously would love to

address that, as well.  Same for Mr. Dalack, of course.

Your Honor, the defendant here is charged with

multiple crimes of violence, based on pernicious and

persistent assaults directed at innocent Jewish victims across

Manhattan.  These assaults all targeted Jews expressing their

First Amendment rights.  All were initiated by the defendant,

and all resulted in injury to the victims.

During each of these assaults, the defendant made his

motivations clear.  During two of the assaults, he called his

Jewish victims "Nazis," a term laced with particular malice

when directed at Jews.  And during the third, he wore a Hamas

headband, aligning himself with a group dedicated to the

murder of Jews.

Beyond the persistence of these assaults, their

timing spanned many months and followed numerous arrests for

similar conduct.  This was not a momentary lapse in judgment

for the defendant, your Honor.  It was a deliberate pattern to

conduct -- of conduct to terrorize Jewish victims, and it

demonstrates a severe and sustained disregard for the law.

As set forth in our letter, the defendant's danger to

the community and risk of flight are further corroborated by

his vocal support for terrorist groups, his avowed hatred of

Jews, his history of violent threats and intimidation,

1    including of a Jewish child at a New York City school, and his

2    access to numerous weapons, including weapons found in the

3    search of his apartment just this morning.

4         Indeed, the defendant possessed, at his home, several

5    knives, shell casings, an airsoft gun that quite resembled a

6    real gun, such that even our agents for several minutes

7    thought it was a real gun, and brass knuckles.  In fact, the

8    agents found a knife in one of -- in the pocket of a jacket

9    that the defendant was wearing during one of the assaults.

10        The defendant's history and characteristics also

11   militate powerfully in favor of detention.  His arrest history

12   record reflects a blatant disregard for the rule of law.  And

13   as we set forth in the letter, we don't know the dispositions

14   of all those arrests; but, at a minimum, he has been arrested

15   at least six times for his conduct at Israel-Gaza protests,

16   showing that his conduct in this case is far from an

17   aberration and showing that he has not responded positively to

18   prior interactions with law enforcement.

19        Indeed, we learned today during the search that the

20   defendant has a framed photograph of himself being arrested in

21   his bedroom.  Far from being deterred by his contact with law

22   enforcement, it appears that he is emboldened by it and proud

23   of it.

24        Beyond his repeated assaults and access to weapons,

25   the defendant has shown his propensity for violence elsewhere,

1    including in his text messages, which we set forth in the --

2    in our letter.  He talks about using his gun.  He talks about

3    shooting people.  He talks about --

4              THE COURT:  You said using his gun.

5              MR. ADELSBERG:  Yes.

6              THE COURT:  The airsoft gun?

7              MR. ADELSBERG:  We don't know, your Honor.  There is

8    one text message in particular, which I can point you to,

9    where he has asked -- he references a gun -- I will give you

10   the exact page I am on.  It is on page 11, your Honor.  It is

11   a June 4, 2024 exchange with an associate where he says, "I

12   was about to," and there is a gun picture, "shoot someone."

13   His associate asks, "with your Orbeez gun, I hope?"  Orbeez is

14   a water pellet gun.  And then he responds, "No.  Real.  I don't

15   even want to talk about it."

16             Now, your Honor, defendants, in the past, in my

17   experience, will bluster and say, "I have a gun" or "I

18   don't" -- you know, when they don't actually have a gun.  We

19   can't conclude from this text (audio disruption) find one this

20   morning, for example.  So we did find real shell casings in

21   his apartment.  We found several other weapons --

22             THE COURT:  To what type of gun were the shell

23   casings -- what type of gun would they be used in?

24             MR. ADELSBERG:  Your Honor, we can get you that

25   information.

1          THE COURT:  Okay.

2          MR. ADELSBERG:  We will ask our agents.  But suffice

3    to say, the agents were quite clear that these were from, at

4    least from their appearance, shell casings from a real

5    firearm.

6          THE COURT:  No, I get it.  But --

7          MR. ADELSBERG:  We will find out --

8          THE COURT:  Yes.

9          MR. ADELSBERG:  -- the exact type of firearm or

10   whatever information we can about what they look like.

11   Certainly -- I think we have a photo in there, in case that is

12   helpful.

