P5DKBAZC1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4                v.                        25 CR 203 (RMB)

 5   TAREK BAZROUK,

 6                                          Conference
                  Defendant.
 7   ------------------------------x

 8
                                           New York, N.Y.
 9                                         May 13, 2025
                                           10:00 a.m.
10

11   Before:

12                    HON. RICHARD M. BERMAN,

13                                          District Judge

14                         APPEARANCES

15   JAY CLAYTON
          United States Attorney for the
16        Southern District of New York
     JAMES LIGTENBERG
17   SAMUEL S. ADELSBERG
          Assistant United States Attorneys
18
     TAMARA GIWA
19   FEDERAL DEFENDERS OF NEW YORK, INC.
          Attorney for Defendant
20   BY:  ANDREW JOHN DALACK

21   Also Present:

22   Akil King, Pretrial

23

24

25
```

P5DKBAZC1

1          (Case called)

2          THE COURT:  Just some preliminary remarks, and then

3   I'm going to ask both sides if you wanted to add anything

4   before we have a resolution.

5          So, as follows:

6          Defendant, Tarek Bazrouk was indicted on May 6, 2025,

7   and charged with what are called three hate crimes.

8          He was arrested on May 7, and was presented and

9   arraigned before Magistrate Judge Stuart Aaron.  Judge Aaron

10  issued a Brady order and held a bail hearing.

11         Having found that the defendant did not pose a flight

12  risk and did not present a danger to the community, Judge Aaron

13  set a series of bail conditions.

14         The government appealed the bail decision, and the

15  parties appeared before this Court in the late afternoon of

16  May 7, 2025, and again here today.

17         During the proceeding before this Court on May 7,

18  2025, defense counsel requested the opportunity to respond in

19  writing to the government's detention letter, dated May 7,

20  2025, seeking a remand.

21         The Court also requested and took the opportunity to

22  review the bail transcript proceeding before Judge Aaron.

23         The Court, upon request of the government, remanded

24  the defendant pending the proceedings of today, May 13, 2025.

25         In addition to the government's May 7, 2025 letter,

P5DKBAZC1

1    the pretrial services department revised its original report

2    and added, among other things, what appears to be a

3    December 2024 arrest by the Hartford, Connecticut Police

4    Department.  The charges appear to be:  One, operation of a

5    drug factory; two, possession of controlled substance, first

6    offense; and, three, possession with the intent to sell,

7    dispense, hallucinogen.

8         This Court has now had the opportunity to review the

9    transcript of the proceedings -- excuse me for a minute.

10        This Connecticut arrest, that I just mentioned to you,

11   did not appear in the pretrial services report.  That was prior

12   to that.

13        This Court has now had the opportunity to review the

14   transcript of the proceedings held before Magistrate

15   Judge Aaron on May 7, 2025; and, also, the government's written

16   submissions; defense counsel's submission, dated on or about

17   May 9, 2025; and the two pretrial services reports, the one

18   dated May 7, 2025, and the other dated today, May 13, 2025.

19        So, let me start by asking counsel for both sides, the

20   government and the defense, if they wish to add anything to the

21   submissions that the Court has received and/or in addition to

22   prior oral arguments held before both this Court and Magistrate

23   Judge Aaron.

24        I'll start with the defense.

25        MR. DALACK:  Thanks, Judge.

P5DKBAZC1

1          Good morning.  Andrew Dalack, from the Federal

2   Defenders, on behalf of Mr. Bazrouk.  We're also joined this

3   morning by a number of family members of Mr. Bazrouk and

4   friends, including the same family members, immediate family

5   members, who were present before the Court on Wednesday,

6   May 7th.

7          THE COURT:  And they were welcome here on that date,

8   and they're welcome here today, and so is everybody else who's

9   sitting in the courtroom.

10          MR. DALACK:  Thank you, Judge.

11          I'm not going to belabor the point.  The Court has our

12   briefing.

13          I would note that with respect to the updated pretrial

14   services report, there's other information that was added to

15   the pretrial services report in addition to the 2024 arrest in

16   Connecticut.

17          Since the initial report was prepared, Officer King

18   has had an interview to interview the proposed third-party

19   custodians that Judge Aaron imposed as a part of his bail

20   conditions.  The pretrial services report indicates that they

21   would readily qualify as third-party custodians.  They don't

22   have any criminal record of any kind.

23          THE COURT:  Would you indicate where in the updated

24   pretrial services report you're referring to, in addition to

25   the Hartford arrest?

P5DKBAZC1

| | |
|---|---|
| 1 | MR. DALACK:  Sure. |
| 2 | It's on the top of page 2, your Honor.  So, the |
| 3 | bottom -- |
| 4 | THE COURT:  In italics? |
| 5 | MR. DALACK:  Yes, your Honor. |
| 6 | THE COURT:  If you wouldn't mind, we can read that |
| 7 | into the record? |
| 8 | MR. DALACK:  Sure. |
| 9 | It's beginning on the bottom of page 1, first noting |
| 10 | that the information contained within the report was confirmed |
| 11 | by Mr. Bazrouk's older sister, and then the sentence begins |
| 12 | with, "Please be advised that on May 7, 2025, the defendant's |
| 13 | parents," and with your Honor's permission, I would just like |
| 14 | to not name them by name for the record? |
| 15 | THE COURT:  That's fine. |
| 16 | MR. DALACK:  Thank you. |
| 17 | -- "and sister were provided to the Court as potential |
| 18 | third-party custodians.  On May 9, 2025, a record check was |
| 19 | conducted, and no history of arrest was noted for either family |
| 20 | member." |
| 21 | THE COURT:  Okay. |
| 22 | MR. DALACK:  I'm happy -- and the reference to the |
| 23 | arrest in Hartford, Connecticut, your Honor, can be found on |
| 24 | page 4. |
| 25 | THE COURT:  In the chart? |

P5DKBAZC1

1         MR. DALACK:  In the chart, your Honor, yes.

2         I'm happy to answer questions about that case, if your

3    Honor is interested.  I actually had an opportunity to speak

4    with Mr. Bazrouk's attorney out in Connecticut.  He's a

5    gentleman by the name of John Dumeer.  And Mr. Dumeer indicated

6    that in or about March of this year, Mr. Bazrouk was admitted

7    into a diversionary program out in Connecticut in connection

8    with that case, and that because the allegations in this case

9    predate his admission to the diversion program in Connecticut,

10   even though the arrest postdates the admission, the fact of an

11   arrest will not affect his ability to complete that

12   diversionary program because the allegations stem from alleged

13   conduct that predate his admission into the program, and should

14   he satisfactorily complete that program, it's my understanding

15   that the case would be dismissed.

16        THE COURT:  Could you just give me a little more

17   detail how that diversionary program works?  So, was there an

18   indictment in Connecticut, or is there a complaint?

19        MR. DALACK:  I think there was just a complaint, your

20   Honor.  I'm not sure if there was an indictment or not.  But,

21   essentially, the allegations stemmed from Mr. Bazrouk's work in

22   an unlicensed smoke shop, which we had brought up with pretrial

23   services and which was included in the initial report.

24        My understanding is that at the moment, it's as if the

25   case is essentially stayed pending his completion of the

P5DKBAZC1

diversionary program.  If he completes the diversionary program

satisfactorily, then the charges will be dismissed.  That's

what I understand from Mr. Dumeer.

THE COURT:  Are those charges felony charges; do you

know?

MR. DALACK:  I think they are -- well, I know for

certain that the possession of a controlled substance as a

first offense is no longer a felony in Connecticut.

With respect to the operation of a drug factory

charges and possession with intent to dispense hallucinogen,

those may be felony charges, your Honor, but suffice to say,

the takeaway point from Mr. Dumeer was that there's nothing

about the fact of his arrest in this case, given the fact that

the allegations predate March of this year, that would

interrupt or interfere with his ability to complete the

diversionary program.

And I say that to emphasize that point, your Honor,

because there's a lot at stake for Mr. Bazrouk's scrupulous

adherence to whatever conditions the Court sets on bail.  He's

a young man, 20 years old.  As we mentioned in our papers, he's

completing his Associate's degree right now and is scheduled to

begin classes at a full-time college in the fall.  He's also

somebody who doesn't have a prior felony record, and I think

would be somebody who would be given strong consideration from

our district's Young Adult Opportunity Program.  I currently

P5DKBAZC1

1    have five clients, fortunately, in that program, your Honor,

2    with a variety of different charges, stemming from alleged

3    possession of firearms to some pretty serious fraud-related

4    charges.  It's a remarkable program, as I'm sure you're aware,

5    that Judges Abrams and Netburn run.  I don't know how they

6    would deal with an application in this case, but I know that

7    they would give it serious consideration, and that's a strong

8    incentive for Mr. Bazrouk to conform his behavior to whatever

9    conditions the Court sets.

10         Of course, that's in addition to the hefty personal

11   recognizance bond that Judge Aaron prescribed that would be

12   cosigned by three financially responsible cosigners,

13   individuals.  I would add that that's one more cosigner, at our

14   request, than what pretrial asked for and recommended, as is

15   the presence of third-party custodianship, which I understand

16   would impose an affirmative obligation on Mr. Bazrouk's parents

17   to report potential violations to the Court and to pretrial

18   services, so doing a little bit more than what we typically

19   expect of financially cosigners to do in this context.

20         The atmospherics here are definitely challenging, and

21   the allegations are, no doubt, serious.  But home incarceration

22   is certainly sufficient to ameliorate any potential risk to

23   public safety that Mr. Bazrouk poses.  Again, the allegations

24   in this case are really confined to participation in highly

25   emotionally charged protests and interactions with

P5DKBAZC1

1    counterprotesters.  Mr. Bazrouk's participation in those

2    protests, as we outlined in our papers, is motivated by a

3    personal connection to the Israel-Palestine conflict, but if

4    you remove his ability to participate in the protests, then,

5    given the facts and the allegations in this case, there's no

6    realistic possibility that he could pose a risk to public

7    safety.  There's no domestic violence allegations in this case.

8    There's no allegation that any of the activities that are

9    alleged against Mr. Bazrouk were sort of premeditated in the

10   sense that there's no allegation that he went to the protest

11   with an intent or a desire to harm other counterprotesters.  As

12   we mentioned, your Honor, in our papers, it's possible to

13   readily recast some of these allegations as physical

14   altercations between individuals in a highly emotionally

15   charged setting.

16           So if you sort of remove that from the equation,

17   you've sufficiently ameliorated any potential risk to public

18   safety that Mr. Bazrouk could pose.

19           I mentioned in my papers, too, your Honor — and it

20   bears reiteration, I think — I've sort of remarked before,

21   despite my being here at this office for some time, this is one

22   of my first cases in front of your Honor, but I'm well aware of

23   the Court's work and reputation on the back end of criminal

24   cases with respect to postrelease supervision and the Court's

25   use of its background in family court and as a social worker to

P5DKBAZC1

1    really get involved in the lives of the individuals that the

2    Court supervises while on supervised release to ensure the best

3    possible reentry and the best possible reacclimation to

4    society.  I would urge the Court here to take some of those

5    experiences and the skills the Court brings to bear in the

6    postrelease supervision to the frontal end, and I think here,

7    when we're dealing with somebody who is as young as

8    Mr. Bazrouk, that there's a lot of really good important work

9    that the Court can do through sort of biweekly or monthly

10   check-ins that certainly Mr. Bazrouk would readily attend and

11   his family would be enthusiastic about his participation in, as

12   well.

13        The letter from Mr. Bazrouk's sister that we appended

14   to our letter is genuine, heartfelt.  The family is quite

15   devastated over this turn of events.  They're very concerned

16   about their son.  They're very concerned about the place where

17   he is, at MDC Brooklyn, which, as your Honor is well aware, is

18   a terrible facility that's rife with violence and neglect.

19   It's certainly not the place that anybody wants to find

20   themselves in.  But given the fact that the most violence

21   Mr. Bazrouk has ever been accused of committing is physical

22   altercations that didn't result in injury requiring any sort of

23   medical attention, I would submit that, especially given to

24   where he's going to be detained, that detaining him is greater

25   than necessary to reasonably assure both the community's safety

P5DKBAZC1

1    and his future appearance in Court.

2              For all those reasons, we would urge the Court to

3    adopt the conditions that Judge Aaron prescribed and release

