# Federal Defenders

## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

October 14, 2025

**By CM/ECF**
The Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Tarek Bazrouk*
              25 Cr. 203 (RMB)

Dear Judge Berman,

      Since May 7, 2025, every night Tarek retreats to his cramped, decrepit cell at MDC Brooklyn to sleep on a razor thin mattress on a concrete bunkbed alongside a stranger, he knows he has nobody to blame but himself. Having never been imprisoned before and with no prior convictions, the past several months in a notoriously dangerous and dysfunctional federal jail have been a shock to Tarek's system. But rather than wallow in self-pity and denial, Tarek has meaningfully reflected on his circumstances and his choices, and he has put himself in the best position possible to realize a brighter future for himself and his family. In addition to preparing a heartfelt and sincere letter to the Court, in which he expresses genuine sadness and remorse for the pain and anguish he caused the people he assaulted (*see* Exhibit A), Tarek has also spent his time at MDC Brooklyn as productively as possible. Over the past several months, Tarek has obtained a coveted job working in the kitchen, where he is a valued employee who gets along with a wide range of people, detainees and correctional officers alike. Tarek has also completed courses in leadership and influence and, perhaps most significantly, in anger management. *See* Exhibit B.

      Against this backdrop, not only does Tarek's time at MDC Brooklyn—a disproportionately punishing and unforgiving environment—mitigate against an additional term of imprisonment, but also his very young age, motivation to discourage others from using violence to solve their problems, and commitment to furthering his education and obtaining mental health treatment demonstrate that more prison would be gratuitous. Instead, a guidelines sentence of six months' imprisonment and six months of home detention, along with three years' supervised release, is sufficient to accomplish the statutory goals of sentencing under 18 U.S.C. § 3553(a). Indeed, because Tarek's advisory guidelines range is 12 to 18 months' imprisonment, he falls within Zone C of the U.S. Sentencing Guidelines table, which

makes his minimum, recommended term of 12 months eligible for a split sentence—half in jail, half in home detention. *See* U.S.S.G. § 5C1.1(d)(2).

**Tarek Bazrouk is a 20-year-old native New Yorker with tremendous potential who comes from a loving and supportive family with a deeply personal connection to the Israel/Palestine conflict.**

Tarek was born in New York City on December 13, 2004, to Alai and Ikram Bazrouk. Along with his parents, he lives with two sisters, Aseel and Anwar, and a brother, Fady. The family all lives together in a three-bedroom apartment in Manhattan. Aseel, Tarek's oldest sibling, is pursuing a career in social work. Anwar recently started a new job where she can put her training in educating students with disabilities to good use. Fady, who graduated from City College in 2024 with a degree in business and marketing, is an entrepreneur. Tarek's father, Alai, purchases clothing from wholesalers and earns commission on the resales. Tarek's mother, Ikram, is a stay-at-home mom who runs the household to this day.



*Tarek with his parents, brother, and one of his sisters*

When Tarek was in elementary school, he received counseling and an individualized education plan to help him focus and learn how to better regulate his behavior. While he was a smart and curious child, he also struggled academically, which sometimes led him to associate with negative peer influences. When he started high school, Tarek was a mediocre student, and his father had to push him to study and pay attention in class. But by the time Tarek was a senior, a switch flipped, and he became much more enthusiastic about his education. He applied to Baruch College and was denied. Undeterred, however, Tarek enrolled in City Tech to obtain an associate's degree, which he nearly completed before his arrest in this case. Tarek also reapplied to Baruch College and was admitted. He hopes to matriculate to Baruch College soon as possible to pursue a bachelor's degree in business and marketing.

Tarek's family is Palestinian, and he still has close family in the West Bank. When Tarek was about three years old, in the summer of 2007, his parents took him and his siblings to their family village to visit relatives. It was on that trip that Tarek met his first cousins, including a (then) 19-year-old named Rashad Khater, who was the son of one of Tarek's father's brothers. Unfortunately, the following summer, in May 2008, when Rashad was just 20 years old, he was killed by Israeli

settlers even though he was not participating in any hostilities. The well-respected Israeli human rights organization, B'Tselem, reported on the fatality. *See* https://statistics.btselem.org/en/all-fatalities/by-date-of-incident/pal-not-take-not-objects/west-bank?section=minors&tab=overview.[1] It does not appear that the perpetrators of Rashad's killing were ever held accountable.



