

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

26 Federal Plaza. 37ᵗʰ Floor
New York, New York 10278

October 21, 2025

**BY ECF**

The Honorable Richard M. Berman
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

> Re:    *United States v. Tarek Bazrouk*, 25 Cr. 203 (RMB)

Dear Judge Berman:

The Government respectfully submits this letter in advance of the October 28, 2025 sentencing of Tarek Bazrouk. For the reasons discussed below, the Government seeks an above-Guidelines sentence of at least 36 months' imprisonment. Such a sentence is necessary to reflect Bazrouk's repeated, premeditated assaults on Jewish individuals based on their ethnicity and religion; the ongoing danger he poses to Jews (as demonstrated by his personal messages, which reveal deeply seeded anti-Jewish animus, and his possession of guns and other weapons); and to afford adequate deterrence to both Bazrouk and to others who seek to engage in hate-motivated violence against those exercising their First Amendment rights.

## I.    Background

As admitted by Bazrouk, between in or about April 2024 and in or about January 2025, he and others participated in a conspiracy to commit hate crimes against individuals who were, or were perceived to be, Jewish and/or Israeli. (Dkt. 35 at 31-32; PSR ¶¶ 5, 26).

### A.    Bazrouk's Serial Assaults of Jewish Protestors

Over the course of at least 9 months, Bazrouk and others participated in a conspiracy to commit hate crimes against Jews. (PSR ¶ 5). In furtherance of this conspiracy, Bazrouk physically assaulted at least three Jewish individuals at protests concerning the Israel/Hamas war. (PSR ¶ 5). The assaults occurred in April 2024, December 2024, and January 2025. (PSR ¶ 5). The assaults were premeditated: as he admitted at the plea hearing, and as corroborated by electronic evidence, Bazrouk conspired with other individuals—in advance—to target and assault Jewish protestors. (PSR ¶¶ 5, 26). During each of the assaults, Bazrouk targeted Jews expressing their First Amendment rights and caused them injury. Despite being arrested by local law enforcement after each assault, Bazrouk persisted in his violent quest to join with others to cause harm to Jewish New Yorkers. (PSR ¶¶ 5, 8-19).

### 1. April 15, 2024 – Bazrouk Assaults a Jewish Protestor in Lower Manhattan

On April 15, 2024, Bazrouk—while wearing a green headband typically worn by Hamas terrorists—attended a protest concerning the Israel/Hamas war in Lower Manhattan, outside the New York Stock Exchange. (PSR ¶ 8). During the protest, Bazrouk walked into a section of the rally populated by pro-Israel protesters, many of whom were carrying Israeli and American flags. (PSR ¶ 8). Bazrouk was holding a Palestinian flag. (PSR ¶ 8). After Bazrouk shouted at the pro-Israel protestors, one of them grabbed his flag. (PSR ¶ 8). Bazrouk then lunged at the individual who took his flag, after which Bazrouk was arrested by NYPD officers on scene and placed in handcuffs. (PSR ¶ 8).

As Bazrouk was being escorted to an NYPD vehicle, Bazrouk kicked a different individual—Victim-1, a Jewish college student—in the lower stomach. (PSR ¶ 9). At the time of the assault, Victim-1 was standing near other Jewish protestors, who were wearing kippahs,[1] carrying Israeli flags, and singing Jewish songs. (PSR ¶ 9).

Evidence of Bazrouk's April 2024 hate crime includes, among other things, witness statements and videos of the incident. One video of the incident also appears to capture Bazrouk yelling—seconds after the assault—"Allahu Akbar," an Arabic phrase meaning "God is great" that radical Islamic extremists have proclaimed while carrying out terrorist attacks. Below is an image of Bazrouk right before he kicked Victim-1.



Bazrouk's communications corroborate the witness testimony and videos of the incident. (PSR ¶ 10). For example, on April 15, 2024, at approximately, 5 p.m., Bazrouk described the incident in a text message as follows: "Long story short I was waving the flag in front of them and

---

[1] A kippah or yarmulke is a brimless skullcap that is traditionally worn by Jewish men on their heads.

they was mad 1 of them snatched it out my hand and then I started swinging at all of them and then the cops arrested me and when they was walking me I started kicking the Zionist cuz they was chatting USA." (PSR ¶ 10). On April 21, 2024, Bazrouk further discussed the incident in a text message exchange with another individual. Bazrouk sent the link to an article in the New York Post from April 18, 2024 titled "Columbia student kicked and told to 'kill himself' as his US flag is set on fire at NYC pro Palestinian rally," and wrote, "Damn they did me bad," before noting that "[t]hey got my whole gov smh"—an apparent reference to the article including Bazrouk's legal (or "Government") name. When Bazrouk was asked how the journalist obtained his "full name," Bazrouk responded "I think cuz he filed a police report / But I can't wear the green headband no more"—an apparent reference to the green Hamas headband he was wearing during the incident.[2]

### 2. December 9, 2024 – Bazrouk Assaults a Jewish Protestor Outside Columbia University

Approximately eight months later, on December 9, 2024, Bazrouk assaulted another Jewish individual at a protest relating to the Israel/Hamas war next to the campus of Columbia University in Manhattan. (PSR ¶¶ 11-13). The victim of the second assault—Victim-2—is a student at Columbia University. (PSR ¶ 11).

On the date of the assault, Victim-2 and his brother were present at a protest on Broadway, right outside the Columbia campus. (PSR ¶ 11). During the protest, Victim-2 and his brother were wearing kippahs and Victim-2 had an Israeli flag draped around his shoulders. (PSR ¶ 11). During the protest, Victim-2 sang Jewish songs.

As the protest continued, Bazrouk began calling Victim-2 and other protestors with Victim-2 "Nazis" and stating, in sum and substance, that Jews stole the land of Israel and have no history there. (PSR ¶ 12). Bazrouk, with his mouth covered by a flag, then stole an Israeli flag from Victim-2's brother and fled. (PSR ¶ 12).