13         THE COURT:  I saw the photo.

14         MR. ADELSBERG:  Okay.

15         So, your Honor, beyond his repeated assaults, he has

16   these -- he has this propensity for violence that shines

17   through in his text messages.

18         And beyond that, his prior arrest history.  Most

19   concernedly, his arrest following a gunpoint robbery of a

20   female victim in Manhattan is highly concerning.  Indeed, none

21   of those arrests, including the ones tied to this case --

22         THE COURT:  Could you go back to the female victim?

23   Were you talking about an arrest or a charge or both?

24         MR. ADELSBERG:  That is an arrest in 2019.  The

25   disposition is sealed.  And again, we are not relying, you

know, on the outcome of that case, because at the time he was

a minor.  We don't have the disposition, but he was arrested

for that, which is quite serious conduct.  And you would think

that that arrest would in some way, being arrested for conduct

like that, serve as a deterrent for why he would perhaps be

more careful going forward in his interactions with others when

it comes to particularly --

THE COURT:  Yes.  I mean, it does trouble me when the

government relies upon arrests that weren't charged because I

know there are exercises of prosecutorial discretion and there

are issues oftentimes involving evidence that would lead

charges not to be pursued.  But people get arrested for things

erroneously, and that is oftentimes why charges aren't

brought.  So I -- just to tell you, I am not moved by arrests.

You know, convictions, or charges and convictions, are another

story, but arrests -- you know, I hear your argument, I saw

what you wrote, but it doesn't sway me.

MR. ADELSBERG:  Totally understood.

For what it's worth, our understanding is he was

charged in that case.  We don't have -- so it might rise to

the charge level, but not the conviction level, but I totally

take your point.

And just to be clear --

THE COURT:  And how old was Mr. Bazrouk when that

happened?

1            MR. ADELSBERG:  He was a minor, sir -- your Honor.

2   He was --

3            MR. DALACK:  He was 15, your Honor.

4            MR. ADELSBERG:  Yes.

5            THE COURT:  15.

6            MR. ADELSBERG:  Thanks.

7            THE COURT:  Okay.

8            MR. ADELSBERG:  Your Honor, I think the point that we

9   are -- I raised that not to say that the facts of that

10  incident should lead you to one conclusion or another.

11           What is probative in my mind, your Honor, is that he

12  has been arrested at least 12 times for some serious things,

13  and none of that has really deterred him.  In fact, in some

14  cases, it seems like it has emboldened him.  The fact that, in

15  each of the assaults that are charged here, he was arrested

16  before, and yet he continued doing it thereafter, it just

17  suggests that the fear of a criminal consequence has just not

18  been effective in the past.

19           But I take your point entirely about the limited

20  value of an arrest versus anything else.

21           I will turn to the flight risk, unless there are any

22  questions your Honor has about our arguments regarding the

23  defendant's danger that he poses to the community?

24           THE COURT:  Go ahead.

25           MR. ADELSBERG:  Okay.

1          Your Honor, the defendant fled the scene after two of

2     the incidents and was already in handcuffs in the third one,

3     so he couldn't flee the scene.  I believe defense counsel

4     referenced that, you know, that he self-surrendered in one

5     instance.  I am not certain, but I am pretty sure that he was

6     caught on camera, and there were social media clips of him

7     committing the act, so he couldn't really not self-surrender

8     at a certain point for that incident.

9          In any event, he has clearly shown a propensity to

10    flee when facing the consequences of his actions.  In fact,

11    just this morning, our understanding from the agents is that,

12    when they got to the apartment, the entire family -- his

13    entire family, except for an older, maybe, member of the

14    family, maybe a grandmother, came to the front of the

15    apartment.  When the agents knocked, Mr. Bazrouk hid in the

16    bathroom for about 10 minutes.  I wasn't there.  This is the

17    report that was given to me.  We don't know what he was doing

18    in the bathroom, but it is consistent with his pattern of

19    avoiding the consequences of law enforcement when they come --

20          THE COURT:  When you talk about a pattern, so he hid

21    in the bathroom.  What are the other elements of the pattern?

22          MR. ADELSBERG:  That on two occasions, the two

23    incidents we have talked about here, he fled from the scene of

24    the assault.  On two other incidents, he also fled.  In 2024

25    and 2018, he also fled the scene of a crime.