4    Mr. Bazrouk on a $150,000 personal recognizance bond, cosigned

5    by three financially responsible people, and have his parents

6    appointed as third-party custodians to a home incarceration.

7              THE COURT:  One administrative point:  I have not

8    seen, just going back to that Connecticut situation, the

9    complaint or the indictment, or whatever it is.  I'll be

10   looking for it.  I imagine you all will, as well.  And if you

11   get it first, so to speak, I'd appreciate it if you send me a

12   copy, and the government should do the same.

13             You haven't looked to see if there's any website or

14   any public way of finding those documents?

15             MR. DALACK:  Admittedly, my experience in Connecticut

16   is limited, your Honor, and I'm not familiar with the sort of

17   WebCrims database that we might have in New York, and I was

18   very grateful to Mr. Dumeer for taking the time -- I think I

19   may have caught him on a trip of his, I think he was on

20   vacation when he called me back.  So I will certainly follow up

21   with Mr. Dumeer and get any sort of charging paperwork.  But

22   one thing that Mr. Dumeer made clear is that he has been

23   admitted to the diversion program, and there's nothing about

24   the arrest --

25             THE COURT:  Yes, yes, I get it.

P5DKBAZC1

1          I believe we do have someone here from pretrial

2    services.

3          If you could just mention your name for the record?

4          MR. KING:  Sure.

5          Officer Akil King.

6          THE COURT:  Are you familiar or have you seen a

7    complaint or indictment in connection with the revision that

8    pretrial services has made to the pretrial services report in

9    this case?

10         MR. KING:  I have not, your Honor.

11         THE COURT:  Okay.

12         MR. DALACK:  Thank you, Judge.

13         THE COURT:  Thank you.

14         MR. ADELSBERG:  Thank you, Judge.

15         Given the fact that the Court has clearly read the

16   memorandum of the government, and defense counsel listened to

17   the transcript, I'll aim to be brief, and aim to particularly

18   address some of the defense's arguments.

19         Your Honor, the defendant here is not charged with

20   atmospherics.  He's charged with multiple crimes of violence

21   based on pernicious and persistent assaults directed at

22   innocent Jewish victims across Manhattan.

23         The defense letter suggests that — this is the

24   language — defense letter says, at page 4 --

25         THE COURT:  Say that again.

P5DKBAZC1

1          MR. ADELSBERG:  The defense letter says, at page 4,

2     that the defendant is "not accused of roaming the streets of

3     New York City looking for and assaulting people who appear to

4     be Jewish or Israeli."  But these assaults all targeted Jews,

5     all targeted Jews expressing their First Amendment rights, all

6     were initiated by the defendant, and all resulted in injury to

7     the victims.

8          Your Honor, a famous saying goes a mistake repeated

9     more than once is a decision.  The defendant made a violent

10    decision not once, not twice, but three times.  Each time, he

11    was arrested and charged, and he went right back to his violent

12    conduct.  How can the Court be assured he will not do so again?

13         The defense also suggests in its letter, and I think

14    defense counsel mentioned it today, too, that these incidents

15    can all be readily recast as physical fights between people.

16    That is not true.  These were physical fights -- these were not

17    physical fights.  These were one-way physical aggression from

18    the defendant toward his victims.  The directionality here is

19    important and suggests, to some degree, a lack of acceptance of

20    responsibility to the facts of these cases.

21         Beyond the persistence and directionality of these

22    assaults, the timing spanned many months and followed, as I

23    mentioned before, numerous other arrests.  This was not a

24    momentary lapse in judgment.  These were deliberate assaults, a

25    pattern of conduct, to terrorize Jewish victims.  It

P5DKBAZC1

1    demonstrates a severe disregard for the law.

2            And the defendant's danger to the community is only

3    underscored by his vocal support for terrorist groups, his

4    avowed hatred for Jews in his private messages --

5            THE COURT:  Can you slow down again?

6            MR. ADELSBERG:  Yes.  Sorry, your Honor.

7            -- his avowed hatred of Jews in his private

8    messages --

9            THE COURT:  In his private messages?

10           MR. ADELSBERG:  In his private messages.

11           -- his history of violent threats and intimidation,

12   and his access to numerous weapons, including weapons found in

13   the search of his apartment.  This included knives, shell

14   casings, a taser, pepper spray, an airsoft gun, brass knuckles.

15   And, in fact, agents found a knife in one of the coats that he

16   was wearing during one of the assaults, meaning during the

17   search at his apartment, the knife was in the coat.  I don't

18   want to imply that they found it at the time of the actual

19   assault.

20           Now, defense here tries to claim that the Court should

21   not consider the defendant's messages, private messages, in its

22   analysis.  It writes, "Without more of a nexus between the

23   messages and his intent on the dates in question, the text

24   messages are of little probative value and do not suggest that

25   he is unbailable."

P5DKBAZC1

1          Your Honor, the government is not required to show

2     that the defendant hurled racial or religious epithets during

3     the assault to meet its burden.  Here, however, the defendant

4     did, in fact, show his religious and racial animus during the

5     assaults.  He made his motivations clear during two of the

6     assaults.  He called his victims Nazis.  During a third, he

7     wore an Hamas headband, aligning himself with a group dedicated

8     to the murder of Jews.

9          Without addressing these statements by the defendant,

10    the defense just tries to minimize the probative value of these

11    messages and his client's support for terrorist groups.

12         I'd submit, your Honor, that private messages are more

13    probative of the defendant's state of mind and propensity for

14    future dangerousness than his able lawyer's polished arguments.

15         Your Honor, I won't belabor some of the other points

16    that we raised below.  I would just say two quick last things.

17         One, the defense counsel is arguing home incarceration

18    here would be sufficient for the defendant.  I would say a

19    couple of things to that.

20         One, the defendant was living in that home at the time

21    that he committed these prior assaults.  It was in that home

22    that he framed a picture -- I think this is actually quite a

23    salient point.  In his room, there's a picture, a framed

24    picture, of him being arrested.  This was not someone who's

25    ashamed by being arrested.  This is someone who took pride in

P5DKBAZC1

being arrested, being arrested multiple times, including for
the assaults alleged in this case.

He's shown an unwillingness to abide by court
intervention by being arrested and still going out and
committing these crimes.  Your Honor mentioned the Hartford
arrest.  That arrest occurred nine days after the assault right
next to Columbia's campus.

THE COURT:  Say that again?

MR. ADELSBERG:  Sorry.  The arrest in Hartford — and I
believe we've sent whatever documentation we have of that
arrest to chambers — that occurred --

THE COURT:  Did you do that --

MR. ADELSBERG:  We did it just now.

THE COURT:  I haven't seen any.

MR. ADELSBERG:  Once your Honor asked questions about
it, we sent it over.

That was approximately nine days after the assault
that occurred at Columbia.  And our understanding, also from
just some quick phone research, is that at least two of the
charges there are felonies.

Your Honor, taken together, our position is that the
defendant, because of his conduct, because of his history of a
dozen-plus arrests at a fairly young age, our position is that
there is no combination of conditions that can assure the
safety of the community and defendant's presence in court.

P5DKBAZC1

1              THE COURT:  All right.  I have a couple of

2    questions --

3              MR. ADELSBERG:  Yes.

4              THE COURT:  -- for you and one or two of them also

5    where the defense can respond.

6              In your submissions, are the dozen or so arrests all

7    presented in the written materials?  I know, of course, there

8    were three, let's say, but you said 12.

9              Are they documented in your submission?

10             MR. ADELSBERG:  Your Honor, we highlighted some of

11   them, not all of them.  Some of them, that's because we

12   couldn't get all the records relating to them.  Some of them,

13   you know, in full candor to the Court, weren't that serious.

14   There was a shoplifting arrest in there.  We just didn't feel

15   that that was incredibly probative to the Court in its analysis

16   right now.

17             We did highlight some, and, again, these are arrests

18   we're still trying to get the underlying records.  At the very

19   least, though, irrespective of what happened with the arrests,

20   to us, what it shows is that the defendant has had many

21   interactions with the criminal justice system, and those

22   interactions have not, in any way, sent a message to the

23   defendant that he should be law-abiding, that he should

24   actually follow the law, he should follow the Court's orders.

25   So, irrespective of the disposition of those, our position is

P5DKBAZC1

1    that being 20 years old and having 12 arrests suggests you're

2    someone who's going to have a real hard time following rules.

3    And what is pretrial supervision?  Following rules.

4              THE COURT:  Okay.  I have two more questions for you.

5              You mentioned, in your oral remarks this morning,

6    items found in his apartment.  I think that's what you said.  I

7    was a little bit surprised that you omitted to say that there

8    was $500,000 in cash in that apartment, and I think under the

9    custody, as it were, or however you phrased it, of the

10   defendant.

11             Is that right?  Any reason for not mentioning the

12   $500,000?

13             MR. ADELSBERG:  No, your Honor.  I was making more of

14   a dangerousness argument in that -- during that sort of string

15   of argument, so I didn't mean to leave it out.  The agents,

16   during the search, found at least 500,000.  I actually think it

17   was considerably more.  There's just a part of the safe that we

18   couldn't open at this stage, but, at this stage, we've already

19   counted $500,000.

20             THE COURT:  And you think there's more?

21             MR. ADELSBERG:  We think there's more.  I don't want

22   to give an exact amount because we haven't gotten into that

23   part of the safe yet, but that is an incredible amount of money

24   of cash to have on hand.  It suggests, at the very least, even

25   though now it has been seized, that the defendant has access to

P5DKBAZC1

1    that kind of money some way.  He had access, he maybe has

2    access to associates, who can derive similar sums of cash.  It

3    suggests to us that he, despite any arrangements the Court

4    makes, poses a risk of flight, as well.  Again, I only didn't

5    mention it because I was talking about dangerousness during

6    that point in my argument.

7              THE COURT:  Something else that I'm interested in:

8    Throughout the papers, the government and the defense, there

9    were at least several references to orders of protection,

10   which, as I understood it, were orders of protection against

11   the defendant.

12             Unless I missed it, there's really no narrative

13   explaining who got the order of protection against whom, and

14   when, and why, and I think that would be very useful

15   information, if you have it --

16             MR. ADELSBERG:  Yes, your Honor.

17             THE COURT:  -- and make that available.

18             MR. ADELSBERG:  And I will let defense counsel and

19   Officer King correct me if I am wrong here.  My understanding

20   is those orders of protection are connected to the underlying

21   incidents in this case.  They were charged in the state.

22   Orders of protection were issued for the victims, to protect

23   the victims in those cases.  And so those, in some ways, are

24   connected to the instant charges in that they protect the

25   victims now in the federal case, as well as the state case.

P5DKBAZC1

| | |
|---|---|
| 1 | THE COURT:  Yes.  Well, I assumed something like that, |
| 2 | but rather than assuming it, I would like to see the written |
| 3 | records that support it, as I say, when the order of protection |
| 4 | was taken, who took it out, and are they all against the |
| 5 | defendant?  And what are the terms of the order of protection, |
| 6 | as well? |
| 7 | MR. ADELSBERG:  Based on what's written in the |
| 8 | pretrial services report, I assume you've read that. |
| 9 | THE COURT:  Yes. |
| 10 | MR. ADELSBERG:  We can obtain the actual orders of |
| 11 | protection. |
| 12 | THE COURT:  I would think so. |
| 13 | MR. ADELSBERG:  I can say that based on an initial |
| 14 | conversation just with the ADA on the case, that that was my |
| 15 | understanding from him, that these were issued pursuant to the |
| 16 | charges in that case to protect the victims in those underlying |
| 17 | assaults. |
| 18 | THE COURT:  So, in this case, where there are three |
| 19 | counts, I think there are more than three orders of protection, |
| 20 | if I added them up correctly, or are there only three? |
| 21 | MR. DALACK:  Your Honor, forgive me, there's only two |
| 22 | active orders of protection that both appear to arise from the |
| 23 | arrests from December of last year and January of this year |
| 24 | that are coextensive with Counts -- |
| 25 | THE COURT:  Not April of 2024? |

P5DKBAZC1