***Tarek and Rashad in July 2007***

Tarek was not even four years old when his cousin Rashad was killed and only remembers his family's overwhelming sadness in the months following the incident. As Tarek got older, and he learned that the individuals responsible for Rashad's killing went unpunished, he became more politically inspired. Tarek tried to start a pro-Palestine group at his high school when he was in 12th grade, but without any experience in organizing, Tarek's efforts never materialized.

The terrible events of October 7, 2023, in which fighters associated with the designated terrorist organization Hamas massacred and took hostage hundreds of Israeli civilians, coincided with Tarek's first year at City Tech. Israel's military campaign in the Gaza Strip in response to the terror attack spurred mass protests across the globe. It was in this context that Tarek began attending protests throughout New York City against Israel's actions in Gaza.

**Tarek accepts responsibility for assaulting three pro-Israel counter protestors at rallies against the war in Gaza based on their perceived religion, ethnicity, and/or national origin.**

A few short weeks after he was arrested, Tarek readily accepted responsibility for his conduct and pleaded guilty to a violation of 18 U.S.C. § 371, admitting as overt acts the assaults he committed against individuals that he perceived to be Israeli and/or Jewish on April 15, 2024, December 9, 2024, and January 6, 2025. The Court knows from experience how unusual it is for a

---

[1] Here is a screenshot of the reference to Rashad's killing from B'Tselem's website:

  May

Rashad 'Ali Ahmad Khater

20 year old resident of Ein Siniya, Ramallah and al-Bira District, killed on May 9, 2008, next to 'Ein Yabrud, Ramallah and al-Bira District, by gunfire. Did not participate in hostilities when killed. Additional information: Killed when with friends hunting birds in the wadi between the villages 'Ein Yabrud, Dura al-Qra, and 'Ein Sinia.

defendant in a federal criminal case to reach an agreement and plead guilty so quickly after an arrest. Tarek's willingness and ability to do so here illustrates the seriousness with which Tarek approached this case and the sincerity of his desire to hold himself accountable. As Tarek writes in his impassioned letter to the Court:

> Over the past 2 years I've seen college students in Vermont be hunted, a child in Chicago be killed, a father in Texas be killed, just for being Palestinian. I was also horrified when I learned about the two young Israeli embassy staffers murdered in Washington DC, and about the firebombing of a pro-Israel protest in Colorado. Nobody should be attacked for their beliefs or for who they are. I apologize to the victims because I kicked them and punched them and hurt them for their beliefs, for their identity. Two wrongs don't make a right, if I'm going to protest against violence, then it makes no sense for me to use violence to make my point. I was wrong and there is no excuse.

Ex. A.

Consistent with Tarek's remorse and acceptance of responsibility, neither he, his family members, nor his friends seek to excuse or justify his actions in any respect. Rather, they all recognize the severity of his actions and emphasize their readiness to hold Tarek accountable to the morals and principles with which he was raised. For example, in providing the Court with some context for her son's participation in the Gaza protests, Tarek's mother Ikram writes:

> As I mentioned earlier, my husband and I raised our children to lead with love, to accept others for who they are, regardless of their religion or beliefs, even when they may not see eye to eye. Before I begin, I want to be clear—I do not condone the crimes my son has pled guilty to, and I fully acknowledge the severity of his actions and the harm they have caused the community and victims. As a mother, I am aware of certain personal traumas my son has experienced growing up that could have contributed to his actions. Tarek was only three years old when his cousin was shot in the Middle East and I don't believe he ever properly processed or grieved that loss. When the recent conflict between Palestine and Israel intensified, he felt a deep emotional response and a misguided sense of responsibility to do something and begin attending protests; anything to try to stop the suffering he saw. Although his actions truly caught me off guard, I believe they were driven by a combination of emotional intensity, the highly charged political climate in New York City and a misguided sense of responsibility for the ongoing conflict. Tarek knows that we have never condoned violence as a way of solving problems, and he knows our deep disappointment in him that he let himself walk down the wrong path.

4

Exhibit C.

Tarek's older sister, Anwar, echoes their mother's sentiments and emphasizes the pain and disappointment her family feels because of Tarek's decision to resort to violence. As Anwar writes:

> I fully acknowledge and am aware of the crimes Tarek has pleaded guilty to. As a family, we have consistently conveyed our disappointment to Tarek and told him how sad and angry we are that he hurt other people. Simply put, we raised him differently. In our conversations with Tarek, we have reminded him that he not only made the people he assaulted victims, but he made us victims of his selfish actions. However, I ask you to take into consideration the time Tarek has already spent at the Metropolitan Detention Center alongside my letter. I can assure you Tarek is remorseful.