Victim-2 and his brother followed Bazrouk in an effort to retrieve their flag. (PSR ¶ 13). As Victim-2 and his brother were talking to other protestors, Bazrouk snuck up to the side of Victim-2 and struck him in the face with a closed fist. (PSR ¶ 13). Bazrouk then fled into the crowd. (PSR ¶ 13). Evidence of Bazrouk's December 2024 assault includes, among other things, statements from multiple witnesses and videos of the incident.

---

[2] As part of the same conversation, Bazrouk appears to describe an incident at Columbia University on April 21, 2024, when Bazrouk lit a flare during a protest concerning the Israel/Hamas war. After Bazrouk states that he "lit the flare," the other individual replied, "u should of lit someone on fire." Bazrouk responded, "I was thinking abt it tbh / It was too many of them tho / Otherwise I would've hurted them." Based on public reporting, anti-Jewish rhetoric was used during the protest. *See* New York Post, "Anti-Israel protester screams 'Go back to Poland' at demonstrators with Israeli flag outside Columbia, harrowing video shows" (Apr. 21, 2024), *https://nypost.com/2024/04/21/us-news/anti-israel-protester-screams-at-demonstrators-with-israeli-flag-outside-columbia-u-go-back-to-poland/.*

### 3. January 6, 2025 – Bazrouk Assaults a Jewish Protestor in Gramercy

On January 6, 2025, Bazrouk assaulted yet another Jewish individual—Victim-3—at a protest concerning the Israel/Hamas war near 1st Avenue and East 18th Street in Manhattan. (PSR ¶¶ 14-16).

At this protest, Victim-3 was wearing an Israeli flag around his shoulders, along with a hat bearing an image of an Israeli flag. (PSR ¶ 14). He was also wearing a chain with a Jewish star on it. (PSR ¶ 14). At various times throughout the protest, Victim-3 sang Jewish songs and chanted Jewish or Hebrew slogans. (PSR ¶ 14).

During the protest, Bazrouk, who was wearing a keffiyeh, made contact with Victim-3's shoulder and then wrapped his foot around Victim-3's ankle. (PSR ¶ 15). After trying to push Bazrouk away, Victim-3 stated, "Get the fuck away from me." (PSR ¶ 15). Bazrouk then proceeded to punch Victim-3 in the nose with a closed fist and stated, "Fuck you, Nazi." (PSR ¶ 15). After he was punched, Victim-3 pulled down Bazrouk's keffiyeh to see his face. (PSR ¶ 15). Bazrouk then fled into the crowd. (PSR ¶ 15).

Ten days later, on January 16, 2025, Victim-3 attended another protest regarding the Israel/Hamas war in Times Square. (PSR ¶ 16). During the protest, an individual with a keffiyeh pointed at Victim-3 and said, in substance and in part, that Victim-3 had been assaulted at the last rally. (PSR ¶ 16). Although part of the individual's face was covered by a keffiyeh, Victim-3 later stated that the individual's height, build, voice, and eyes matched those of the individual who punched him ten days earlier. After Victim-3 alerted a nearby police officer about this exchange and the January 6 incident, the NYPD brought the individual in the keffiyeh to a nearby NYPD precinct. (PSR ¶ 16). After the keffiyeh obstructing the individual's face was removed, Victim-3 identified the individual—Bazrouk—as his assailant during the January 6 incident. (PSR ¶ 16).

### B.    Bazrouk's Anti-Jewish Animus

Bazrouk's text messages, social media presence, and vocal support for anti-Semitic terrorist groups further show his bias against Jews, underscoring his motivation for the three charged assaults and demonstrating the ongoing danger he poses to the community.

### 1. Bazrouk's Anti-Semitic Text Messages

Bazrouk's private text messages lay bare his anti-Semitic motivations. As detailed below, in these messages, Bazrouk identified himself as a "Jew hater," labeled Jews "worthless," exhorted "Allah" to "get us rid of [Jews]," called an acquaintance a "Fucking Jew," and told a friend to "slap that bitch" in reference to a woman with an Israel sticker on her laptop. (PSR ¶ 6). A sampling of the text messages in which Bazrouk made anti-Semitic statements is reproduced below:

- **February 9, 2024**

| Associate-2 | Tee do you like Jewish |
|---|---|
| Bazrouk | No way |

- **May 19, 2024**

| Bazrouk | Kal I'm a Jew hater 😂 |
|---------|----------------------|

- **June 19, 2024**

| Bazrouk | Owner of the building he was there yesterday when we got raided |
|---------|------------------------------------------------------------------|
| Associate-2 | Fuck him |
| Bazrouk | He took of the stickers I put lol |
| Bazrouk | Fucking Jew |

- **September 17, 2024**

| Associate-1 | Bro everyone is jewish there |
|-------------|------------------------------|
| Bazrouk | Ik fuck them |
| Bazrouk | They are worthless |
| Bazrouk | Inshallah Allah get us rid of them |
| Associate-1 | This other girl too / they started talking about this jewish party i was like omg stfu |
| Bazrouk | Lmaooooo talk about Hamas |
| Bazrouk | Bro I gotta pyo |
| Bazrouk | Yk I got family that are .. |
| Bazrouk | I didn't even know 😂 |
| Bazrouk | I'm mad happy wallah |

- **September 17, 2024**

| Associate-1 | imma throw up |
|-------------|---------------|
| Associate-1 | this girl next to me has a greetings from israel sticker on her laptop imma crash out |
| Bazrouk | Slap that bitch |
| Bazrouk | Take her laptop and throw it |

- **October 2, 2024**

| Bazrouk | Yk what I need to do on Oct |
|---------|----------------------------|
| Bazrouk | I need too whip a Zionist wallah |

### 2. Bazrouk's Social Media Presence

Bazrouk's pattern of hostility towards Jews is further evidenced by his social media presence. For example, Bazrouk (using the username king_palestinee[3]) posted a photo on Instagram of what appears to be a young boy, along with the following message, as depicted below: "1 OF THE ZIONISTS HAVE BEEN FOUND HE GOES TO [NAME OF SCHOOL] LOCATED AT [ADDRESS] #found #exposed #gethim #stophate #share #bronx #wanted #keepthesmile #explorepage #fyp #foryou #fyp :/ #foryoupage." (PSR ¶ 6).