1          And so, your Honor, to us this just says that here is

2     someone who, when faced with consequences, is going to flee.

3     He bragged about being on Crime Stoppers in his text messages,

4     about a photo of himself being on Crime Stoppers.  That is

5     what that suggests to us.

6          Your Honor, I would also like to focus on the fact

7     that today we found out he had over $500,000 worth of cash in

8     his apartment.  This was in a safe, which he controlled.

9     Other members of his family were asked who has the code to

10    that safe, and they all said he had the code to that safe.  He

11    is the only one who can get in there and get out of there.

12    That is a lot, a lot of money.

13          THE COURT:  Where is that money now?

14          MR. ADELSBERG:  It has been seized, your Honor.

15          And your Honor, I mean, for what it is worth, on his

16    financial affidavit, he lists his stated net worth at $3,000.

17    I don't know if he was excluding money that he maybe

18    understood to be seized, but --

19          THE COURT:  I wasn't of the awareness that the

20    government saw the financial affidavit.

21          MR. DALACK:  They didn't, Judge.

22          MR. ADELSBERG:  Your Honor --

23          MR. DALACK:  You have the financial affidavit.  You

24    know on the financial affidavit that I mentioned that money.

25          THE COURT:  No, I am just -- but, no, I understand

1    that.  How did the government get it?  I thought the

2    government doesn't usually --

3         MR. DALACK:  They didn't.  I think the government is

4    referring, your Honor, to a reference in the Pretrial Services

5    report, and I just wanted --

6         THE COURT:  Oh, okay.

7         MR. DALACK:  -- to be clear that the -- let me just,

8    you know, because -- I don't mean to take Mr. Adelsberg's

9    thunder here for a second, but at that point in the Pretrial

10   Services interview——and I am happy to get into this in more

11   detail for the Court to the extent it desires——but Mr. Bazrouk

12   had been working in an unlicensed smoke shop in Connecticut

13   for a couple of years.  And that was money that he had earned

14   in connection with an unlicensed smoke shop.  It ended up

15   resulting in charges in connection with that Connecticut case

16   that he has resolved favorably and was in a diversion program

17   for.

18        But that money has been seized.  Any discrepancy

19   between the financial affidavit and the Pretrial Services

20   report is attributable to my reluctance into him getting into,

21   with Pretrial Services, conduct and allegations that resulted

22   in a criminal charge, but there is no hiding the ball here.

23   We mentioned it in the financial affidavit.  The government

24   has not seen the financial affidavit, but you have.

25        THE COURT:  Got it.  So what confused me is that you

```
 1   had mentioned the financial affidavit, but now I understand.

 2            MR. ADELSBERG:  Yes.  As was the basis of --

 3            THE COURT:  Yes.  You were talking about the bail

 4   report.

 5            MR. ADELSBERG:  Yes, and --

 6            THE COURT:  The Pretrial Services report.  Excuse me.

 7            MR. ADELSBERG:  The Pretrial Services report.

 8            THE COURT:  Yes.

 9            MR. ADELSBERG:  And I appreciate Mr. Dalack's

10   clarification but, at the very least, it shows that he has had

11   access to incredible amounts of cash.  Perhaps it has all been

12   seized, but perhaps not.  And it suggests he may have access

13   to other amounts of cash if he has already been able to access

14   that amount of cash.

15            Beyond that, your Honor, the defendant is facing

16   quite serious criminal charges.  And as described in our

17   letter, the evidence is, in our view, overwhelming.  And there

18   also may be additional charges, given the discovery of shell

19   casings in his apartment.

20            We would submit that his potential exposure,

21   including a potentially significant incarceratory sentence --

22            THE COURT:  But you talked about the shell casings in

23   his apartment.  Do we know yet what gun they came from?  What

24   type of gun?  Not yet?

25            But people -- I mean, obviously not everyone has
```

```
1    shell casings, but I am not sure I understand, what would

2    the -- he doesn't have any prior felony convictions, so I am

3    trying to understand why you say that the presence of shell

4    casings would indicate other charges.

5              MR. ADELSBERG:  If the defendant is under indictment,

6    your Honor, that is a separate predicate for a -- there is a

7    felon in possession or felon in possession of ammunition,

8    so --

9              THE COURT:  But he is not a felon.

10             MR. ADELSBERG:  Right.  I am not arguing he is a

11   felon, the felon provision, if he is under indictment, 922(n).

12             THE COURT:  But he is under indictment now.

13             MR. ADELSBERG:  But he is under indictment -- my

14   point is, he has been charged in other cases, as well.

15             MR. DALACK:  He has never faced a felony indictment

16   before today's case, so there is no 922(n) exposure, your

17   Honor.  That's -- that's that.

18             THE COURT:  I mean, just to state the obvious out

19   loud, but for the hate crime aspect of this, this is a state

20   court case that, at 111 Centre, that they see hundreds a week,

21   and people are bailed.  I just make that observation.  But we

22   have a hate crimes act, so it is a federal crime, and that is

23   why we are here.  But continue.

24             MR. ADELSBERG:  And as you know, we have very

25   different standards than state court.
```