```
1              MR. DALACK:  Sorry, I didn't mean to interrupt you,

2    your Honor.

3              THE COURT:  Were there others that dissolved?  Are

4    there other orders of protection, or were there only related to

5    December and January, December of 2024 and January of 2025?

6              MR. DALACK:  My understanding is that's correct, your

7    Honor, that it's just the two that relate back to December of

8    '24 and January of '25.

9              THE COURT:  It would be useful to see the backup --

10             MR. ADELSBERG:  Yes.

11             THE COURT:  -- on those.

12             MR. ADELSBERG:  We can obtain those, your Honor.

13             THE COURT:  Okay.

14             MR. ADELSBERG:  Thank you, Judge.

15             MR. DALACK:  I appreciate your Honor --

16             THE COURT:  Counsel, you'll get the last word.

17             MR. DALACK:  Thank you.

18             And I'm obviously — perhaps not so obviously — but a

19   little bit reluctant to get into the details of the case

20   because I haven't received discovery or any additional

21   information about the allegations beyond what's contained in

22   the government's filings.  But I'll say that with respect to

23   the weight of the evidence, I don't know if acceptance of

24   responsibility is something that the Court can and should take

25   into consideration in the context of a bail hearing, and,
```

P5DKBAZC1

```
1    obviously, Mr. Bazrouk is presumed innocent.  We're happy to

2    discuss with the government the possibility of a pretrial

3    disposition, but it's still very early, and nothing about sort

4    of our presentation or what we've put in writing at all

5    suggests any sort of refusal by Mr. Bazrouk or his family to

6    take this very seriously.  Quite the opposite, they're taking

7    it extremely seriously, and they're willing to put their entire

8    livelihoods on the line.

9            THE COURT:  And, of course, as you point out, at this

10   stage, the defendant is presumed to be innocent from all of

11   this, so to speak, the pending counts.

12           MR. DALACK:  Yes, Judge.

13           THE COURT:  And I'm sure everybody in this court is

14   aware of that concept.  I certainly am.

15           MR. DALACK:  Thank you, Judge.

16           We did mention, however, in our moving papers — and I

17   think in light of government counsel's arguments, it's worth

18   drawing attention to these two points — when the government

19   says that these were incidents that were initiated by the

20   defendant, I think that's not readily apparent from public

21   reporting and from the other contexts of the alleged incidents.