Exhibit D.

Of course, as reiterated by Tarek and his family, there is absolutely no justification for Tarek's conduct. Although there was nothing wrong with Tarek's participation in protests over Israel's military actions in Gaza over the past two years—a form of collective punishment that inflicted massive civilian casualties and triggered widespread international condemnation, including from within Israel itself[2]—physical violence of any kind is completely unacceptable, especially when it is motivated by a person's actual or perceived race or religion. As Tarek writes:

> There is no excuse for my behavior. I could tell you how I let my feelings over the suffering in Gaza get the best of me, but that would fail to capture how I made the wrong choice on three different occasions. I know that, no matter how angry, sad, or upset I may be, violence is never the right response. I hope when I'm out that I can preach to others and unite one another with actual solutions. I hope to sit, grab some food, and talk.

Ex. A.

**Tarek has a demonstrated record of being a kind and thoughtful young man who enjoys rich relationships with friends and family alike.**

Of course, if there is any day that a person should not be judged based solely on the worst of his decisions, it is the day he faces sentencing in federal court. 18 U.S.C. § 3553(a)(1). Over the past several months, Tarek has been effusively

---

[2] *See, e.g.*, Jeremy Bowen, *Netanyahu is presiding over a divided Israel—the fault lines are now chasms*, BBC (Aug. 14, 2025), available at: https://www.bbc.com/news/articles/c3r441zyw27o.

grateful to receive an outpouring of support from family and friends, who all recognize Tarek's capacity for love, kindness, and generosity. Remarkably, more than 10,000 people have publicly signed a petition on Tarek's behalf, urging the Court to impose a sentence of time served. Exhibit E. And all the letters appended to this submission contain numerous examples of Tarek's selflessness and love for the people around him, painting a far richer and more comprehensive picture of his character and record than the cold details of the assaults he committed allow.

For example, in his letter to the Court, Tarek's childhood friend for many years, Anwr Albadani, reflected on how Tarek has been a source of physical and emotional support as he has navigated life with a debilitating birth defect. As Anwr writes:

> All I've ever known Tarek to be is a kind, sweet and helpful friend. I have a birth defect known as spina bifida, that's left me paralyzed from the waist down and wheelchair bound for life. Throughout the time I have known Tarek there was never a time he hesitated to help me get from point A to point B. If I asked for help, he always helped me with my homework, would come over to my place and help me get things done. Having a friend that lived in the same building as me was truly a blessing, if I wanted to get a quick snack or was ever hungry and needed help making a quick lunch Tarek never hesitated to come downstairs. In March, I was recovering from a surgery and was hospitalized since surgery didn't go as planned. Throughout my hospitalization Tarek visited me many times, bought me lunch, snacks, and never failed to neglect my needs. He made sure I was well taken care of getting a speedy recovery.

Exhibit F.

Similarly, Fadi Shuman, a newer friend of Tarek and student at Columbia University recounted how Tarek graciously assisted an older woman who was clearly struggling from thirst and exhaustion after a protest. As Fadi writes:

> From the moment I first met Tarek, he exemplified what it means to care for your community. After a protest, an older woman, exhausted from marching, sat on a curb. I remember scrambling through my backpack, hoping I had an extra water bottle to give her — I didn't. Not even a minute later, I watched a young man, cradling several bottles he had just purchased from a nearby food cart, approach her. Crouching down to her level, he offered her one, which she graciously accepted. What struck me wasn't only the act itself, but how he carried himself — unpretentious, with a humble smile across his face. Then, without pause, his eyes scanned the crowd. He spotted a mother with

6

her kids and moved in their direction to offer them water as well. Later, I introduced myself to Tarek, knowing right then I wanted to be close to someone who carried himself with such quiet selflessness.

Exhibit G.

And in her letter to the Court, Sabida Ahmed, a close friend of Tarek's and his older sister Anwar, described how Tarek regularly goes out of his way to support his sister's endeavors and goes the extra mile for the people he loves. As Sabida writes:

His sister runs a small business where she hosts workshop classes for embroidery and a portion of the funds go to charitable organizations. Whenever I attended these workshops, I got to observe how earnest and caring of a friend and brother Tarek is. From helping his sister set up the classes and staying through all the events to helping her clean up, he is the kind of person to drop everything to show up for others. He even offers to bring my friends and me food during and after the events, always tips extra whenever we're at a cafe to show support for small businesses, and constantly offers us rides home. I live the furthest away and my commute is extremely long but Tarek always offers up a ride to my home no matter how late it is or how busy he is and that is something I will always be grateful for. Through these car rides, I got to learn how witty and funny he is too. I have never had a brother but I imagine this is what it is like to have one and makes me wish I did. Tarek has felt like a little brother to all of us now and he truly set the standards high up.