The school listed in the post is a Jewish school located in the Bronx, New York, which provides a Judaic and secular education to students from pre-school through eighth grade. (PSR ¶ 6).

The profile information for Bazrouk's Instagram account also includes the text "Ismail Haniyeh" followed by a green heart. Haniyeh was chairman of Hamas's Politboro until his death in 2024 and was designated in 2018 by the State Department as a Specially Designated Global Terrorist under Executive Order 13224. On September 3, 2024, a Complaint was unsealed in this District charging Haniyeh and five other senior Hamas leaders with various terrorism, murder conspiracy, bombing conspiracy, and sanctions-evasion charges. *See United States v. Haniyeh et al.*, 24 Mag. 438 (S.D.N.Y.).

---

[3] Among other things tying this account to Bazrouk, the subscriber phone number and the subscriber email address for this Instagram account both belong to Bazrouk.

### 3. Bazrouk's Support for Hamas and Hizballah

Beyond his social media presence, Bazrouk's phones contains extensive additional pro-Hamas and pro-Hizballah propaganda (*see* PSR ¶ 7), evidencing his support for organizations that have killed and injured thousands of individuals, including U.S. citizens, and repeatedly avowed that they want to destroy Israel and attack the United States. For example, Bazrouk is a member of a chat group that received regular updates from the al-Qassam Brigades chief spokesperson, Abu Obeida. (PSR ¶ 7). Bazrouk also possessed on his phones the below images of individuals wearing a keffiyeh and a green headband, the type typically worn by members of Hamas and by Bazrouk in his April 2024 assault. (PSR ¶ 7).

 

Bazrouk's phones also contained the below image of Yahya Sinwar wearing a scarf with the flag of Hamas on it. (PSR ¶ 7). Sinwar is one of the founders of the al-Qassam Brigades[4] and, until his death in October 2024, was the leader of Hamas and is credited with being the architect behind the October 7 Hamas massacres. (PSR ¶ 7). Sinwar was also charged in *United States v. Haniyeh*, 24 Mag. 438 (S.D.N.Y) with various terrorism, murder conspiracy, bombing conspiracy, and sanctions-evasion charges.

---

[4] Hamas carries out terrorist attacks and armed conflict through the Izz al-Din al-Qassam Brigades, its military wing. The al-Qassam Brigades have conducted suicide bombings and carried out other terrorist attacks within Israel, Gaza, and the West Bank, and have done so for decades. These attacks have included large-scale bombings against Israeli civilian targets, small-arms attacks, improvised roadside explosives, and rocket attacks. The al-Qassam Brigades frequently target civilians and have killed and injured thousands of individuals, including American citizens.



The below images—an individual waiving the Hamas flag and a post celebrating the al-Qassam Brigades, Hamas' military wing—were also found on Bazrouk's phones.



Content on Bazrouk's phones similarly demonstrates his support for Hizballah. His phones contained the below image of Mohammad Hussein Srour, a senior Hizballah drone commander. (*See* PSR ¶ 6). The yellow and red logo on the bottom left of the image is the Hizballah public affairs logo.



#### 4. Other Evidence of Bazrouk's Anti-Jewish Animus

In addition to the above-mentioned examples, other content on Bazrouk's phones evidences his anti-Jewish animus and his endorsement of violence to advance his cause. For example, Bazrouk possessed on his phones a video of an individual in a keffiyeh with what appear to be knives in his hands on a public street. A screenshot of the video is depicted below.



Bazrouk also possessed images and videos showing attacks on other people. Below on the left is an image of an individual in a keffiyeh appearing to assault another person, and on the right is a screenshot from a video depicting an individual wearing tzitzit (depicted in the red circle)—tassels worn on traditional garments by Jewish males—being chased on a public street.




### 5. Other Evidence from Bazrouk's Phones

Bazrouk's text messages, images, and other phone contents also indicate that he appears to have access to firearms, ammunition, and other weapons. For example, the following images were either sent or received by Bazrouk through SMS message[5]:




---

[5] The file path for these images includes the term "SMS/Attachments," which—based on information from FBI forensic examiners—means that the images were either sent or received by the user of Bazrouk's phone via SMS message.

Moreover, below is a sampling of communications in which Bazrouk discusses his access to weapons with others[6]:

- **June 4, 2024**

| Associate-1 | menace wallah [We shot them [n*****s] 😂 ] |
|---|---|
| Bazrouk | I was about too 🔫 someone |
| Associate-1 | i got time yallahh [Long story] / omg [I was about too 🔫 someone] / w ur orbeez[7] gun i hopee |
| Bazrouk | No real / I dead don't even wanna talk about it |

- **May 21, 2024**

| Bazrouk | You know if they do something too u ima have too defend you |
|---|---|
| Associate-1 | whatever u do don't hit a cop / hit as many zionists as u want / just not a cop / i don't want u to get life LMFAO |
| Bazrouk | You know I gothcu and if I don't my gun do 😂 |

- **May 2, 2024**

| Bazrouk | 🔥 🔥 🔥 I need that knife |
|---|---|

- **April 19, 2024**

| Bazrouk | These Zionist feening to dox me smh |
|---|---|
| Associate-1 | whooo [These Zionist feening to dox me smh] / i'll kill them [These Zionist feening to dox me smh] |
| Bazrouk | The yahoodi[8] pages / If I ever see 1 of them ima boom them fr fr |

- **March 6, 2022**

| Bazrouk | My knifes just came |
|---|---|

---

[6] The brackets in the messages indicate that the author of that particular message is replying to a prior message in the thread.

[7] An orbeez gun is a water pellet gun that shoots water-absorbent beads.