1          THE COURT:  They don't consider dangerousness in
2    state court.  They do consider risk of flight --
3          MR. ADELSBERG:  Right.
4          THE COURT:  -- but they don't consider
5    dangerousness --
6          MR. ADELSBERG:  Right.
7          THE COURT:  -- which we can have that discussion
8    another day as a policy matter as to whether that is good or
9    not.
10         But, yes, under the Bail Reform Act, I am required to
11   consider both dangerousness and risk of flight.
12         MR. ADELSBERG:  And I think we would submit, your
13   Honor, that a one-off physical assault is one thing.  Here,
14   where we are seeing this pattern, it is not -- his danger to
15   the community must be seen in the aggregate, in the context of
16   his course of conduct.  And here, we have seen that course of
17   conduct.
18         I would also submit, your Honor, he has been charged
19   with felonies.  So I think Mr. Dalack is not correct on that
20   point --
21         THE COURT:  Has he been convicted of felonies?
22         MR. ADELSBERG:  No, your Honor.
23         THE COURT:  And isn't that what the statute requires?
24         MR. ADELSBERG:  No, the statute requires if he is
25   under indictment.  That is a separate prong from being a

felon.  If you are under indictment at the time that you

possess ammunition, that -- again, I don't want to overstate

our case here.  We found these shell cases this morning.  We

are still figuring out what these are about.  They are nine

millimeter (unintelligible) we just learned.

THE COURT:  Okay.

MR. ADELSBERG:  So we do -- we are coming to the core

of just the information that we have.  And the point is that

if I am in the defendant's shoes, I learned this morning that

the government now has a potential gun charge case against me,

and that may influence my calculus when I think about whether

I would flee.

And so we raise that as a -- as just part of the

Court's analysis, when it thinks about what his potential

sentencing exposure might be, is that it is not just

necessarily the three hate crimes that he has been charged

with, but there is a potential for additional charges down the

line.

You know, the only other thing I would add is, on his

hate -- in the Pretrial Services form, he listed only -- his

foreign travel as only Jordan.  Our understanding is that he

also traveled to the West Bank.  We are not overstating

that --

THE COURT:  In the same trip?

MR. ADELSBERG:  In the same trip.  And that is based

1    on his statements to CBP upon returning.  And so I think that

2    is potentially relevant inasmuch as you, I am sure, read in

3    our letter, that trip does feature somewhat prominently in our

4    view of his conduct.

5         He talks about, on that trip, learning that he has

6    family in Hamas.  We think that contributes in some ways,

7    perhaps, to his animus in this -- and as reflected in the

8    conduct here.  But we also want to point out that

9    inconsistency between where he said he traveled and where he,

10   in fact, seems to have traveled.

11        Barring any questions from the Court, we would rest

12   there and just emphasize our position that we do not think

13   that there are a combination of conditions that will

14   reasonably assure the safety of the community and the

15   defendant's appearance in court.

16            THE COURT:  All right.  Mr. Dalack.

17            MR. DALACK:  Thanks, Judge.

18        I will just try and work backwards a bit.

19        The first thing, regardless of whether or not he has

20   ever been charged with a felony previously, I am not aware and

21   the government has not alleged, and there is no record

22   indicating that he has ever been under felony indictment.  So

23   there is just no 922(n) exposure.  It is just a nonissue.