22           So, for example, with respect to the April '24

23   allegations, in the government's moving papers and based on the

24   photograph that they provided, it's very clear that Mr. Bazrouk

25   was being escorted out of the protest in handcuffs by the NYPD
```

P5DKBAZC1

   1    when he allegedly kicked somebody in the chest.  It's our

   2    position, on information and belief, that as he was being

   3    escorted to the police car, there were counterprotesters

   4    jeering at him and trying to engage with him while he was in

   5    police custody.  It's hard to say when somebody's in handcuffs

   6    by the NYPD that they're initiating any sort of interaction

   7    after that.

   8            Similarly, with respect to the December incident, your

   9    Honor, the individual complainant in that case -- that event

  10    was covered pretty widely in the press by, in particular, the

  11    Columbia Spectator.  The NYPD spokesperson, who announced the

  12    arrest of Mr. Bazrouk in December of last year, made very clear

  13    that the complainant in that case initiated, through a verbal

  14    dispute, and that that person was, essentially -- I think it

  15    sort of belies the government's argument that Mr. Bazrouk was

  16    out there targeting particular counterprotesters.  By the NYPD

  17    spokesperson's own admission, this individual began to engage

  18    with Mr. Bazrouk on his own.

  19            With respect to the third incident, we've been able to

  20    do a little bit of investigation in the last few days, and it

  21    would appear that the individual complainant who was involved

  22    in the third count may very well be, in fact, associated with

  23    an organization that's called Betar, which is a --

  24            THE COURT:  Could you spell that for the court

  25    reporter --

P5DKBAZC1

1          MR. DALACK:  Sure.

2          THE COURT:  -- and for me?

3          MR. DALACK:  No problem, your Honor.

4     B-e-t-a-r.

5          That's a particularly well-known, right-wing

6     organization in the United States that's classified as a hate

7     group, to my understanding, by the Anti-Defamation League, and

8     I do have a video that I found that I could provide to the

9     Court upon request, where that particular complainant is

10    standing outside of the police precinct on the date of

11    Mr. Bazrouk's arrest in January, giving an expletive-laden

12    speech about what occurred a couple of days before.

13         So, I say this because this is complicated, and it's

14    messy, and it's not as clear-cut as the government is

15    presenting it to be.  So when I talk about these incidents

16    being recast as physical altercations between people in an

17    emotionally charged setting, I think that is very accurate.

18    And, again, if, at some point, there's a trial, it certainly

19    would be a defense to the charges that if there was some other

20    reason to provoke a physical altercation between Mr. Bazrouk

21    and these three individuals, besides their perceived ethnicity

22    or religion, that that would be exculpatory and a reason to

23    acquit.

24         And, lastly, your Honor, I don't really know what to

25    make of the government's argument that he had a picture of

P5DKBAZC1

1   himself being arrested hanging in his room.  I just don't think

2   that that's particularly probative.  So I would urge the Court

3   to not really give that too much weight in the calculus here.

4   I would sort of note that President Trump has a picture of his

5   mugshot from his arrest in Atlanta, Georgia, hanging

6   prominently in the White House.  It certainly doesn't

7   necessarily suggest that President Trump has a disregard to the

8   law or is gloating about his arrest.  But, again, I just don't

9   think that that's particularly relevant, here or there.

10          And then with respect to being a rule-follower, we're

11   not operating on a clean slate here.  Mr. Bazrouk has been

12   facing overlapping charges in state court for the past

13   six months, and he's appeared to court, as directed, in

14   connection with those matters.  He's been bailed without

15   incident since both December and January in connection with

16   those matters.  I've been in touch with his Legal Aid attorney,

17   who reports to me that Mr. Bazrouk takes those cases extremely

18   seriously.  He comes to her office when she asks him to come.

19   His family is extremely responsive and engaging with her.

20   There's absolutely no indication on the present record that

21   with a very strictly home incarceration regime, backed by

22   third-party custodianship enforced by a 150,000 personal

23   recognizance bond cosigned by three people, that Mr. Bazrouk

24   would not show up to court as directed or would pose a threat

25   to public safety.

P5DKBAZC1

1          So, for all those reasons, the Court should affirm

2    Judge Aaron's decision on May 7th, and bail Mr. Bazrouk.

3          Thank you.

4          MR. ADELSBERG:  Your Honor, can I have one point, your

5    Honor?  Your Honor, I just want -- I think defense counsel

6    grossly mischaracterized the nature of these assaults in his

7    presentation.  I can go one by one.  But I just want to say, as

8    our papers laid out, in the first assault, the defendant was

9    arrested after he lunged at protesters.  He being jeered at,

10   even if that's true, is not an excuse to go ahead and kick

11   someone in the stomach.

12         During the second assault, I'm not sure what NYPD

13   spokesperson said what.  There's video, and it shows that the

14   defendant snuck up on someone and sucker punched him in the

15   face.

16         And the third assault, I mean, with defense counsel

17   here is doing is a character assault of a witness at this stage

18   in the proceedings when, again, the defendant was identified as

19   being a part of that assault, he initiated the assault, and he

20   was -- he admits -- he sort of alludes to it on video, as well.

21         So I just think that the characterization there,

22   I just didn't want to leave that as is, and I'll leave it

23   there, your Honor.

24         THE COURT:  Yes, okay.  Hold on for one second.

25         MR. DALACK:  Thank you, Judge.

P5DKBAZC1

1          (Pause)

2          THE COURT:  My question is related to the issues that

3    I mentioned before.  How long do you think it would take to get

4    the indictment or the complaint, or whatever it is, in

5    connection with the Hartford case, number one?

6          And, number two, I also want to see more detail with

7    respect to all orders of protection that are related to the

8    three counts here, or even beyond, if there's more than three.

9          How long do you think that will take?  Do you want to

10   confer with each other?

11         MR. DALACK:  It's just the two orders of protection,

12   Judge, and I'm confident that we can obtain those.  I can also

13   I'll speak with government counsel, but we can speak with his

14   state attorney in Connecticut today to provide those papers as

15   soon as possible.

16         THE COURT:  Are you sure it's only two orders of

17   protection?  I don't remember definitively, but I thought, from

18   what I recollect, it seemed like there were more than two.

19         MR. DALACK:  My primary source of information is just

20   from the pretrial report, at the bottom of page 4, your Honor,

21   which refers to two active orders of protection.

22         THE COURT:  Two active?

23         MR. DALACK:  Right.

24         THE COURT:  But were there others that terminated

25   or --

P5DKBAZC1

1            MR. DALACK:  I'm not aware of any others that were

2    terminated or lodged.  I'm not aware, also, of any other

3    state-related charges arising from the allegations from April

4    of 2024.

5            So, my understanding is the two orders of protection

6    in place stem from the December and January allegations, which

7    are coextensive with Counts Two and Three.

8            THE COURT:  Okay.

9            Actually, I would hold off with a ruling until I see

10   that because it might have some impact.  I'd certainly like to

11   at least read it, read them, before I give you a ruling.

12           MR. DALACK:  Okay, your Honor.

13           THE COURT:  I'm just trying to figure out how long it

14   would take you all to get that.

15           MR. DALACK:  Could I confer with government counsel --

16           THE COURT:  Yes, sure.

17           MR. DALACK:  -- and Mr. King.

18           (Pause)

19           MR. DALACK:  Thank you, Judge.

20           THE COURT:  Yes.

21           MR. ADELSBERG:  Your Honor, the parties and pretrial

22   will endeavor, right after this, to get both the two orders of

23   protection highlighted in the pretrial services report.  We

24   understand that there are prior orders of protection that may

25   have expired.

P5DKBAZC1

1              THE COURT:  That's my sense.

2              MR. ADELSBERG:  So, am I hearing, your Honor, you also

3    want to see those as well?

4              THE COURT:  Yes, if they relate to this case, yes.

5              MR. ADELSBERG:  They may not relate to this case,

6    but --

7              THE COURT:  I'll see them anyway.

8              MR. ADELSBERG:  Right.

9              And, then, for the Hartford arrest, we've sent what we

10   have so far, but we will all, using our collective resources,

11   try to find more.  Our proposal would be that -- it's

12   approximately almost 11:00 o'clock right now.  We can update

13   the Court by noon with what we have, if not sooner.  My

14   understanding is defense counsel has some travel today, and so

15   I don't know if that impacts how we proceed.

16             THE COURT:  So here's what I was going to offer you.

17   I don't know if this works.  I am eager to move things along.

18   If I had all the material, I would recall you by, say, 3:30

19   today, or 2:30 tomorrow.  Do you think that gives you enough

20   time for --

21             MR. DALACK:  I don't mean to be difficult, Judge.  I

22   am scheduled to participate -- I have an appointment at the

23   Supermax prison tomorrow in Florence, Colorado, and then I'm

24   attending a capital training in Boulder after that.  So my

25   ability to appear is very limited beyond the next couple of

P5DKBAZC1

1    hours.

2           But, that being said, I think what I would propose is

3    we're happy to, obviously, get the Court as much additional

4    paperwork as possible on the Hartford case and on the full

5    scope of the orders of protection.  I would just note, for the

6    purposes of the record here, I'm not aware — and I don't

7    believe that pretrial is in any possession or the government —

8    of any indication that Mr. Bazrouk has ever violated an order

9    of protection, either one that has previously expired or in

10   connection with the ones that were issued by the state court

11   here, and I think that fact should weigh favorably towards

12   bailing Mr. Bazrouk.

13          And then, again, with respect to the charges out in

14   Connecticut, we will get the charging instruments to the Court,

15   of course, but we just want to reiterate the fact that he is in

16   a diversionary program there now, that if satisfactorily

17   completed --

18          THE COURT:  No, no, I got that; I heard it.  But I'd

19   like to know diverted from what.

20          MR. DALACK:  Understood.

21          THE COURT:  You know what I mean?

22          MR. DALACK:  Understood.

23          My understanding, from Mr. Dumeer, is that was

24   diverted from the charges that were set forth in the --

25          THE COURT:  No, no --

P5DKBAZC2

1          MR. DALACK:  We'll get this to the Court before noon,

2     and if it's acceptable to the Court, if you have additional

3     questions, I'm happy to be available up until --

4          THE COURT:  You really think I'll have this by noon?

5     It's five to 11:00 now.

6          MR. DALACK:  I'm going to make this my sole focus for

7     the next hour, Judge.  I'll work with pretrial and government

8     counsel, and we can get something to the Court.

9          THE COURT:  All right.  So we'll adjourn until

10    12:00 o'clock and see you back here then --

11         MR. DALACK:  Okay.

12         THE COURT:  -- at that time.

13         MR. DALACK:  Thanks, Judge.

14         (Recess)

15         THE COURT:  So I have received a series of documents

16    pertinent to our case, and I have reviewed them.

17         I think, for purposes of today, I would ask either the

18    government or the defense to just walk through — because you

19    have these documents, as well — just identify what they are for

20    the record.

21         Is that okay?

22         MR. DALACK:  Sure.  I'm happy to do that, your Honor.

23         THE COURT:  Okay.

24         MR. DALACK:  I understand that the first is a document

25    from pretrial services, and that sets forth a summary of any of

P5DKBAZC2

```
1    the orders of protection that had been issued in connection

2    with Mr. Bazrouk.