Exhibit H.

All the letters of support attached herein are replete with positive, prosocial anecdotes about the love Tarek regularly displays and how he positively affects the people around him. And while they do not eliminate the seriousness of his offense or his culpability in choosing to physically assault others, they provide important, indisputable reassurance that Tarek can put this terrible chapter of his very young life behind him and return to bringing people together through kindness and acts of service.

**A guidelines sentence of six months' imprisonment and six months' home detention, along with three years' supervised release, is an appropriate punishment that adequately balances the seriousness of the offense and the need to impose just punishment with the totality of Tarek's personal circumstances.**

A split sentence of six months' imprisonment and six months' home detention, resulting in a guidelines sentence of 12 months under U.S.S.G. § 5C1.1(d)(2), is sufficient but not greater than necessary to adequately punish and deter Tarek given his unique background and record, including his age, the need to afford him necessary educational and medical treatment in the most effective manner, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

1.  *Tarek's age weighs heavily in favor of a split sentence.*

Tarek's age strongly supports a split sentence at the bottom of the guidelines range. So much of Tarek's personal potential and mitigating qualities—along with the emotionally-driven, intemperate nature of his offense—is driven by the fact that, at only 20 years old, Tarek has barely lived life. He has substantial room to grow and develop, which the Court can plainly observe through his commendable conduct at MDC Brooklyn and by his willingness to meaningfully reflect and atone for his crime.

It is widely acknowledged in the neuroscience field that the brain's frontal lobes, responsible for the executive functions of planning for the future, problem-solving, and self-regulation, continue to develop well into one's mid-20's. Indeed, "even when teenagers' cognitive capacities come close to those of adults, adolescent judgment and their actual decisions may differ from that of adults as a result of psychosocial immaturity. Among the psychosocial factors that are most relevant to understanding differences in judgment and decision making are (a) susceptibility to peer influence, (b) attitudes toward and perception of risk, (c) future orientation, and (d) the capacity for self-management…. In other words, to the extent that adolescents are less psychosocially mature than adults, they are likely to be deficient in their decision-making capacity, even if their cognitive processes are mature."[3]

An emerging body of caselaw and positive law is consistent with the applicable medical and social science data. As the Supreme Court has explained,

---

[3] Laurence Steinberg & Elizabeth Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility and the Juvenile Death Penalty*, American Psychologist (Jan. 2004).

"children are constitutionally different from adults for purposes of sentencing," *Miller v. Alabama*, 567 U.S. 460, 471 (2012), a principle that "requires the district court to undertake additional reflection on the special social, psychological, and biological factors attributable to youth," *United States v. Delgado*, 971 F.3d 144, 159 (2d Cir. 2020). The Supreme Court has recognized that the "significant gaps" in adolescent maturity and developmental vulnerability to outside influence are highly relevant to sentencing. *Miller*, 567 U.S. at 471. In *Miller*, the Supreme Court noted that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 472; *see also Graham v. Florida*, 560 U.S. 48, 68, 74 (2010) (noting that it is well-established that "juveniles have lessened culpability," "are less deserving of the most severe punishments," and have a greater "capacity for change" (quoting *Roper v. Simmons*, 543 U.S. 551, 569 (2005)); *Gall v. United States*, 552 U.S. 38, 58 (2007) (holding that "it was not unreasonable for the District Judge to view [21-year-old] Gall's immaturity at the time of the offense as a mitigating factor, and his later behavior as a sign that he had matured and would not engage in such impetuous and ill-considered conduct in the future"); *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (finding, in the case of a 19-year-old convicted of murder, that there "is no dispute that a defendant's youth is a relevant mitigating circumstance . . . . Our cases recognize that 'youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage'" (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982))).

Judge Rakoff has written about how this change in courts' "understanding of adolescence and adolescent cognition" impacts the sentencing analysis under section 3553(a)(2). *United States v. Ramsay*, 538 F. Supp. 3d 407, 423 (S.D.N.Y. 2021). As Judge Rakoff noted, "the frontal lobes, home to key components of the neutral circuitry underlying executive functions such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." *Id.* at 417-18 (quotation omitted). For these reasons, "courts cannot simply treat anyone over 18 as an 'adult' for sentencing purposes but must inquire whether the human being they are about to sentence is still in many respects an adolescent." *Id.* at 423; *see also Gall*, 552 U.S. at 58 ("Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five." (quoting district court with approval)).