[8] "Yahoodi" in Hebrew and Arabic translates to "Jew."

| Associate-3 | U got any better knifes then the one u got me ? |
| Bazrouk | Yo bring the knife tmm for jaydan |

### C.  Bazrouk's Other Arrests

In addition to his arrests for the above-described assaults on Jewish protestors, Bazrouk has a history of other arrests. (*See, e.g.*, PSR ¶¶ 59-62). According to law enforcement records, Bazrouk has been arrested on at least 12 separate occasions—the 3 arrests related to the charged conduct, plus at least 9 additional arrests, including for robbery, assault, operating a drug factory, possessing a controlled substance with intent to distribute, reckless endangerment, obstructing governmental administration, resisting arrest, grand larceny, forgery, and criminal possession of stolen property. In particular, NYPD records and records from the Hartford Police Department indicate the following[9]:

- In 2018, Bazrouk was found in possession of a stolen backpack in Central Park. When police approached, Bazrouk attempted to throw the backpack in a bush and flee on his bike.
- In 2019, Bazrouk was arrested and charged with second degree robbery after he and five co-conspirators (all on Citi Bikes) surrounded a female victim at Pier 84 in Manhattan; one of them pulled out a black firearm and said, "Give me everything on you"; and they stole and used the victim's credit card.
- In 2023, Bazrouk was arrested in possession of a MetroCard with an altered magnetic strip, as he attempted to evade a subway fare. At the time of his arrest, Bazrouk was in possession of metal brass knuckles.
- In July 2024, near Union Square in Manhattan, Bazrouk was observed on the sidewalk—in a large crowd of approximately 1,000 people—holding a lit and smoking flare, covering bystanders with smoke. When a police officer attempted to arrest Bazrouk, he ran away while holding the flare, which was still lit and billowing out smoke.
- In December 2024, Bazrouk was arrested in Hartford, Connecticut for operating a drug factory, possessing a controlled substance, and possessing a controlled substance with intent to sell. At the time of the arrest, Bazrouk was operating a business illegally selling THC products. During a search of the business, law enforcement officers found large quantities of marijuana products, including 7 pounds of unpackaged marijuana, almost 1,000 pre-rolled marijuana cigarettes, and large numbers of THC edibles and THC vapes. The resale value of the seized products totaled approximately $25,000.
- Bazrouk received multiple C summons for engaging in violent, tumultuous, or threatening behavior. *See* N.Y. Penal Law § 240.20(1).

### D.    Weapons and Cash Found in Bazrouk's Apartment

On May 7, 2025, the day of Bazrouk's arrest, law enforcement agents searched the Manhattan apartment where Bazrouk lives with other family members pursuant to a judicially authorized search warrant. (PSR ¶¶ 17-18). During the search, agents examined a cabinet, as

---

[9] These records reflect arrests, not convictions. The arrests not reflected in the Presentence Report are described in law enforcement records that have been produced to the defendant.

depicted below:



The cabinet contained Bazrouk's personal possessions—including his wallet (with his driver's license inside), court papers relating to his prior arrests and contacts with law enforcement, and clothes that appear to be his. (PSR ¶ 17). Inside Bazrouk's cabinet, agents found (1) an airsoft gun (*i.e.*, a replica firearm that fires small, spherical projectiles instead of bullets) that looks identical to a real gun; (2) spent shell casings from a real gun; (3) brass knuckles; (4) a hunting knife; (5) a pocket knife; and (6) an additional knife, as depicted below:









(PSR ¶ 17).

Elsewhere in Bazrouk's apartment, law enforcement agents found what appears to be the same black jacket that Bazrouk was wearing during the December 2024 assault discussed above:

 

(PSR ¶ 18). Inside a pocket of that jacket, agents found a fourth knife (a switchblade), as depicted below:

15

 

(PSR ¶ 18). Also inside Bazrouk's apartment, agents found a safe containing more than $750,000 in cash. (PSR ¶ 18). Bazrouk's family members indicated that he was the only one with access to the safe. (PSR ¶ 18).

Finally, officers observed that, on the wall of Bazrouk's bedroom, there was hanging a photograph of Bazrouk being arrested in connection with an Israel/Gaza protest—suggesting that Bazrouk was proudly displaying his repeated criminal acts at such protests.

## II.      Plea and Applicable Guidelines Range

Pursuant to a plea agreement, dated June 11, 2025, Bazrouk pled guilty to Count One of the Superseding Information charging him with participating in a conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371—specifically, participating in a conspiracy to commit hate crime acts, in violation of 18 U.S.C. § 249(a)(1)(A), between in or about April 2024, and in or about January 2025. (PSR ¶ 2). This offense has a statutory maximum sentence of five years' imprisonment. (PSR ¶ 95).

The plea agreement provides that U.S.S.G. § 2H1.1 applies to the offense, and because Count One charges a conspiracy to commit more than one underlying offense, each underlying offense is treated as a separate count of conviction. *See* U.S.S.G. § 1B1.2(d). Pursuant to U.S.S.G. § 2H1.1(a)(3), the April 2024 assault of Victim-1, the December 2024 assault of Victim-2, and the January 2025 assault of Victim-3 each have a base offense level of 10. Pursuant to U.S.S.G. § 3A1.1, because the defendant intentionally selected Victim-1, Victim-2, and Victim-3 because of their actual or perceived religion or national origin, a three-level increase is warranted. Pursuant to U.S.S.G § 3D1.2(d), the three offenses do not group. Because there are 3 separate groups—each

with an offense level of 13—3 levels are added. Thus, the combined offense level for Count One is 16. After three levels are removed for the defendant accepting responsibility pursuant to U.S.S.G. § 3E1.1, the offense level for the conspiracy to commit the assaults of Victim-1, Victim-2, and Victim-3 is 13. (*See* PSR ¶¶ 29-54).

Because the defendant is in Criminal History Category I, the agreement provides that the Guidelines Range is 12 to 18 months' imprisonment. The United States Probation Office calculated the same Guidelines range. (PSR ¶ 96).