24        The government has the burden of proving by a

25   preponderance of the evidence, as your Honor knows, that no

1    combination of conditions can be fashioned to reasonably

2    assure his appearance in court in the future.  I think they

3    flatly fail to satisfy that burden, given his history of

4    appearing in court, the fact that he self-surrendered in

5    connection with the pending Manhattan case, and there is

6    absolutely no indication whatsoever that he has ever shirked,

7    neglected, ignored, or otherwise thumbed his nose at any sort

8    of court orders.

9            I don't know what transpired this morning when he

10    went to the bathroom for 10 minutes and what happened there.

11    I just know that when federal agents show up at a person's

12    house at 5:30 in the morning and bang on the door --

13            THE COURT:  6.

14            MR. DALACK:  6:00 in the morning and bang on the

15    door, it is an alarming experience, and I am sure there was

16    some level of panic.  But be that as it may, he was arrested.

17    They searched the apartment without incident.  His family was

18    completely compliant.  They didn't get in the agent's way.

19    They were able to obtain everything they wanted to obtain from

20    the apartment.  And, in fact, it is clear from what

21    Mr. Adelsberg said, that when the agents asked the family

22    about information that could have incriminated their family

23    member that they provided a candid answer.

24            So there is no indication here that this is a family

25    or a person who is incapable of abiding by the Court's

1    authority, which is really what the risk of flight issue is

2    about.  I say that because (audio disruption) appearance in

3    court in the future is to reasonably assure his appearance in

4    court.

5            And certainly, the conditions that Pretrial Services

6    has recommended, including home incarceration enforced by

7    location monitoring, is more than adequate to reasonably

8    assure his appearance in future court appearances,

9    particularly given his record of doing that exact same.

10            With respect to dangerousness, they have to prove

11   dangerousness by clear and convincing evidence, that there is

12   no combination of conditions that can be fashioned to

13   reasonably assure the safety of the community.  Your Honor's

14   observation that this is nothing more than a series of

15   run-of-the-mill state cases, with a gloss on them alleging a

16   particular malintent that makes it federal, is exactly on

17   point.

18            And the context matters here, your Honor.  What we

19   are dealing with here are essentially three different

20   fistfights, at best.  And I will say, the first one, even by

21   the government's own allegations, he was in handcuffs at the

22   time.  He had been arrested in connection with that protest.

23   And on information and belief, I understand that the person

24   that he allegedly kicked confronted him while he was in NYPD

25   custody.

1          So what we are dealing with here is a series of minor

2     fistfights at highly charged and highly emotional protests in

3     which thousands of people are gathering to protest Israel's

4     genocide in Gaza against the Palestinians.  My client is

5     Palestinian.  He has family that are affected by Israel's

6     policy of ethnic cleansing and starving the community

7     against --

8          MR. ADELSBERG:  Your Honor, objection to this line

9     of --

10         MR. DALACK:  I just --

11         (Indiscernible crosstalk)

12         THE COURT:  Mr. Dalack, you are not going to be

13    making any persuasive arguments to me by using words like

14    "genocide" and things of that kind.

15         MR. DALACK:  I appreciate that, your Honor, and I am

16    really trying to home in on the emotionally charged nature of

17    the protests that Mr. Bazrouk was participating in by these

18    allegations, and that each one of these incidents happened in

19    a particular setting in which there was clearly, according to

20    the government's own allegations, some kind of dispute, an

21    altercation between him and other counterprotesters.

22         I would also note that, in connection with the

23    December incident, your Honor, that resulted in state charges,

24    the NYPD spokesperson herself said that that particular

25    altercation, in December of 2024, was triggered by something

1    that had been said, according to the NYPD officer or

2    spokesperson, to Mr. Bazrouk, so there was some sort of an

3    instigation there.

4              But the atmospherics of this are important.  There is

5    no allegation that Mr. Bazrouk used a weapon in connection

6    with any of these alleged assaults.  There is no allegation

7    that any of the alleged assaults resulted in anything but, you

8    know, relatively minor -- I am not trying to minimize the

9    impact of it on the alleged complainants, but we are not

10   dealing with a situation here in which there is any allegation

11   that people were taken to the hospital or suffered any sort of

12   other serious bodily injury.  What we are dealing with here is

13   a series of alleged physical altercations that occurred in a

14   highly emotionally charged environment.