3              THE COURT:  Right.  It's dated May 13, 2025?

4              MR. DALACK:  Yes.

5              THE COURT:  And it's from, as you point out,

6    Akil King, pretrial services officer, right?

7              MR. DALACK:  Yes.

8              And I would note, just in relation to that report from

9    Officer King, the government transmitted to your Honor two

10   documents reflecting the actual orders of protection that have

11   been issued in connection with Counts Two and Three in the

12   state case.  So your Honor has them, as well, and I have them,

13   too.  And then the government also transmitted a police report

14   that addresses --

15             THE COURT:  Yes.

16             MR. DALACK:  -- the circumstances surrounding the

17   order of protection at issue from 2023.  I'll start there

18   because I think we've identified the basis for the orders of

19   protection for Counts Two and Three that relate back to the

20   December and January allegations.

21             THE COURT:  Okay.

22             MR. DALACK:  With respect to the now-expired order of

23   protection from February of 2023, it's worth noting, first,

24   that Mr. Bazrouk was a minor at the time that these were

25   issued.  My understanding --
```

P5DKBAZC2

1              THE COURT:  Your client?

2              MR. DALACK:  Exactly, my client, yes.

3              And that the order of protection, there was a

4    companion order of protection issued against the other

5    individual, who I'll just identify by initials, AB, who's a

6    relative of my client.  Based on just the police report, and

7    that's all I really have, that your Honor has as well, there

8    seemed to be some sort of a verbal, or at least alleged, some

9    sort of a verbal altercation that got a little bit physical,

10   but I would just note that the person at issue in that order of

11   protection is in the courtroom here today.  It's Mr. Bazrouk's

12   uncle, my client's uncle.  He's here, he's supportive.

13             THE COURT:  And he lives at the same residence as --

14             MR. DALACK:  At the time, he did, your Honor.

15             THE COURT:  He did then?

16             MR. DALACK:  Yes.

17             THE COURT:  Not now?

18             MR. DALACK:  I'm not sure what the circumstances are

19   now, but they're on completely fine terms, and no charges came

20   from that order of protection.  There were no assault charges

21   lodged beyond just the problems of an order of protection.

22   There's no indication that it resulted in any sort of

23   conviction or charge whatsoever.

24             THE COURT:  For my own edification, I believe in the

25   pretrial services report — I think this is where it came from —

P5DKBAZC2

```
1    it identifies that he, your client, lives at address X along

2    with his mother, father, uncle, and siblings?

3              MR. DALACK:  Yes.  It's possible that the uncle is

4    there temporarily here and there.

5              THE COURT:  Or it could be another uncle, I suppose.

6              MR. DALACK:  But the more important point is that it's

7    an incident that occurred when my client was a minor.  It

8    didn't result in any sort of criminal charges.  There was also

9    an order of protection that was issued against AB that ordered

10   him to not have contact with my client.  It all sort of got

11   resolved favorably.  And it's entirely possible that this is

12   the same person who is currently residing with Mr. Bazrouk,

13   without incident.