This has several implications for a court sentencing someone who was just emerging from adolescence at the time of his offense conduct, all of which weigh in favor of leniency. "Adolescents' immaturity, their susceptibility to peer influence,

and their dependence mean 'their irresponsible conduct is not as morally reprehensible as that of an adult.'" *Ramsay*, 538 F. Supp. 3d at 423 (quoting *Roper*, 543 U.S. at 570). Further, there is less deterrent value in significant sentences for young offenders because adolescents are less likely to consider potential punishment when making decisions, frequently influenced by their peers. *Id.* There is also a reduced need to incapacitate adolescent offenders because their character remains in development, and thus "adolescent crime is a poor predictor of future criminal behavior." *Id.* And lastly, "adolescents' slow but steady development of means of self-control make rehabilitation and successful reintegration into society more likely than for similarly situated adult offenders." *Id.*[4]

Last year, the Sentencing Commission further validated this consensus, amending the Sentencing Guidelines, as the Commission noted, "[i]n line with the Commission's statutory duty to establish sentencing policies that reflect 'advancement in the knowledge of human behavior as it relates to the criminal justice process.'" U.S. Sent. Comm'n, *Amendments to the Sentencing Guidelines* (Apr. 30, 2024) at 25 ("Youthful Individuals") (quoting 28 U.S.C. § 991(b)(1)(C)).[5] As the Sentencing Commission described, the amendment it adopted "reflects the evolving science and data surrounding youthful individuals, including recognition of the age-crime curve and that cognitive changes lasting into the mid-20s affect individual behavior and culpability," as well as "expert testimony to the Commission indicating that certain risk factors may contribute to youthful involvement in criminal justice systems." *Id.*

The Sentencing Commission amended the policy statement at section 5H.1 of the Guidelines to provide that:

> A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In

---

[4] The observation that criminal behavior increases in adolescence and decreases in adulthood is known as the "age-crime curve" and is "one of the most established facts in the field of criminology." L. Kazemian, Nat'l Inst. of Justice, *Pathways to Desistance from Crime Among Juveniles and Adults: Applications to Criminal Justice Policy and Practice* (2021) (citing E.P. Mulvey, Dep't of Justice, Office of Juvenile Justice and Delinquency Prevention, *Highlights from Pathways to Desistance: A Longitudinal Study of Serious Adolescent Offenders* (2011) (noting this is true even among those who engage in more serious crime)).

[5] https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202405_RF.pdf

addition, youthful individuals generally are more impulsive, risk-
seeking, and susceptible to outside influence as their brains continue
to develop into young adulthood. Youthful individuals also are more
amenable to rehabilitation.

The age-crime curve, one of the most consistent findings in
criminology, demonstrates that criminal behavior tends to decrease
with age. Age-appropriate interventions and other protective factors
may promote desistance from crime. Accordingly, in an appropriate
case, the court may consider whether a form of punishment other than
imprisonment might be sufficient to meet the purposes of sentencing.

The reasons behind the Commission's Guidelines amendment and the
growing body of caselaw surrounding the reduced culpability of (nearly) adolescent
defendants weigh heavily in favor of a split sentence.

2. *The extremely punishing nature of the time Tarek has already served at MDC
Brooklyn weighs in favor of a split sentence.*

In conjunction with the time Tarek has already served at MDC Brooklyn, an
additional six months' home detention is an adequate punishment. While it is
certainly better than jail, home confinement is a significant restriction on a person's
liberty, so much so that both Congress and the Sentencing Commission have
equated it with imprisonment. *See* 18 U.S.C. § 3563(b)(19) (home detention may be
imposed as a condition of probation "only as an alternative to incarceration");
U.S.S.G. § 5C1.1(e)(3) (one day of home detention is equal to one day of
imprisonment); *id.* § 5F1.2 ("Home detention may be imposed as a condition of
probation or supervised release, but only as a substitute for imprisonment"); *United
States v. Fiume*, 643 F. App'x 25, 28 (2d Cir. 2016) ("Home detention is a distinct
condition that is significantly more onerous than GPS monitoring").

In this case, home detention would occur on the heels of Tarek's first time
ever in jail—and not just in any jail, but a grueling, six-month-long stint at MDC
Brooklyn, an environment that is undeniably more harsh, punishing, and callous
than pre-trial detention should be. Put differently, even without Tarek's significant
personal accomplishments at MDC Brooklyn, the conditions of his pre-trial
detention have imposed an additional, significant punishment that is not reflected
in the calculation of his guidelines range.