## III.    Discussion

### 1.    Applicable Law

In addition to the Guidelines, which are not mandatory, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall v. United States*, 552 U.S. 32, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2.    The Section 3553(a) Factors Support an Above-Guidelines Sentence of at Least 36 Month's Imprisonment

In this case, each of the 3553(a) factors supports the imposition of an above-Guidelines sentence of no less than 36 months' imprisonment.

First, the nature and circumstances of the offense are very serious. The defendant agreed with others to conduct multiple assaults of strangers, known to him not as individuals, but as members of the Jewish faith. (PSR ¶¶ 5, 8-16, 19, 26). Each of these assaults was brazen, occurring on crowded streets, in the middle of the day. During each of the assaults, Bazrouk made his motivations clear: during two of the assaults he called his Jewish victims "Nazis"—a term laced with particular malice when directed at Jews—and during the third, the defendant wore a Hamas headband, aligning himself with a group dedicated to the wholesale murder of Jews. (*See* PSR ¶¶

17

12, 15). The defendant, indeed, knew nothing about the victims beyond what any passerby could observe: a yarmulke, a Star of David, an Israeli flag. (*See* PSR ¶¶ 9, 11, 14). The victims were expressing their First Amendment rights when the strength of the defendant's anti-Jewish animus moved him to physical violence. Each of the victims was injured as a result. (PSR ¶¶ 9, 13, 15, 19, 26). But, as the victims make clear, each of them carries lasting scars beyond the wounds of the physical assaults themselves. For example, Victim-1 explained that Bazrouk's assault has "impacted [his] sense of safety as a Jewish student in New York City," causing him to "always wonder if [he is] going to be a victim of another assault." (PSR ¶ 21). Similarly, Victim-2 writes that since being assaulted by Bazrouk, he has "felt increasingly unsafe walking through the city I call home," (Ex. B), while Victim-3 notes that following Bazrouk's attack, "I have carried the emotional and physical pain of the attack, but I refuse to be a victim of hate." (Ex. C).

Indeed, the seriousness of these assaults cannot be measured by physical injuries to the victims alone. In passing the Hate Crime Act, Congress found "a prominent characteristic of violent crime motivated by bias is that it devastates not just the actual victim and the family and friends of the victim, but frequently savages the community sharing the traits that caused the victim to be selected." *See* Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act, Pub. L. No. 111-84, 123 Stat. 2190, 2835 (2009). This sentiment is particularly relevant here, where the defendant chose to assault Jews because they were Jewish. Hate motivated violence sends a message to an entire group of people that its members are not safe. It targets communities, dehumanizing them, and reinforcing that they are vulnerable due to perceived otherness. This is an unacceptable message in New York City, or anywhere else in the United States. And it is a particularly pernicious message to be sending at this moment in time, as anti-Semitic acts are steeply on the rise in this city and across this country. According to hate crimes data from the FBI for 2024, Jews, who account for approximately 2% of the U.S. population, are victims in 69% of religiously-motivated hate crimes.[10] In fact, 88% of religious-based hate crimes in New York City targeted Jewish victims, the largest share of all such crimes.[11] Against this backdrop, Bazrouk's pattern of violence against Jewish targets is not merely a collection of run-of-the-mill assaults. And his sentencing submission—which mentions the word Jew or Jewish only once in a passing reference to the statutory violation (Def. Mem. 3)—fails to grasp the context in which these assaults have occurred, and how they have contributed to the sense of fear and insecurity that many in the Jewish community are currently experiencing.

The history and characteristics of the defendant similarly support an above-Guidelines sentence. Bazrouk has repeatedly been arrested for his behavior at Israel/Gaza protests, including for conduct not charged in this case, showing that the offense conduct was not an aberration. Indeed, the defendant proudly displayed a framed photograph of himself being arrested in his bedroom. Far from being deterred by his contact with law enforcement, he appears to have been emboldened by it and proud of it. The extent of the defendant's anti-Jewish animus is laid bare in

---

[10] *See* FBI Crime Data Explorer,
https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate-crime (last visited October 20, 2025).

[11]   *See*   https://www.osc.ny.gov/press/releases/2024/08/dinapoli-hate-crimes-surged-new-york-over-last-five-years.

his private text messages, where he identified himself as a "Jew hater," labeled Jews "worthless," exhorted "Allah" to "get us rid of [Jews]," and called an acquaintance a "Fucking Jew." The defendant's pattern of hostility towards Jews is further evidenced by his social media presence. For example, he posted on Instagram a photograph of what appears to be a young boy, along with the following message, "1 OF THE ZIONISTS HAVE BEEN FOUND HE GOES TO [NAME OF SCHOOL] LOCATED AT [ADDRESS] #found #exposed #gethim #stophate #share #bronx #wanted #keepthesmile #explorepage #fyp #foryou #fyp :/ #foryoupage." The school is a Jewish school in the Bronx, New York.

Beyond his assaults and his threats, the defendant has shown his propensity for violence elsewhere, including in violent text messages. (*See, e.g.*, "I was about too 🔫 someone"; "You know I gothcu and if I don't my gun do 😂"; "If I ever see 1 of them ima boom them fr fr"). The defendant also possessed in his home knives, shell casings, a taser, pepper spray, air-soft gun, and brass knuckles. (*See* PSR ¶ 17).[12] In fact, Bazrouk had stashed a knife in the pocket of the jacket he wore to commit at least one of the assaults. (PSR ¶ 18). The defendant is not an individual who peacefully attends protests to advocate a political view; he has shown himself to be someone who proudly uses violence fueled by anti-Semitic animus in an attempt to silence Jews.

In arguing otherwise, Bazrouk's claim that his age "weighs heavily in favor of a split sentence" falls short for several reasons. (Def. Mem. 8). For one, this argument turns, in part, on the defendant's contention that there is less need for incapacitation because "'adolescent crime is a poor predictor of future criminal behavior.'" (Def. Mem. 10 (quoting *United States v. Ramsey*, 538 F. Supp. 3d 407, 423 (S.D.N.Y 2021))). Leaving aside the fact that Bazrouk was not an adolescent at the time of his conduct (and that he spills much ink applying law applicable to minors to someone who is no longer a minor), if Bazrouk is given the sentence sought by the defense, he still will be in his very early 20s, under the age when his brain is fully formed, when he is released back into the community, and therefore still suffering from the allegedly impaired judgment that the defense suggests helped lead him to commit the crime of which he was convicted. Indeed, the defense's argument counsels in favor of *longer* incapacitation, so that the defendant will be released to the community as a more mature and developed adult.