15             And now, the case is no longer in 111 Centre Street,

16   100 Centre Street, it is here in federal court.  He was bailed

17   in connection with those cases.  He showed up to court as

18   directed.  There is no indication that he used or had access

19   to any sort of weapons.

20             I will say, with respect to the gun issue, your

21   Honor, it was a pellet gun——a BB gun or one of those plastic

22   BB guns.  It has been seized by law enforcement.  All of the

23   items that are listed in the government's letter have been

24   seized by the government.

25             And what we are proposing here, your Honor, is

1    Mr. Bazrouk's release on some pretty strict conditions.

2            What I am proposing is a $150,000 personal

3    recognizance bond that is cosigned by three financially

4    responsible persons, enforced by home incarceration with

5    location monitoring.

6            And I would even propose, your Honor, in light of the

7    fact that he has all of his family in court today too, that

8    any one of either his mother, his father, or his sister would

9    readily serve as third-party custodians, which would also sort

10   of, you know, up the ante for them.  They would have an

11   affirmative responsibility to report to the Court any

12   noncompliance with the bail conditions.

13           I also want to say that Mr. Bazrouk is very young.

14   He is 20 years old.  This is not the typical kind of defendant

15   that we see in federal court.  And in fact, even if you assume

16   all of the allegations in the government's letter and in the

17   indictment to be correct, this is exactly the kind of case

18   that would be completely appropriate for, at least, a strong

19   consideration by the Young Adult Opportunity Program.  That

20   would give Mr. Bazrouk an opportunity to interact with

21   Judges Abrams and Netburn in a highly controlled, rigorous

22   program that is designed to get to the root causes of whatever

23   circumstances culminated in the alleged offense conduct.

24           And certainly, we have seen many other more serious

25   kinds of cases either involving, you know, drugs or even some

acts of violence or fraud get admitted into the Young Adult
Opportunity Program.  I, myself, have several clients who face
allegations with dramatically more sentencing exposure than
Mr. Bazrouk faces get admitted to that program, and I think he
would be an excellent fit.

       All of this must also be understood in what remand
would require here, and that is putting a 20-year-old into MDC
Brooklyn, which is a, as your Honor knows, and not to be
hyperbolic about it, but a total disaster.  It is
understaffed.  It is neglected.  It is violent.  It is rife
with drugs and contraband and assaults and attacks.
Mr. Bazrouk has never been to jail or prison before.  That is
simply too great an intervention at this particular point,
especially knowing where he is going to be remanded and
especially given the strong family and community support that
he enjoys.

       With all of that said, your Honor, and in the absence
of any additional information from the government here, some
of the things that Mr. Bazrouk -- that is attributable to
Mr. Bazrouk in this letter are certainly very difficult to
read and, if you were to take them at face value,
reprehensible.  Some of the language that he uses, some of the
references that he makes in text messages, but those are just
text messages, and some of them are with friends, some of them
are with people that he is trying to impress.  But it is just

sort of grandstanding in the abstract.  And again, it would be
this sort of -- it presents a perfect opportunity for him to
participate in a rigorous diversion program to get to the root
of where some of that angst and frustration is coming from.

All of the circumstances taken together, your Honor,
the government cannot prove by clear and convincing evidence
that the Court is incapable of fashioning conditions to
reasonably assure the safety of the community.  Pretrial
Services concurs in that assessment, and the Court should
release Mr. Bazrouk to home incarceration.

THE COURT:  I am happy to hear a rebuttal from the
government.  Please keep it brief.

MR. ADELSBERG:  I will keep it extraordinarily brief,
your Honor.

I would just say the defendant may have gone to state
court.  He may have appeared.  We actually are asking the ADA.
We haven't gotten back whether he has or not.  But he
continued to assault Jews through that entire period of time
while he was going to court.  You know, he may be quite --

THE COURT:  Well, when you say "that entire period of
time," there are three incidents charged in the indictment.

MR. ADELSBERG:  There are three -- exactly.  So he
gets charged in April, and then he continues assaulting
people.  And, you know -- and there may be more.  I mean,
like, again, I am not relying on that, but, you know, in the

1    incidents he generally covered his face.  His face is covered.