14             THE COURT:  Okay.

15             MR. DALACK:  So that's the --

16             THE COURT:  Let him finish.

17             MR. ADELSBERG:  Okay.

18             MR. DALACK:  I would just say, your Honor, that,

19   certainly, I think the Court was primarily concerned with

20   whether or not there was any other outstanding order of

21   protection or expired order of protection that dealt with any

22   of the other allegations in this case, and there is none.  So

23   there does not appear to have been any order of protection

24   issued in connection with the April 2024 incident, and the only

25   other order of protection at issue is with a family member that
```

P5DKBAZC2

1   has since been addressed, and it's a nonissue.

2           THE COURT:  Well, for me anyway, it's a background.  I

3   won't say it's insignificant.  I mean, if there's an order of

4   protection, that's why I wanted to flesh it out, find out -- it

5   may not relate to the three counts --

6           MR. DALACK:  Right.

7           THE COURT:  -- in the government's indictment here,

8   and, in fact, it doesn't, apparently.

9           MR. DALACK:  Right.

10          THE COURT:  But it has relevance to me.

11          MR. DALACK:  Understood.

12          THE COURT:  That's all.

13          MR. DALACK:  I think as far as the relevance is

14  concerned, and given the Court's background in family court as

15  well, I'm sure your Honor has seen a lot of circumstances in

16  which sometimes family members can --

17          THE COURT:  I get it.

18          MR. DALACK:  -- have issues with one another, and I

19  think the fact that at the time, Mr. Bazrouk was a minor, and

20  it didn't ultimately escalate or go anywhere, diminishes the

21  sort of probative value of this particular fact.

22          With respect to the balance of the documentation,

23  there is a charge sheet that the government submitted to the

24  Court with respect to the allegations in Connecticut.  Those

25  reflect -- I think they are identical, essentially, in nature

P5DKBAZC2

1    to the charge sheet that I sent the Court that I received from

2    Mr. Dumeer.  I should note for the record that Mr. Bazrouk's

3    state attorney in Connecticut is Brian Dumeer.  I had said John

4    before, and that was my mistake.  But it's clear from the

5    document that the government sent, which essentially is an

6    unusual occurrence report -- by the way, I was able to confirm

7    with Mr. Dumeer that there are no indictments in Connecticut,

8    which was something that I wasn't familiar with before, so that

9    the case was not indicted, but that the charges pending against

10   Mr. Bazrouk are misdemeanor possession of narcotics and --

11   forgive me, your Honor, I'll read exactly what it is from the

12   information.

13        So, it's possession of a controlled substance, first

14   offense, which is an A misdemeanor; possession with intent to

15   distribute hallucinogens, which is an unclassified felony; and

16   then operation of a so-called drug factory, which is an

17   E felony.  Mr. Dumeer made clear that all of these three

18   charges arise from Mr. Bazrouk's alleged employment in an

19   unlicensed smoke shop in Connecticut, and that, assuming he's

20   able to complete the diversionary program that he's in right

21   now, all of those charges will be dismissed with prejudice in

22   March of next year.

23        So, I think that underscores my point about how much

24   Mr. Bazrouk has at stake to abide by any orders and conditions

25   that the Court sets.  It's not only highly relevant to a

P5DKBAZC2

potential outcome and what he could face in this case, but it's
also material and relevant to a favorable outcome in these
pending state charges, that arise solely out of his employment
at an unlicensed smoke shop.

THE COURT:  So this Hartford Police Department unusual
occurrence report says, among other things, that the resale
value of the seized products totaled an approximate of $25,000;
one suspect was arrested.

So, I think that's helpful information.  It does not
account for the $500,000 in cash that was found in
Mr. Bazrouk's safe, or wherever he had control over.  So that
still leaves me wondering, I have to say, where did the
$500,000 -- I'm not asking you to answer the question, but this
report, which accounts for 25,000, does not account for
$500,000 in cash.

MR. DALACK:  I can direct that more on point, your
Honor, and forgive me for not doing so in the first instance
earlier this morning.

We had brought this up with pretrial services in the
interview, and this was a fact that was squarely before
Judge Aaron in the bail argument from May 7th.  Again, at the
risk of causing Mr. Bazrouk prejudice on the Connecticut case,
but I think we're here to be as candid as possible with the
Court, obviously, as we explained to Judge Aaron during the
presentment, that's money that was attributed to the -- he had

P5DKBAZC2

1    worked at that smoke shop for a couple of years, and it's a

2    cash business.  And so --

3              THE COURT:  $500,000 in cash?

4              MR. DALACK:  I understand that it's --

5              THE COURT:  Over two years?

6              MR. DALACK:  It's a substantial sum of money, your

7    Honor.  It's a cash business, and it was an unlicensed smoke

8    shop, akin to the kinds of smoke shops that we had seen that

9    were ubiquitous about New York City before the state Attorney

10   General's Office cracked down on the unlicensed smoke shops and

11   closed them down.

12             I understand exactly -- forgive me.

13             THE COURT:  I don't quite understand.  So, you say

14   that Mr. Bazrouk, that was his enterprise?

15             MR. DALACK:  Not his enterprise.

16             THE COURT:  The smoke shop?

17             MR. DALACK:  He was working there, your Honor.

18             THE COURT:  So he was an employee — I'll say it

19   again — he was an employee in this unlicensed smoke shop, and

20   that's how he amassed $500,000 in cash?  That's my question.

21             MR. DALACK:  Yes, over --

22             THE COURT:  It's rhetorical.

23             MR. DALACK:  Understood.

24             And over a period of two or three years, Judge.

25   Again, I would note that with respect to the money — and I get

P5DKBAZC2

1    why that would give the Court pause, and we had addressed this,

2    obviously, with Judge Aaron — that money has been seized.

3    There's no ability at this point, no mechanism that I can think

4    of, for Mr. Bazrouk to obtain that money or to put it to any

5    use or purpose.  It will be forfeited.

6              THE COURT:  Yes.  And we learned this morning that

7    there may be more.

8              MR. DALACK:  Well, again, I would note that this is a

9    discussion -- that was the first that I had heard of that, this

10   morning.  I would note for the record that when Mr. Bazrouk was

11   being booked and processed by the FBI in connection with this

12   case, they had asked the family about the safe.  The family was

13   very candid with the FBI, again, to show that they're willing

14   to be cooperative with authorities.  They explained that that's

15   a safe that was in Mr. Bazrouk's room.  The agents who were

16   booking Mr. Bazrouk asked him for the passcode to the safe, and

17   he gave it to them.

18             THE COURT:  Yes.

19             MR. DALACK:  There might be -- to the extent the

20   government may seek to use that in any sort of a trial, there

21   might be a suppression motion lurking there, to the extent

22   Mr. Bazrouk was not *Mirandized* before the agents asked him for

23   the passcode.  Be that as it may, though, I think, for the

24   purposes of today's proceedings, the fact that he answered the

25   agents and gave them the passcode, I think, weighs in his

P5DKBAZC2

1    favor, cuts in his favor.  If they need more assistance getting

2    into the safe because they're curious about what else is in the

3    safe, I'm happy to have that discussion with the prosecutors

4    here.  But the money was seized.  That was something that

5    Judge Aaron considered.

6            THE COURT:  I read the transcript, and I didn't really

7    see any discussion about -- I know that there was $500,000 in

8    cash, but as to its significance or whatever, I didn't see

9    any -- frankly, I didn't see any conversation at all.

10           MR. DALACK:  There was one particular exchange, your

11   Honor, between Judge Aaron and the prosecutors.  And that

12   exchange revolved around what, if any, significance the half a

13   million dollars in cash has on the Court's risk of flight

14   analysis.

15           THE COURT:  That is precisely what I have in mind.

16           MR. DALACK:  Yes.  And Judge Aaron pointedly asked the

17   government:  It's been seized, it's not going back to him?  And

18   the government had raised the half a million dollars cash in

19   support of their argument as to risk of flight.  Judge Aaron

20   pointedly considered it and said, well, it's been seized, and

21   obviously considered that fact in arriving at the conclusion

22   that home incarceration, enforced by a hefty personal

23   recognizance bond and third-party custodianship, was sufficient

24   to ameliorate any concerns related to the money, particularly

25   given the fact that it's gone, and it's never coming back.

P5DKBAZC2

1          THE COURT:  I'm not sure I agree with you about the

2     implications of it, but I get it.  I think that is what the

3     discussion was.  I have to say, it's still on my mind.  I'm

4     still trying to figure out how did a part-time employee in a

5     Hartford unlicensed smoke shop accumulate $500,000 in cash in

6     two years, the way I read all the papers.  Unlike the analysis

7     of it in the magistrate judge's court, I think it's a

8     significant -- it's a reality, and I --

9          MR. DALACK:  It's a reality, of course, and we're not

10    trying to pull away from it.

11         THE COURT:  I'm not suggesting you are, but --

12         MR. DALACK:  I would point to --

13         THE COURT:  -- I think when people go and read the

14    transcript of today, they'll think differently, and I just want

15    to be open and candid with all of you that I think it's a

16    significant number.  I don't know exactly what to make of it,

17    where it came from, or where it was going.

18         MR. DALACK:  I have two quick responses to that, your

19    Honor.

20         THE COURT:  Yes.

21         MR. DALACK:  The first is:  In the pretrial interview,

22    Mr. Bazrouk disclosed to the pretrial officer that he was

23    approximately making about $5,000 a week at that unlicensed

24    smoke shop.  Again, to the extent that that's --

25         THE COURT:  I saw that.

P5DKBAZC2

1          MR. DALACK:  -- unlicensed, untaxed --

2          THE COURT:  I did see that, I did see that.  It's a

3   good business, I guess, then.

4          MR. DALACK:  Again, if we were here on a drug-related

5   charge, I would submit, the Court has seen a number of

6   drug-related charges in this district where individuals in the

7   position like Mr. Bazrouk's, who don't have a prior felony

8   record and who find themselves caught up in either a

9   substantial amount of drug-related currency, in the hundreds of

10  thousands of dollars range, or caught with a substantial amount

11  of drugs, so as to trigger (b)(1)(A) weight mandatory minimums,

12  are routinely bailed in this district on conditions, oftentimes

13  with the consent of the government.

14          So that point alone, your Honor, while I get why it

15  would give the Court pause and why it is something that the

16  Court is certainly considering and mulling over, I think that

17  it has diminishing probative value because of the fact that the

18  money has been seized, he gave it up, essentially, to law

19  enforcement when they asked about it, your Honor.  That was not

20  a situation where he resisted or fought the agents on giving

21  up --

22          THE COURT:  Yes, yes, I know what you're saying.

23          The pretrial services report says that Mr. Bazrouk has

24  a $3,000 net worth.  It says he's unemployed.  It says he is

25  supported by his family.  That's how he survives, right?  I

P5DKBAZC2

1    don't want to beat a dead horse, but, to me, that is thoroughly

2    inconsistent with having a safe upstairs or in your bedroom, or

3    whatever, with $500,000 in cash.

4         MR. DALACK:  But there's no tension there in the

5    report, though, Judge, because, ultimately, Mr. Bazrouk did

6    talk to the pretrial officer about his work in the unlicensed

7    smoke shop and told him about the weekly earnings there that,

8    if sort of extrapolated out, would come up to roughly about a

9    half million dollars.  So, I think part of the challenge with

10   some of these pretrial interviews — and I will be even more

11   candid — when there are circumstances where a person comes in,

12   and you have just met them, and there might be some other

13   uncharged criminal conduct in the background, it's difficult to

14   make a judgment call in the moment about how sort of candid you

15   should be with pretrial services about that uncharged criminal

16   conduct.  But I think, here, that weighs favorably in support

17   of bail because we were open with pretrial services about the

18   work at the smoke shop and the money that he was making at the

19   smoke shop, which was a fact that was brought before

20   Judge Aaron.

21        The fact that it was seized, and that Mr. Bazrouk is

22   not going to reobtain it, cuts against the idea that it

23   presents so much of a risk of flight, that he can't be bailed

24   under some -- the most strict conditions available to pretrial

25   services.

P5DKBAZC2

1          THE COURT:  Okay.

2          I'll hear from the government.

3          MR. ADELSBERG:  Thank you, your Honor.

4          Two things:

5          First, I just want to go back quickly to the 2023

6     incident, the domestic violence incident.  I believe defense

7     counsel said, on several occasions, that the defendant was a

8     minor.  Our understanding is he was not a minor at the time.

9     This occurred in February 2023.  That makes -- he would have

10    been 18, and that order was actually extended thereafter later

11    that year.

12         More crucially — and we apologize, your Honor, we

13    honestly were not focusing as much on the Hartford arrest until

14    your Honor raised it today — once we got to court, we have

15    paralegals in our office who have been searching the

16    defendant's phone for anything related to this arrest.  We have

17    since -- you can see the timestamp, we just got it while we

18    were in court.  We sent it to chambers and to defense counsel.

19    There are two separate text exchanges between the defendant and

20    another individual in January of 2025.  So that's approximately

21    a month after his arrest in Hartford in December 2024.

22         In both of those exchanges, it's very clear that the

23    defendant is still dealing in marijuana.  He says, when can you

24    deliver, after a bunch of pictures of what, quite clearly,

25    appears to be marijuana.  In the second exchange, which we've

P5DKBAZC2

sent chambers and defense counsel, the defendant himself asks

for the prices for -- what's the prices for these, he writes,

and then lists a bunch of what appear to be strands of

marijuana, which include Air Bud and other terms that seem

quite clear to refer to marijuana.

We're not raising this because we think he's a danger

to the community because he deals in marijuana.  We're raising

this because, to us, it suggests three things:

One, the defendant is not deterred by arrest.

THE COURT:  Is not?

MR. ADELSBERG:  He is not deterred by arrest.

That's true with his assaults, it's true with his drug

charges, and, honestly, that, I think, just is a thread that