As the Court has noted, MDC Brooklyn has long been "dirty" and "infested
with drugs," with a prevalence of "violence." *United States v. Moran*, 19 Cr. 209
(RMB) (S.D.N.Y. May 5, 2020), Doc. 90, Tr. 12:25-15:21, 37:15-18. Judge McMahon
described the conditions there "as disgusting [and as] inhuman as anything I've

11

heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Days*, 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), Doc. 35, Tr. 19:17-20. These conditions have deteriorated over the past few years, with multiple individuals having been killed or dying. *See, e.g.*, L. Fadulu, N.Y. TIMES, "Inmate Dies After Fight Breaks Out at Troubled Brooklyn Jail" (July 17, 2024).[6]

In an opinion issued at the beginning of 2024, Judge Furman described in detail how the "dreadful" conditions there impact the lives of those unfortunate enough to be housed there. *United States v. Chavez*, 710 F. Supp. 3d 227 (S.D.N.Y. 2024). "First, inmates at the MDC spend an inordinate amount of time on 'lockdown'—that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise." *Id.* at 233.

"Second," Judge Furman found that "MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates," and that "[i]t has become common for defense counsel to require court intervention to ensure that inmates receive basic care — and, even more shocking, not uncommon for court orders to go unheeded." *Chavez*, 710 F. Supp. 3d at 234.

Third, Judge Furman noted that "the MDC's physical conditions have long been problematic," and described how other litigations had found "visible mold on walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers." *Chavez*, 710 F. Supp. 3d at 235.

As Judge Furman wrote, there have been severe staffing shortages at the MDC for years." *Chavez*, 710 F. Supp. 3d at 229 (noting that "as of November 2023, *the MDC was operating at only about 55% of its full correctional officer staffing level*" (emphasis in original)). As Judge Furman further noted:

> A recent memo by Rhonda Barnwell, the president of the union local representing the MDC's correctional officers, helps explain why the MDC's staffing shortage translates directly into its inhumane conditions of confinement. *See United States v. Irizarry*, 23 Cr. 60 (JMF), Doc. 47-3 (S.D.N.Y. Oct. 30, 2023). According to her memo, "[o]n a daily basis housing units . . . are left . . . unmanned by staff[] and locked down, with the expectation . . . that a single [] Officer is to

---

[6] https://www.nytimes.com/2024/07/17/nyregion/inmate-dies-metropolitan-detention-center.html (last visited Aug. 13, 2025).

make rounds, feed, and perform additional correctional duties" on three units during a single shift. *Id.* at 12. The frequency of lockdowns "angers the inmates and heightens the inherent danger for staff," but "[c]overage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and[/]or inmate medical emergencies." *Id.* at 2.

*Chavez*, 710 F. Supp. 3d at 236, n.16.

Eight months after *Chavez*, Judge Brown reiterated how "dangerous, barbaric conditions . . . have existed for some time at the Metropolitan Detention Center in Brooklyn." *United States v. Colluci*, 12 Cr. 417 (GRB), 2024 WL 3643857, at *1 (E.D.N.Y. Aug. 5, 2024). Judge Brown summarized how judges in the Southern and Eastern Districts of New York frequently lower, reduce, or don't impose sentences of incarceration based on the conditions at MDC, including "inadequate supervision, unbridled assaults[,] and lack of sufficient medical care." *Id.* at *3.

The Government is likely to argue that conditions at MDC Brooklyn have improved recently and that the sentence reductions granted by courts in this Circuit to account for these conditions are no longer warranted. This is, sadly, not true. MDC remains on lockdown for prolonged periods of time due to institutional staffing and safety issues. *See, e.g.*, Notice to the Inmate Population (Feb. 22, 2025) (Exhibit I). For example, for several weeks from late February to early March, the facility was locked down after a "brawl" that the Government has described as involving multiple individuals "armed with weapons," "chasing and stabbing" one victim 18 times, requiring hospitalization for his injuries, necessitating trips to the hospital for four other inmates, and medical treatment needed for more than 20 other inmates. *See* U.S. Att'y's Office, Eastern District of New York, "25 Metropolitan Detention Center Inmates, Their Associates and a Former Correctional Officer— Charged in a Dozen Criminal Cases at the Federal Jail in Brooklyn," (March 6, 2025).[7] Shortly thereafter, the Government announced "criminal charges against 25 defendants in 12 separate cases relating to violence and contraband smuggling," including "against 15 inmates for violent assaults against other inmates from May 2024 to the present; a former correctional officer for attempting to smuggle contraband into the facility on January 21, 2025; an inmate for orchestrating a contraband smuggling operation between April and June 2024; an inmate for smuggling ceramic scalpels into the facility on October 12, 2024; an inmate for possession of contraband and continuing to commit fraud while detained at MDC-Brooklyn; and an MS-13 gang associate for attempting to smuggle a large package