In requesting what is effectively a sentence of time served, Bazrouk's submission also dedicates considerable effort to highlighting how he is a first-time offender who is therefore "less culpable" and thus "less likely to re-offend." (Def. Mem. 15). The submission explains that "first offenders are considered less culpable because their offense is more properly understood as an aberration from their true character and less reflective of ongoing criminal intent." (*Id.*). But Bazrouk is not a typical youthful first-time offender who made one bad decision because of his undeveloped frontal lobe. Bazrouk made a violent decision, not once, not twice, but at least three

---

[12] As noted above, Bazrouk was also in possession of $750,000—a tremendous sum of money for a young man with little to no history of legitimate employment. Bazrouk's claim that he made all of this money from two years working at a smoke shop is unsubstantiated and at odds with representations he made about his past income and assets in the PSR. (PSR ¶¶ 60, 87). In any event, regardless of how Bazrouk obtained the $750,000, his ability to do so—combined with his deeply held anti-Semitic views and connections to Hamas—underscores his danger to the community.

separate times—notwithstanding his many prior arrests. Moreover, he agreed to do so with others. Each time he was arrested and charged he went right back to his violent conduct. Further, his electronic communications demonstrate that his violent actions were consistent with, not aberrant from, his beliefs about Jews. He should thus not be granted the leniency that might be afforded to a traditional first-time offender.

The defense tries to paint a picture of someone with immense "capacity for love, kindness, and generosity." (Def. Mem. 6). In support of this portrayal, the defense's submission notes that "[r]emarkably, more than 10,000 people have publicly signed a petition on Tarek's behalf, urging the Court to impose a sentence of time served" (*Id.* (citing Def. Ex. E)), and attaches the petition and a list of signatories. The petition itself claims that Bazrouk "has a vast and committed network of support that includes family members, close friends, classmates, and community members." (Def. Ex. E at first unnumbered page). It asserts that "[w]e," i.e., those who signed the petition, "duly affirm that Tarek is not a danger to the community, nor is he a flight risk," and that "we are unequivocally committed to ensuring," inter alia, that Bazrouk "will continue working towards completing his bachelor's degree," "will remain in the jurisdiction of the Southern District of New York and abide by all the guidelines of probation and/or community control," and "will enroll in any and all counseling as suggested by the Court." (*Id.*).

These assertions are not credible on their face. The petition is signed by people who list their addresses in states across the United States and around the globe. For example, more than 375 of the signatories list addresses in Texas and well over 500 list addresses in Canada. (*See* Def. Ex. E). There are signatories from countries as far afield as Singapore, Malaysia, Australia, Japan, and New Zealand. (*Id.*). Moreover, social media posts soliciting signatures on this petition described Bazrouk as a Palestinian who was "unjustly targeted, arrested, and detained by the FBI," and described the charges as stemming from his "participation" in "2024 protests against the ongoing genocide in Gaza," making no mention of his violent assaults or his guilty plea to a conspiracy to commit hate crimes. (*See, e.g.*, Ex. A (attached at the end of this letter)). One of the posts casts Bazrouk as one of those subject to a broad "effort to criminalize and silence the growing movement for Palestinian liberation" while another labels him a "political prisoner." (*Id.*). Thus, it appears likely that few, if any, of the far-flung petition signatories are competent to "duly affirm" anything about Bazrouk's danger to the community or in a position to provide meaningful support to Bazrouk or assurances to the Court about how Bazrouk will conduct himself when he is released. If anything, the petition suggests that Bazrouk's pattern of assaulting innocent Jews is no bar to, and may be a qualification for, an organized effort to make him a symbol of courage and unjust persecution.

An above-Guidelines sentence would also promote respect for the law and is necessary to protect the victims and the public from future crimes by the defendant. As noted above, this was not a momentary lapse in judgment for the defendant. It was a deliberate pattern of conduct to attack and frighten Jewish victims. And it demonstrates a severe and sustained disregard for the law. None of Bazrouk's prior arrests—including for those tied to the assaults in this case—deterred him from continuing to engage in violence and continuing to assault Jews. It was only after the defendant was detained that his assault spree ended. In a case like this one, where the victims have experienced physical and psychological harm, and where the defendant's conduct has persisted—

and in many ways worsened—despite law enforcement contact, a substantial sentence is warranted.

In addition, the need to avoid unwarranted sentencing disparities merits an above-Guidelines sentence. While the defendant points to nationwide averages for sentences imposed on first time offenders under the assault guideline, U.S.S.G. § 2H1.1, his submission overlooks the fact that Section 3553(a) demands consideration of "defendants with similar records who have been found guilty of similar conduct." The statistics highlighted by the defendant shed little, if any, light on the precise facts of the cases and the similarities, if any, to those presented here. In fact, defendants charged with committing hate crimes or threat crimes against Jews are regularly sentenced to substantial sentences within and above the applicable Guidelines. *See*, *e.g.*, *United States v. Saadah Massoud*, 22 Cr. 359 (DLC) (S.D.N.Y. 2023) (18-month sentence, which was at the top of the Guidelines range, for conspiracy to commit three assaults against Jewish targets); *United States v. Eric Lin*, 19 Cr. 20551 (S.D.F.L. 2020) (60-month statutory maximum sentence for anti-Semitic and anti-Hispanic threats); *United States v. Nathan Weeden*, 23 Cr. 0007 (W.D. Mich. 2024) (26-month sentence for hate crimes against Jewish and Black community). Here, the defendant pleaded guilty to conspiring to commit *three* separate hate crimes—each of which would constitute a violation of Section 249. Accordingly, an above-Guidelines sentence is consistent with other cases with similar fact patterns and would avoid unwarranted sentencing disparities.