2    And so we know of at least two additional times after he was

3    arrested.

4          Defense counsel talked about how, you know, he is

5    inflamed, and this was very emotional for him.  But that only

6    underscores, in our view, his dangerousness and why he might

7    just continue to do the exact same thing he has been doing if

8    released.

9          Defense counsel also talked about how he is only 20

10    years old, and yet he still -- he has had at least 12 arrests

11    in that period of time.  In our view, that militates in favor

12    of sending -- his inability to keep himself out of law

13    enforcement's grasp.

14          And then finally, your Honor, defense counsel is

15    arguing that he should be released to his apartment; the same

16    apartment where he kept many weapons, where he kept hundreds

17    of thousands of dollars of cash, where his family was unable

18    to prevent him from this course -- from continuing this course

19    of conduct.  And so we just submit, your Honor, that we are

20    putting him essentially back in the same place.  I am not sure

21    that we are really going to see much of a different outcome.

22    In fact, we would submit that the danger to the community here

23    is quite significant.

24          THE COURT:  So all the things you talked about were

25    confiscated, correct?  The money, the knife, the soft gun?

1            MR. ADELSBERG:  Sure.  But it suggests, one, he

2     has -- he can get access to other similar things and to commit

3     his crimes, he didn't need any weapons.  And so, you know, he

4     lives in Midtown Manhattan, where there are many, many

5     different protests going on.  He is going right back to that

6     same place.

7            THE COURT:  Not if he is on home incarceration,

8     right?

9            MR. ADELSBERG:  Your Honor, I am not sure that that

10    is a full failsafe, but if he is on home incarceration, sure.

11    Does that minimize some of the potential?  Yes.

12           But again, he was under the specter of various

13    arrests while he committed some of the, you know, most

14    dangerous conduct in this case.  And so we would submit that

15    home incarceration would not fully allay that concern.

16           THE COURT:  Mr. Dalack, very, very, very briefly.

17           MR. DALACK:  Very briefly.

18           Just to be clear, this is not a case and the

19    allegations are not accusing Mr. Bazrouk of roaming (audio

20    disruption) attacking random people who he perceives to be

21    Jewish.  That is not what this case is about.  This is about

22    physical altercations, in a highly charged emotional

23    environment, at protests concerning a matter of significant

24    international and public importance.  And so it is that

25    context that matters.

1              The fact that the government cannot point to any sort

2       of serious injury or use of a weapon in connection with any of

3       those incidents matter.  The fact that the items that were

4       seized from Mr. Bazrouk's apartment, none of them were

5       illegal, that matters.  And the fact that he has a strong

6       record of appearing in court when directed in connection with

7       his other cases matters.

8              Taken together, this is not a situation where

9       detention is appropriate and the Court should release

10      Mr. Bazrouk to home incarceration.

11             THE COURT:  I am going to take a brief recess.  I will

12      ask Pretrial Services to join me in the back.

13             THE DEPUTY CLERK:  All rise.

14         (Recess)

15             THE COURT:  Mr. Bazrouk, I am required under the law

16      to release you, either with or without conditions imposed,

17      unless I determine there are no conditions that will

18      reasonably assure your appearance in court as required and the

19      safety of the community.

20             In making a bail determination, I am required to

21      consider the following factors: the nature and circumstances

22      of the offense charged, the weight of the evidence against

23      you, your history and characteristics, and the nature and

24      seriousness of the danger to any person or the community that

25      would be posed by your release.

1              The government bears the burden of establishing by

2       clear and convincing evidence that you are a danger to the

3       community or by a preponderance of the evidence that you are a

4       flight risk.  And what I need to (audio disruption) that will,

5       in combination, reasonably assure your appearance and the

6       safety of the persons in the community.

7              I am attaching a statement of reasons to the

8       disposition sheet.  I will just read that for the record:

9              The Court finds the government has not met its burden

10      of establishing by a preponderance of the evidence that the

11      defendant is a flight risk.  Among other things, I will

12      note——and I wrote "notably"——he has appeared in state court as

13      required.