goes throughout this case, is that the defendant has not showed

that he changes his conduct after interactions with the

criminal justice system, with police officers, with judges,

with lawyers.  It just does not change his calculus.

Two, I think it suggests he still has the ability to

earn money.  Even after his $25,000 and a lot of his product

was seized, he's still out there doing business.  It suggests

that tomorrow, he can still do that again.  Yes, he doesn't

have the money in his safe, but can he get more money?  It

seems he still has contacts, it seems he still has at least the

wherewithal to raise serious money, if that was something he

wanted to do.

P5DKBAZC2

1              And then, three, defense counsel spent a good deal of

2      time earlier this morning talking about the diversion program

3      that the defendant was participating in in Connecticut.  Our

4      understanding is that this conduct has not been brought before

5      that diversion program, and so the extent to which the defense

6      is relying upon that arrest, those two felony arrests, two

7      felony charges, and one misdemeanor charge going away, I'm not

8      sure that is going to happen, given the fact that after that

9      arrest, he continued with his criminal conduct thereafter.

10             THE COURT:  Got it.

11             MR. DALACK:  I have just a little bit of a problem,

12     Judge, with the government bringing to the Court's attention

13     items found from the defendant's phone sort of in realtime.  I

14     would just note for the Court that the screenshots that we have

15     in front of us, at least with respect to the sort of numbers

16     that we're dealing with here, they all have -- first, his

17     admission to the diversionary program was March of this year,

18     and so to the extent the government is relying on conduct that

19     predates it, based on my conversation with Mr. Dumeer, his

20     admission to the diversion program, whatever commitments and

21     agreements that he made in connection with that diversionary

22     program, would not be interrupted or affected, per se, by

23     conduct that predated his entry into the program.

24             Conduct that postdates the entry into the program, I

25     understand, from Mr. Dumeer, would be automatically

P5DKBAZC2

1   disqualifying, but conduct that predates his admission into the

2   program would not be.

3       So, obviously, with the substantial potential penalty

4   hanging over his head and the possibility of facing felony

5   charges in Connecticut, should he not see the program through,

6   there's a substantial incentive for Mr. Bazrouk to scrupulously

7   adhere to the conditions.

8       But with respect to these text messages, there's a

9   fraction listed next to each of the, I will call them, strains,

10  but I'm not sure that's how the government counsel

11  characterized them.  It's eight entries with the fraction

12  one-eighth next to it, which comes out to, I can only imagine,

13  if you're talking about how marijuana is purchased and

14  distributed, eighths of an ounce, which comes out to a full

15  ounce, which is just decriminalized both in Connecticut and

16  also here in New York.

17      But be that as it may, we're here now, in May of 2025,

18  on a record that is the following:  He's been arrested and

19  charged in the state in December and in January.  In December,

20  he self-surrendered, and in January, he was arrested.  He was

21  bailed with respect to both of those cases, and has been on

22  bail without incident since.

23      I don't know exactly the dates, and I'm very

24  interested in digging into the specifics of the text exchange

25  here.  He was admitted into a diversionary program in

P5DKBAZC2

Connecticut in March of this year, and he has still been on
bail in connection with parallel matters in state court in New
York.

The charges in state court in New York, to the extent
they're coextensive here, are certainly serious — I'm not
trying to diminish them — but it's undisputed that there was no
serious physical injury, let alone physical injury resulting in
any kind of medical attention or a trip to the hospital. So,
the most violent thing that Mr. Bazrouk has ever been accused
of doing is getting into physical altercations in the context
of extremely contentious and emotionally charged protests over
an issue of significant international and national importance.

Against that backdrop, we're now sitting here with a
person who doesn't have a felony record, who has strong family
support, and substantial ties to New York City. He's born and
raised in the city. He's lived in Manhattan his whole life.
His family is willing to put everything on the line for him,
literally — their own livelihood, their own apartments,
themselves as third-party custodians, which intensifies what
their obligations would be to the Court and to pretrial
services — to ensure his, again, scrupulous adherence to any
conditions that the Court sets. All of this information has
been put in front of pretrial services now twice. Twice, they
have recommended bail. And all of this information was put in
front of Judge Aaron, including the presence of the half a

P5DKBAZC2

1    million dollars cash seized in the apartment, and he

2    recommended bail and ordered bail.

3              So, taken together, the totality of the circumstances

4    here demonstrate that there are a set of conditions that the

5    Court can fashion, particularly given the Court's experience in

6    supervising what can only be categorized sometimes as difficult

7    supervised releasees.  And on top of all of that, your Honor,

8    we have a 20-year-old, who's about to wrap up his Associate's

9    degree, who's been admitted to a full-time college in the fall.

10   He has a substantial interest in seeing all of this through, to

11   try and get his life back on track.  It just cannot be the case

12   that a 20-year-old, with no felony record — the most violent

13   thing he's been accused of is getting into physical

14   altercations with others — is so incorrigible or so potentially

15   irredeemable, that the only thing to do is to put him in MDC

16   Brooklyn, which is just hell on earth.  People are stabbed

17   there on a regular basis, they're assaulted, they're neglected,

18   their medical needs are neglected, they spend the bulk of their

19   days in solitary confinement-like conditions because the place

20   is so understaffed and neglected.  It just is not the case that

21   that's necessary in order to assure the safety of the public

22   and his future appearance in court.

23             For those reasons, the Court should bail Mr. Bazrouk

24   to the very strict conditions that Judge Aaron prescribed on

25   May 7th.

P5DKBAZC2

MR. ADELSBERG:  Just very, very quickly.

THE COURT:  And that's it.

MR. ADELSBERG:  Just because we know we sent a few things to the Court email address:

One additional thing, just to highlight, is that on page 9 of the last report we sent, it shows a couple of things, including page 2 -- 1 and 2 show that these were substantial dollar amounts we were talking about.  This was not -- I think there was an $8,000 transaction, there appeared to be two $1,000 transactions, and then I think most, in our view, critically, on page 9, it appears that a delivery coordinated for these drugs at the apartment where he is the defense is suggesting that the defendant be on home confinement.

So, we would submit that using that apartment for his drug business suggests that he is not going to be deterred from bringing that into his home irrespective of his family, who appears to be very dedicated to putting him on the right track, but given his violent domestic incident in that home, and this, the fact that he was dealing drugs out of his home, which the text messages appear to suggest, we would submit that that does not assure both the safety of the community and the defendant's presence back in court.

MR. DALACK:  Judge, forgive me.  There's nothing about these messages that would suggest that he's selling drugs out of the apartment.  I just want to make that clear.  And all of

P5DKBAZC2

1    the messages here relate back, according to the Cellebrite

2    extraction I'm just looking at now --

3              THE COURT:  I don't have any information to that

4    effect either.

5              MR. DALACK:  Say again?

6              THE COURT:  I said I don't have any information to

7    that effect either.  So --

8              MR. DALACK:  They all --

9              THE COURT:  You won the argument already, that

10   argument.

11             MR. DALACK:  They all relate back to January 4th of

12   this year, your Honor, which, again, predates not only the

13   conduct alleged at Count Three, but, by a couple of months, his

14   admission into the diversion program in Connecticut.

15             MR. ADELSBERG:  I can make clear what I was

16   referencing.

17             THE COURT:  So there's now a new --

18             MR. ADELSBERG:  It's a 13-page document.

19             THE COURT:  Okay.  And this is what?

20             MR. ADELSBERG:  So this 13-page document, your Honor,

21   if you look at page -- starting on page 2, they start talking

22   about prices for an order, and then they --

23             THE COURT:  These are texts?

24             MR. ADELSBERG:  These are text messages, yes.

25             THE COURT:  So you're on page 2?

P5DKBAZC2

1          MR. ADELSBERG:  Yes, on page 2.

2          THE COURT:  Okay.  And?

3          MR. ADELSBERG:  And then they keep going and sort of

4    discussing different parts of the transaction, until when you

5    get to page number 9 --

6          THE COURT:  Wait.  I'm not sure mine are numbered.

7    Where is the numbering?

8          MR. ADELSBERG:  At least on my phone, it appears on

9    the bottom right of the page.

10          THE COURT:  Bottom right?

11          (Pause)

12          THE COURT:  We have them on the screen, but the

13    numbers --

14          MR. ADELSBERG:  Got it.

15          THE DEPUTY CLERK:  One second, counsel.

16          MR. ADELSBERG:  Thank you, Christine.

17          (Pause)

18          THE DEPUTY CLERK:  Go ahead, counsel.

19          MR. ADELSBERG:  Your Honor, if you look at page 2,

20    they start talking about prices.  If you keep going down

21    towards page 8, they talk about the defendant asked — this is

22    the defendant's phone number — to put them in trash bags

23    because you can't pick it up.  And then on page 9, the other

24    individual says, which addy — which I take to mean address —

25    which the defendant responds with his home address, which is

P5DKBAZC2

1      the address where the home detention would be.

2                   THE COURT:  Oh, I see.

3                   MR. ADELSBERG:  So, combined with the other chats,

4      which, again, all occurred after this arrest, we would just

5      suggest that the defendant is not deterred by these

6      interactions with law enforcement, which gives us a lot of

7      concern.

8                   THE COURT:  Okay.  All right.

9                   MR. DALACK:  Again, they're --

10                  THE COURT:  Here's what we have to do.  I'm going to

11     have to adjourn.  There's a meeting I have to go to in about

12     ten minutes, and so I don't want to rush that or this either.

13     I'll be back here at ten minutes after 2:00.

14                  You're not here?

15                  MR. DALACK:  Forgive me, Judge.  Let me just think

16     about this for a second.  I have a --

17                  THE COURT:  I'll need you for ten minutes or

18     fifteen minutes in the next and, hopefully, last session of

19     today.

20                  MR. DALACK:  Okay.

21                  THE COURT:  Okay?

22                  MR. DALACK:  Okay.

23                  THE COURT:  I'll see you then.  I'll try and get here

24     at 2:00, but it more likely will be 2:10.

25                  MR. DALACK:  Thanks, Judge.

P5DKBAZC3

1            THE COURT:  Okay.  Thanks.

2            (Luncheon recess)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P5DKBAZC3

AFTERNOON SESSION

2:10 PM

1    (Conference resumed)

2        THE COURT:  I decided to do the following:  I haven't

3    finalized the opinion yet, although I have a pretty strong idea

4    about it.  What I'm going to do is tell you that I'll have a --

5    first, I'm going to ask you, again, the government and the

6    defense, if there's any last word, if you want to, and then I'm

7    going to have a written decision for you by the end of the

8    week.

9        Is there anything further from the defense?  I'll

10   start with the defense.

11       MR. DALACK:  I think we captured it all, your Honor.

12   I want to just emphasize the lack of a criminal record and

13   strong family ties and his young age, and just for the purposes

14   of the record, to object to the government's introduction of

15   additional information sort of on the fly.  I think it's

16   regrettable that, given the fact that we had the weekend and a

17   briefing schedule, we're just sort of receiving information in

18   realtime, presumably, from Mr. Bazrouk's phone.  And I think

19   that that's unfortunate because I would have loved to have had

20   more of an opportunity to take on some of the allegations more

21   directly.  But, to that end, I would encourage the Court to

22   give them, at least the new allegations with respect to the

23   communication on his phone --

P5DKBAZC3

| | |
|---|---|
| 1 | THE COURT:  Yes, I'm focusing on what you've |
| 2 | submitted, really, writtenwise and as interpreted with your |
| 3 | oral argument, essentially.  I don't think anybody's going to |
| 4 | be prejudiced by having added something during the course of |
| 5 | today, for example. |
| 6 | MR. DALACK:  I appreciate that, your Honor. |
| 7 | THE COURT:  And I mean that.  And you will see.  It |
| 8 | may not be as elegantly written as we sometimes do, but I think |
| 9 | it will do the job. |
| 10 | MR. DALACK:  I appreciate that, Judge. |
| 11 | THE COURT:  You bet. |
| 12 | MR. DALACK:  All right.  Thank you. |
| 13 | MR. ADELSBERG:  Judge, we've had a lot of argument, so |
| 14 | I won't add to that.  The only thing I would say is the |
| 15 | government was not intending in any way to sandbag defense |
| 16 | counsel. |
| 17 | THE COURT:  Oh, no, I -- |
| 18 | MR. ADELSBERG:  We were responding to the Court's |
| 19 | inquiries about the specific arrest that led us to search |
| 20 | within the phone.  During the break, we found them, we wanted |
| 21 | to bring them to the Court's attention, but we did not, in any |
| 22 | way, intend to not give defense an opportunity to address |
| 23 | those. |
| 24 | THE COURT:  Yes, I didn't think that. |
| 25 | Now, what do I have to do mechanically, so to speak? |

P5DKBAZC3

Do I have to extend anything?  As I say, my intention is to
have something out by Friday.  I suppose there could be a storm
of some kind, and it might go to Monday — I doubt it — but,
literally, what do we have to do?  So we have the decision of
the magistrate judge, we have all that information that I have,
and I have to make a decision.

Do I have to do any kind of extension of something, or
not?

MR. ADELSBERG:  My understanding, your Honor — if I'm
understanding the Court's preference, which is to keep the
defendant detained until the decision, but correct me if that's
wrong — my understanding is what happened is after Judge Aaron
ordered the defendant released, we then appealed, we orally
filed a motion to stay that decision --

THE COURT:  Which we did.

MR. ADELSBERG:  Which you did.  I believe it made it
onto the docket after we came to court on Thursday
memorializing that he was detained.  So I think, I guess, at
the very least, I would extend his detention order until the
Court --

THE COURT:  How would this be?  The remand in this
case continues pending the Court's written order?

MR. ADELSBERG:  That works for the government, your
Honor.

MR. DALACK:  I think that makes sense procedurally,

P5DKBAZC3