---

[7] https://www.justice.gov/usao-edny/pr/25-metropolitan-detention-center-inmates-their-associates-and-former-correctional

of contraband, including 18 cellphones and marijuana, to other MS-13 gang members incarcerated at MDC-Brooklyn"—all of this after nine inmates were previously charged with violence and contraband offenses in September 2024 and after a "week-long multi-agency operation aimed at detecting and seized contraband from MDC-Brooklyn" in October 2024. *Id.*

Clearly, the commendable efforts of the BOP and other government agencies to improve the horrid conditions at MDC Brooklyn have not had an appreciable impact, and the detainees like Tarek who are unlucky enough to be housed there deserve recognition of these harsh conditions when courts sentence them. Accordingly, as many courts in this District have done, the Court should take into consideration that the excessively harsh conditions of Tarek's confinement have made every day he has served more punishing than it should be. *See, e.g., United States v. Phillibert*, 15 Cr. 647 (PAE), 2021 WL 3855894, at *4 (S.D.N.Y. Aug. 27, 2021) ("Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring a just sentence." (citing, *inter alia, United States v. Carty*, 264 F.3d 191, 196-97 (2d Cir. 2001)). As Judge Brown described, "the present conditions at MDC make [time served there] materially different than [time] served at a jail or prison elsewhere in the United States that is appropriately managed." *Colucci*, 2024 WL 3643857, at *7. Tarek's sentence must reflect the disproportionate punishment he has already received.

3. *A split sentence of six months' imprisonment and six months' home detention is necessary to avoid unwarranted sentencing disparities and afford Tarek access to higher education and mental health treatment in the most effective manner.*

As reflected in the Presentence Report, during the last five fiscal years (FY2020-2024), there were 28 defendants whose primary guideline was §2H1.1, with a Final Offense Level of 13 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. *See* PSR at 20 (Appendix A). For the 18 defendants (64%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 9 months and the median length of imprisonment imposed was 6 months.

Although the circumstances of this case are serious, there is nothing so extraordinary or aggravating about them that would justify sentencing Tarek to a term of imprisonment greater than the median term of imprisonment for similarly situated defendants nationwide. 18 U.S.C. § 3553(a)(6). Nor would a greater sentence further promote the goals of specific deterrence;[8] Tarek's age, lack of a

---

[8] A lengthier sentence would also fail to promote general deterrence. Indeed, to achieve the aim of general deterrence, "social science conclusively finds that certainty matters more than severity." Brian Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021),

criminal record, and robust family and community ties strongly militate against a risk of recidivism. 18 U.S.C. § 3553(a)(2)(C).

As the Sentencing Commission and the policies behind the Sentencing Guidelines make clear, "first offenders are less culpable and less likely to re-offend." U.S. Sent'g Comm'n, *Recidivism and the "First Offender*," at 1, 9 (2004);[9] *see* U.S.S.G. § 4A1.1, Introductory Comment. Accordingly, as the Sentence Commission has written, first offenders "are deserving of reduced punishment." *Recidivism and the "First Offender," supra* at 1. Separate and apart from lower recidivism rates, first offenders are considered less culpable because their offense is more properly understood as an aberration from their true character and less reflective of ongoing criminal intent. *Cf. United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (reasoning that because "Criminal History I did not fully account for [the defendant's] complete lack of criminal history, considering it as a mitigating factor was not redundant or improper").