Finally, an above-Guidelines sentence of incarceration is necessary to deter the defendant from continuing to threaten the victims and others, and to deter individuals similarly situated to the defendant from committing such crimes. Bazrouk participated in a conspiracy designed to intimidate, threaten, and frighten members of the Jewish community. As described above, he was undeterred after numerous contacts with law enforcement and after being arrested two separate times for his prior assaults. An above-Guidelines sentence of incarceration is thus necessary to deter the defendant from further endangering members of the Jewish community.

General deterrence principles also weigh heavily in favor of an above-Guidelines sentence here. This case is of particular interest to the public. As noted above, in the wake of the rise of anti-Semitic crimes over the past few years, many in the Jewish community—in New York and elsewhere—live in a state of constant fear for their safety and security. For example, a Washington Post article from this past week notes that "U.S. Jews increasingly say they are hiding their identity in a country where they believe they continue to face significant antisemitism and where slightly fewer than 1 in 5 feel very safe."[13] This sentiment is echoed by Bazrouk's victims, all of whom express their fears for their safety and security in the current climate and following their assaults by the defendant. (PSR ¶ 21; Ex. B; Ex. C). Taking a broader lens, Victim-2 explains that his feelings of insecurity are driven by "heinous acts" of violence "becoming far too common, and when the perpetrators receive lenient sentences, it sends a devastating message—that this behavior is tolerated and that they can continue with impunity." (Ex. B). An above-Guidelines sentence will

---

[13] *See* WASH. POST (Oct. 15, 2025): More U.S. Jews shield identity in public amid antisemitism fears, Post poll finds, *available at* https://www.washingtonpost.com/nation/2025/10/15/us-jews-poll-safety-antisemitism/.

send a clear message to those considering attacks on Jews or anyone else: violence of this sort is unacceptable and will be met with serious consequences.

Concerningly, it appears that many have taken the opposite lesson from this case thus far; the defendant appears to have become a "cause célèbre" for his serial attacks on Jews. As noted above, the defense submission attaches a petition signed by more than ten thousand of Bazrouk's supporters (Def. Mem. 6; Def. Ex. E) who were recruited based on claims that the defendant is a "political prisoner" being "unjustly targeted" as part of a "broader effort to criminalize and silence the growing movement for Palestinian liberation." This petition demonstrates that there is an organized effort to spread information, including misinformation, about this case in New York City, across the United States, and around the world. As a result, a very large number of people, presumably including many who attend demonstrations related to events in Gaza and its environs, likely will learn what sentence Bazrouk receives and from that sentence the potential consequences of engaging in crimes of violence at such demonstrations. Thus, unlike many other criminal cases where few beyond the defendant and the defendant's family learn what sentence was imposed, the Court's sentence here will very likely reach this large, specific community, among others focused on the outcome of this case. An above-Guidelines sentence of incarceration will therefore send a clear signal to an unusually broad, and interested, group of people that attacks against others during future demonstrations will merit significant prison sentences. In contrast, the effectively time-served sentence requested by Bazrouk would send a dangerous message: one can repeatedly assault Jewish people at protests and receive about two months in prison per assault. That is unlikely to be a sufficient deterrent to repeated instances of such conduct.

### 3. The Defendant's Remaining Arguments are Meritless

The defendant argues that a lenient sentence is appropriate given the "extremely punishing nature" of his time at the Metropolitan Detention Center ("MDC"). (Def. Mem. 11-14). But, as detailed below, there is no indication that the defendant personally experienced most of the conditions about which he complains; and even if he had, it is now well-known that conditions at the MDC have continuously and significantly improved since the defendant's incarceration there beginning in May 2025. Ultimately, MDC conditions over the past six months do not warrant a more lenient sentence.

The defendant leans heavily on the rulings in *Chavez* and *Colucci* (Def. Mem. 12-13) to argue that a reduced sentence is warranted due to conditions at the MDC. However, conditions at the MDC have improved dramatically since those cases were decided more than a year ago.[14] Indeed, courts in this District have consistently noted these improvements, which occurred before and throughout the period in which the defendant has been incarcerated. *See, e.g.*, *United States v. Carazas-Pinez*, No. 23 Cr. 346 (JPC) (noting improved conditions at MDC during a Sept. 19, 2025 sentencing); *United States v. McCullum*, No. 24 Cr. 667 (JPC) (noting improved conditions at MDC during an Aug. 29, 2025 sentencing); *United States v. Burgos*, No. 24 Cr. 650 (LTS) (noting improved conditions at MDC during a May 21, 2025 plea); *United States v. Reshard*, No. 24 Cr.

---

[14] *Colucci* was decided in August 2024, while *Chavez* was decided several months prior in January 2024. The defendant arrived at MDC in May 2025.

392 (JMF) (noting improved conditions at MDC during a May 14, 2025 sentencing); *United States v. Alexander et al.*, No. 24 Cr. 676 (VEC) (noting improved conditions at MDC during a Jan. 16, 2025 bail argument). Indeed, none of the cases cited by the defendant (Def. Mem. 14) for the proposition that his sentence should be reduced to account for his time at MDC involved sentencings that occurred during the pendency of his own incarceration in the facility. Rather, and in stark contrast to the Government's citations above, all substantially predated his time at MDC.

Moreover, the Government is not aware of defendant raising any specific complaints throughout his incarceration at MDC, nor does his submission claim that he experienced any particularized harms from his detention at the facility. To the extent the defendant experienced such harm and has not raised the issue before now, then the defense has deprived the Government, the Bureau of Prisons ("BOP"), and the Court of any opportunity to investigate or remediate any of his purported issues. Put simply, the defendant's attempt to point to dated conditions at the facility without any showing of how he was impacted by those conditions does not counsel for a reduced sentence.