14             The Court also finds the government has not met its

15      burden of establishing by clear and convincing evidence that

16      defendant is a danger to the community.  Again, I note the

17      crimes alleged in the indictment did not involve the use of

18      weapons.

19             Appearing before me is a 20-year-old defendant who

20      has no prior convictions, let alone felony convictions.  I

21      find that the conditions I am about to impose will reasonably

22      assure the safety of the community and the appearance of the

23      defendant in court as required.

24             The conditions are as follows:

25             A $150,000 bond signed by three financially

1    responsible persons;

2          Travel restricted to the Southern and Eastern

3    Districts of New York;

4          Surrender travel documents and no new applications;

5          Pretrial supervision as directed by Pretrial

6    Services;

7          Defendant to submit to urinalysis and, if positive,

8    there will be a condition added of drug testing or treatment;

9          Home incarceration supported by GPS monitoring;

10          Avoid contact with any person who is or may become a

11    victim or witness, unless in the presence of counsel;

12          Defendant's mother and father shall serve as

13    third-party custodians for defendant.

14          The defendant is to be released on his own signature,

15    plus the following condition, installation of the bracelet, and

16    the remaining conditions to be met by May 21, 2025.

17          Mr. Bazrouk, this is not state court.  This is

18    federal court.  If you don't abide by these conditions, there

19    will be very, very serious consequences that I am about to

20    tell you about.

21          First of all, if you fail to appear in court as

22    required or violate any of the conditions that are set forth,

23    a warrant is going to be issued for your arrest.

24          You and anyone who signs the bond——in other words,

25    the three people who sign the bond——will each be responsible

1    for paying its full amount.  That is $150,000.  And you may be

2    charged with a separate crime of bail jumping, which can mean

3    additional jail time and/or a fine.

4              In addition, if you were to commit a new

5    offense——assault someone, let's say——while you are released,

6    in addition to the sentence prescribed for that offense, you

7    would be sentenced to an additional term of imprisonment of

8    not more than 10 years if the offense is a felony, or not more

9    than one year if the offense is a misdemeanor.  That term

10   imprisonment will be executed (audio disruption) any other

11   sentence of imprisonment is completed.

12             And while you are awaiting trial, I must warn you not

13   to have any contact with or engage in any intimidation of

14   potential or designated witnesses or jurors; not to engage in

15   any intimidation of any court officer; not to engage in any

16   conduct that would obstruct any investigation by law

17   enforcement.

18             Has Judge Berman set a date for a conference?

19             MR. ADELSBERG:  Your Honor, the Court has set a date.

20   We haven't confirmed the date, but it is, I believe, Tuesday,

21   the 13th?  I think the 13th.

22             Your Honor, the government requests——I apologize if

23   this is not the appropriate time——that the Court stay the

24   defendant's release pending appeal of this decision

25   (unintelligible).

```
 1            THE COURT:  I am going to go back and call
 2   Judge Berman right now.  We will recess for one minute.
 3            THE DEPUTY CLERK:  All rise.
 4            (Recess)
 5            THE COURT:  Katherine, I want you to print this stuff
 6   out.
 7            You are going to (audio disruption) the parties that
 8   are to bring this to Judge Berman in Courtroom 17B at 4:30.  I
 9   want him to see this.
10            THE DEPUTY CLERK:  Okay.
11            THE COURT:  And this matter is adjourned.
12            MR. ADELSBERG:  Thank you.
13            MR. DALACK:  Thanks, Judge.
14            THE COURT:  So I am not -- I am staying it until you
15   see Judge Berman.  Judge Berman is the presiding district
16   judge, and he will ultimately make the decision.
17            MR. DALACK:  Thank you, Judge.
18            MR. ADELSBERG:  Thank you, Judge.
19            (Adjourned)
20
21
22
23
24
25
```

1

2                       C E R T I F I C A T E

3

4        I, Kristen J. Carannante, certify that the

5   transcript of the digital audio recording of the

6   proceedings in the above-entitled matter is a true

7   and accurate transcription.

8

9

10  Signature   /s/ *Kristen J. Carannante*
                KRISTEN J. CARANNANTE, RPR, RMR, FCRR
11              (848) 459-3124
                kjcarannante@gmail.com
12

13  Date:       May 8, 2025

14

15

16

17

18

19

20

21

22

23

24

25