```
 1    Judge.  And I would just add that, certainly, our hope is that
 2    your written decision lands in our favor.  To the extent that's
 3    the case, obviously, mechanically speaking, it would require
 4    then, on Friday, Mr. Bazrouk to be produced here so that the
 5    location monitoring equipment could be imposed.
 6            To that end, I just want to say, I will be out of town
 7    then, but what I will do is connect your deputy with a
 8    colleague of mine at the office who can be available to help,
 9    to the extent that's the direction the Court goes in, in making
10    sure that all of those arrangements happen seamlessly, and
11    we'll also put them in touch with Officer King, as well.
12            THE COURT:  Okay.  Good thought.
13            MR. ADELSBERG:  One additional thing:  We'd like to
14    orally submit a motion, also, to exclude time.  So, in terms of
15    when to exclude time until, would it be helpful, maybe, to set
16    a control date or a conference date out in the future, and then
17    we can --
18            THE COURT:  Yes.  In fact, I thought I would have a
19    date in that written order.
20            MR. ADELSBERG:  Got it.  Okay.
21            THE COURT:  In other words, whatever it is, and then
22    say, see you again, you know --
23            MR. ADELSBERG:  My only concern is, we've already lost
24    a few days and -- we can do it until Friday.  I think our
25    preference would be to exclude time until whenever that
```

P5DKBAZC3

conference is, or at least request that the Court exclude

time --

THE COURT:  Shall we pick a date, a target date, out

in two weeks, three weeks, or something like that, and say --

MR. ADELSBERG:  That works for the government, your

Honor.

THE COURT:  Have you come back on that date?

MR. DALACK:  The date is certainly fine.  The

government counsel is correct that time has started running

since the date of Mr. Bazrouk's arraignment on the indictment,

May 7th, and there was no application at the time for an

extension of time.  So, the Speedy Trial Clock has been running

since May 7th, and we would object, at this point, to an

exclusion of additional time as it relates to the fact that

we're still litigating the bail issue.

But I'm happy to pick a control date for an appearance

in the future.  That makes sense to me.

MR. ADELSBERG:  Your Honor, we would submit that there

are many reasons to exclude time at this stage, including

preparing discovery, including the Court resolving an ongoing

bail motion, including that the parties have already engaged in

preliminary discussions about dispositions.  So I would say

that there are several reasons and bases to exclude time, and

we would ask the Court to exclude time under the Speedy Trial

Act.

P5DKBAZC3

1          THE COURT:  Has the government started producing

2     discovery?  Where I'm heading is, I think it would be a good

3     thing to start, if you haven't already.  What are your thoughts

4     about --

5          MR. ADELSBERG:  Yes, we would intend to do so as a

6     minimal course.  We'd ask for approximately, maybe, two weeks,

7     just to sort of get a big chunk of it together.  Here, the

8     things that might hold it up a little bit are there's victim

9     information in a lot of these documents, and we want to make

10    sure that doesn't go over.  Also, there are devices, there are

11    things that may take some time, but I think we can get a good

12    chunk out to defense in the next two weeks.

13         THE COURT:  Yes.  Okay, I'd like to see that.  That

14    would be good.

15         Tuesday, May 20, 9:00 a.m.

16         Among other things, I will expect and anticipate that

17    you will be producing fast and furious to that date.

18         Is that fair?

19         MR. ADELSBERG:  Yes, your Honor.

20         Just so I understand, is time excluded until that

21    date?

22         THE COURT:  That would be my intention.

23         Is that okay with defense counsel?

24         MR. DALACK:  We just would maintain our objection,

25    your Honor.

P5DKBAZC3

1          THE COURT:  Well, I think I'm going to find, then,

2     under 18, United States Code, Section 3161, that the joint

3     request for adjournment by the government and the defense is

4     appropriate and warrants exclusion of the adjourned time from

5     speedy trial calculations.

6          I further find that the exclusion is designed to

7     prevent any possible miscarriage of justice, to facilitate

8     these proceedings, and to guarantee effective representation of

9     and preparation by counsel for both sides.  And, thus, the need

10     for exclusion and the ends of justice outweigh the interests of

11     the public and the defendant in a speedy trial pursuant to 18,

12     U.S.C., Section 3161(h)(7)(A) and (B).

13          MR. DALACK:  Just to be -- I don't mean to be

14     difficult, Judge.  We're not asking for an adjournment, we're

15     okay with setting a control date, but --

16          THE COURT:  Oh, okay.

17          MR. DALACK:  -- there's no joint application in that

18     respect.

19          THE COURT:  Okay.  Fair enough, fair enough.

20          MR. DALACK:  And with the Court's indulgence, if it is

21     possible to start at 9:30 on the 20th, as opposed to --

22          THE COURT:  Yes, make it 9:30.

23          MR. DALACK:  Thank you.

24          (Pause)

25          THE COURT:  I have a 10:00 o'clock.  I think we'd be

P5DKBAZC3

1    finished by then, in any event.

2            MR. DALACK:  If it's just an initial appearance and

3    status conference, I think that's safe.

4            MR. ADELSBERG:  I believe so, your Honor.

5            THE COURT:  Thanks, everybody.  Good to work with all

6    of you.  See you in two weeks.

7            MR. DALACK:  Thank you, Judge.

8            MR. ADELSBERG:  Thank you, Judge.

9            (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25