Sentencing Commission data further corroborates that first offenders are less likely to re-offend. U.S. Sent'g Comm'n, *Recidivism and the "First Offender," supra* at 1, 9. Multiple Sentencing Commission studies have shown that first offenders, like Tarek, with zero criminal history points are in a wholly unique category of defendants—one that is least in need of incarceration to prevent rearrest or reconviction. Studies in 2004, 2017, and 2021 all confirmed that offenders with zero criminal history points continue to have by far the lowest rates of recidivism, whether measured by rearrest, reconviction, or reincarceration. *See* U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010*, at 26 (2021);[10] U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of*

---

https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affording-deterrence/?sh=6f8975277bd4 (hereinafter "Jacobs Report"). "[T]he vast majority of people who are committing crime are not particularly forward-looking. So adding five or ten years to an already long prison sentence simply doesn't have much of an effect on their behavior today." *Id.* In a bulletin by the National Institute of Justice, the U.S. Department of Justice echoes, "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even draconian punishment." U.S. Department of Justice, *Five Things About Deterrence* 1, National Institute of Justice (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf. "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." *Id.*

[9] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

[10] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf

*Federal Offenders*, at 6-7 (March 2017);[11] *Recidivism and the "First Offender," supra* at 13.

The Sentencing Commission has explained that "[f]rom both culpability and recidivism risk perspectives … offenders with no prior arrests most strongly meet the conceptual definition of the first offender[,]" and with "their extremely low recidivism rate of 6.8 percent, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend." *Recidivism and the "First Offender," supra* at 17. Even this "recidivism" rate overstates the risk. Sentencing Commission data show that "the re-conviction rate" for offenders with no prior arrests was only 2.5 percent. *Id.* at 14 n.28.

Lastly, it is axiomatic that Tarek will have better access to education and healthcare in the most effective manner while on supervised release and not in BOP custody. Regarding his education, Tarek has an opportunity to pursue his bachelor's degree at a top-notch CUNY school where he will be surrounded by other curious minds and people genuinely interested in intellectual stimulation and academic rigor. There is no such comparable curriculum in BOP. And regarding mental health treatment, the Court will have at its disposal the full spectrum of services available through United States Probation at a fraction of the cost it would take to simply warehouse Tarek in an overcrowded and understaffed BOP facility. *See* PSR at 17, ¶105 (stating that it will cost $4,742 per year to supervise Tarek in the community, but $51,711 annually to house him in BOP).

Indeed, due to budgetary, staffing, overcrowding, and core competency issues, the BOP is unequipped and unable to provide Tarek with adequate mental health care and other social services that Probation has at the ready. BOP data reflect that, "as of 2015, only 3 percent of the BOP's sentenced inmate population was being treated regularly for mental illness. Yet, the BOP's FY 2016 Performance Budget Congressional Submission cited an internal BOP study, which suggested that approximately 19 percent of federal inmates had a history of mental illness." Office of the Inspector General, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness* (July 2017), at ii.[12] In 2006, the Department of Justice Bureau of Justice Statistics published a report that summarized the lack of mental health treatment in the Bureau of Prisons. *See* Bureau of Justice Statistics, *Special Report: Mental Health Problems of Prison and*

---

[11] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf

[12] https://oig.justice.gov/reports/2017/e1705.pdf.

*Jail Inmates* (Dec. 2006).[13] The report showed that 43.6% of males in federal prison had a mental health problem,[14] yet only 15.1% had "professional mental health therapy."[15] The treatment other than therapy that is provided is primarily medication and an overnight hospital stay.[16] According to the report "[t]aking a prescribed medication for a mental health problem was the most common type of treatment inmates who had a mental health problem had received since admission to prison or jail."[17]

**Conclusion**

Tarek comes before the Court humbled and contrite, eager to continue atoning for his offense through dedicated self-improvement, reflection, education, and mental health treatment. His words of remorse and embrace of non-violence sends a powerful message to anyone who would consider resorting to violence to settle political scores or disputes, particularly at protests. Tarek's near-immediate acceptance of responsibility and personal growth over the past five-and-a-half months proves that he will continue doing the hard work necessary to put this terrible experience behind him and continue to atone for the pain and hurt he caused his victims. According to BOP, as of September 27, 2025, a mere 0.9% of federal prisoners were 18 to 21 years old—a fact that underscores just how rare an intervention federal prison is for very young adults.[18] No such further intervention is necessary here, and a guidelines sentence of six months' imprisonment and six months' home detention, enforced by three years' supervised release, is sufficient.

Respectfully submitted,

Andrew John Dalack, Esq.
Assistant Federal Defender, SDNY
(646) 315-1527

Counsel for Tarek Bazrouk

Cc:    AUSA Samuel Adelsberg
       AUSA James Ligtenberg

---

[13] https://www.bjs.gov/content/pub/pdf/mhppji.pdf.

[14] *Id.* at 4.

[15] *Id.* at 9.

[16] *Id.*

[17] *Id.*

[18] https://www.bop.gov/about/statistics/statistics_inmate_age.jsp.