Relatedly, the arguments set forth by the defense regarding the conditions at the MDC are highly misleading or outright inaccurate. For example, contrary to the defendant's claims, lockdowns are no longer common at the MDC. (Def. Mem. 12-13). Indeed, it is not clear that there have been any lockdowns in the defendant's unit during his incarceration. According to a September 2025 BOP Fact Sheet, "[i]n 2025, MDC Brooklyn has not 'locked down' or modified its operations on any housing unit owing to a shortage of available staff."[15] The defendant further cites to charges brought against those committing crimes at MDC. (Def. Mem. 13-14). But those cases (which focus on time periods before the defendant arrived at MDC) merely show the sustained efforts by law enforcement to root out the issues at the facility. Indeed, Bazrouk stated in his interview with Probation that he does "not have any safety concerns at this time." (PSR ¶ 76). At bottom, the Government submits that MDC's past history should not impact the defendant's sentence, given the vast improvements that predated his detention at the facility.

---

[15]    *See*    Sept.    2025    BOP    Fact    Sheet,    *available    at* https://www.bop.gov/resources/pdfs/mdc_bro_des_fact_sheet_sep_2025.pdf,

**IV.        Conclusion**

For the reasons discussed above, the Government respectfully requests that the Court impose an above-Guidelines sentence of at least 36 months' imprisonment. Such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:  /s/_____
     Sam Adelsberg
     Jim Ligtenberg
     Assistant United States Attorneys
     (212) 637-2494 / 2665

cc:  Defense counsel (by ECF and E-mail)

# Exhibit A



← **Post**



**Eye on Palestine**
@EyeonPalestine                                                    ...

FREE TAREK BAZROUK NOW !!

On May 7th, 20-year-old Palestinian Tarek Bazrouk was unjustly targeted, arrested, and detained by the FBI. Federal agents raided and searched his home for over eight hours before charging him with federal "hate crime" offenses.

These charges stem from his participation in 2024 protests against the ongoing genocide in Gaza-charges that were already pending in state court.

Bazrouk now faces up to 5 years in federal prison. Since Bazrouk's arrest, he has been subjected to relentless character defamation, doxxing, and slander. This is part of a broader effort to criminalize and silence the growing movement for Palestinian liberation

Despite his lack of a record and strong ties to NYC, Bazrouk has been denied bail and remains held at the Metropolitan Detention Center in Brooklyn-one of the most dangerous and inhumane detention facilities in the country.

The call to action? Bazrouk is currently awaiting his sentencing scheduled for this October. By then, Bazrouk will have already spent several months behind bars. We are calling on the judge to acknowledge the time Bazrouk has already served behind bars and to issue a sentence of "time served" in October, allowing him to go home with his family instead of serving additional jail time.

By signing this petition, we are demanding no more jail time and a sentence of "time served" in October for Bazrouk. A sentence of time served would recognize the months he has already spent incarcerated, since his arrest by the FBI and allow this young adult to get back on his feet and rebuild his life rather than lose his future in the inhumane and barbaric conditions of America's prisons.

Take Action Now

SIGN THE PETITION:

tinyurl.com/FreeTarekBazro...

DONATE TO BOOKS:

tinyurl.com/tareksbooks

If you are NOT a citizen, do NOT use your real name when signing for safety reasons.





# Exhibit B

Since October 7th, 2023, the Jewish community has been pleading for people to recognize our fears—that antisemitism is being normalized and acts of violence and intimidation targeting our community are becoming more common on the streets of New York City. Many of us no longer feel safe walking in our own neighborhoods.

Members of *Within Our Lifetime* have a documented history of violence against Jewish pedestrians. In 2021, individuals affiliated with that group brutally attacked and hospitalized a Jewish man who I knew from my hometown synagogue.

I am imploring you—from the bottom of my heart, on behalf of myself, the Jewish community, and the people of New York City—not to tolerate this blatant act of hate.

On the day of the attack, Bazrouk approached my twin brother and me while my brother was speaking with a reporter. He called me a Nazi, stole our Israeli flag, and then punched me in the face. Since that day, I have felt increasingly unsafe walking through the city I call home.

These kinds of heinous acts are becoming far too common, and when the perpetrators receive lenient sentences, it sends a devastating message—that this behavior is tolerated and that they can continue with impunity. I have been losing faith in the justice system.

I am asking you, with utmost sincerity, to uphold law and order—to show that such acts of hate and violence will not be accepted in New York City. Please demonstrate that the Jewish community has the same right as everyone else to feel safe in public. I urge you to deliver justice to my attacker. Allowing someone with such hatred and violence in their heart to walk away with only a slap on the wrist would leave me—and many others—feeling deeply vulnerable, unsafe, and unprotected in our own city.

Victim-2

Exhibit C

**Victim Impact Statement By**  ▆Victim-3▆

Your Honor,

On January 6, 2025, I was assaulted simply for standing up for what I believe in, for standing up for America and Israel. I was at a peaceful protest to show my support for freedom, democracy, and the right of both nations to defend themselves. I proudly wore the Israeli flag around my shoulders, a hat with the Israeli flag, and a Star of David chain, not as a provocation but as a statement of faith, identity, and solidarity with our allies.

The defendant, Bazrouk, approached me with his face covered, made contact with my shoulder, and tried to trip me. When I pushed him away, he punched me in the nose. I was attacked not for anything I said or did, but for what I represent: a proud Jew, an American, and a supporter of Israel.

That punch was meant to silence me and make me afraid to stand for what is right. But it did the opposite. It made me stronger. I will continue to fight for America and Israel, for freedom, for faith, and for truth. These are not just words; they are values worth defending.

Since that day, I have carried the emotional and physical pain of the attack, but I refuse to be a victim of hate. What happened to me is part of a larger problem, the rise of antisemitism and hatred toward those who support Israel and the United States. But I will not back down. I will always stand tall for both nations that represent liberty and justice.

I ask this Court to recognize that this was not only an attack on me and my people but on everything America stands for: freedom of expression, religious liberty, and the right to live without fear. Justice here means sending a message that hate and violence have no place in our city or our country.

Respectfully,

▆Victim-3▆